# EXHIBIT A

cc
40.75

# Supreme Court of Pennsylvania
## Court of Common Pleas
### Civil Cover Sheet
FRANKLIN _____ County

| For Prothonotary Use Only: |
|---|
| Docket No: 2019-4895 |

2019 DEC 12 PM 4: 06
PROTHONOTARY
FRANKLIN COUNTY PA

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| STACEY L. SCHMADER et al. | THOMAS ALAN LINZEY et al. |

**Are money damages requested?** ☒ Yes  ☐ No

**Dollar Amount Requested:** (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes  ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney: _____

☐ Check here if you have no attorney (are a Self-Represented {Pro Se} Litigant)

---

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the ONE case category that most accurately describes your *PRIMARY CASE*. If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
- ☐ Other: _____
  _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other: _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☒ Other: Equity - Injunction

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY,
PENNSYLVANIA

Stacey L. Schmader, Leticia O'Dell, Chad  )
Nicholson, Kai Huschke, Markie Miller,     )
Malinda Clatterbuck, Michelle Sanborn,     )
Crystal Jankowski,                          )
                                            )
        Plaintiffs,                         )
                                            )
v.                                          )
                                            )
Thomas Alan Linzey, in his Individual and  )
Official Capacities; Tammy Belinsky, in her )
Individual and Official Capacities; Fred    )
Walls, in his Individual and Official       )
Capacities; Edward Wells, in his Individual )
and Official Capacities; Community          )
Environmental Legal Defense Fund and the   )
Center for Democratic and Environmental     )
Rights,                                     )
                                            )
        Defendants.                         )

CIVIL DIVISION

No. 2019-4895

Judge TODD M. Sponseller



**COMPLAINT FOR PERMANENT INJUNCTIVE RELIEF AND MOTION FOR
PRELIMINARY INJUNCTION WITH JURY DEMAND ENDORSED HEREON**

NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following
pages, you must take action within twenty (20) days after this complaint and notice are served,
by entering a written appearance personally or by attorney and filing in writing with the court
your defenses or objections to the claims set forth against you. You are warned that if you fail to
do so the case may proceed without you and a judgment may be entered against you by the court
without further notice for any money claimed in the complaint or for any other claim or relief
requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT
HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.
THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A
LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE
ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY
OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO
FEE.**

Pennsylvania Bar Association

Lawyer Referral Service
Telephone: 1-800-692-7375 (PA ONLY)
or 717-238-6715

**KOLLER LAW LLC**
David M. Koller, Esq. (90119)
Sarah R. Lavelle, Esq. (93383)                    *Counsel for Plaintiffs*
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
T: (215) 545-8917
F: (215) 575-0826
davidk@kollerlawfirm.com
slavelle@kollerlawfirm.com

## IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| Stacey L. Schmader, Leticia O'Dell, Chad Nicholson, Kai Huschke, Markie Miller, Malinda Clatterbuck, Michelle Sanborn, Crystal Jankowski, | ) ) ) ) ) | CIVIL DIVISION |
| Plaintiffs, | ) ) | No. _____ |
| v. | ) ) | |
| Thomas Alan Linzey, in his Individual and Official Capacities; Tammy Belinsky, in her Individual and Official Capacities; Fred Walls, in his Individual and Official Capacities; Edward Wells, in his Individual and Official Capacities; Community Environmental Legal Defense Fund and the Center for Democratic and Environmental Rights, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR PERMANENT INJUNCTIVE RELIEF AND MOTION FOR PRELIMINARY INJUNCTION WITH JURY DEMAND ENDORSED HEREON

### INTRODUCTION

Plaintiffs seek relief from the unfaithful, arbitrary, and illegal actions of their nonprofit employer's Board of Directors and Executive Director. After months of written and verbal attempts to rectify the officers' and director's blatant disregard for fiduciary duties, met only

with retaliation, the employees must now turn to the courts to save their livelihoods and preserve

their ability to continue furthering the mission of a nonprofit organization they have built from

the ground up. Plaintiffs seek preliminary and permanent injunctions so that the Board of

Directors can no longer undermine the work of the organization, or worse, destroy it for the

benefit of an executive director who all along has shown loyalty only to himself.

## PARTIES

1.   Plaintiff Stacey L. Schmader is a natural person residing at 10914 Clay Lick Road,

Mercersburg, PA 17236.

2.   Plaintiff Leticia O'Dell is a natural person residing at 7976 McCreary Road, Broadview

Heights, OH 44147.

3.   Plaintiff Chad Nicholson is a natural person residing at 107 Center St., East Pittsburgh,

PA 15112.

4.   Plaintiff Kai Huschke is a natural person residing at 2711 S. Oak Street, Spokane, WA

99224.

5.   Plaintiff Markie Miller is a natural person residing at 3754 Grantley Rd, Toledo, OH

43613.

6.   Plaintiff Malinda Clatterbuck is a natural person residing at 550 Tucquan Glen Road,

Holtwood, PA 17532.

7.   Plaintiff Michelle Sanborn is a natural person residing at 102 Lakeview Heights,

Alexandria, NH 03222.

8.   Plaintiff Crystal Jankowski is a natural person residing at 6030 Vistamar Rd, Toledo, OH

43611.

9. Defendant Thomas Alan Linzey is a natural person residing at 1320 North Hollis Street, Spokane, WA 99201.

10. Defendant Tammy Belinsky is a natural person residing at 9544 Pine Forest Road, Copper Hill, VA 24079.

11. Defendant Fred Walls is a natural person residing at 8048 Lincoln Way West, St. Thomas, PA 17252.

12. Defendant Edward Wells is a natural person residing at 1881 Scotland Avenue, Chambersburg, PA 17201.

13. Defendant Community Environmental Legal Defense Fund (CELDF) is a nonprofit corporation incorporated in Pennsylvania and with its principal place of business 10914 Clay Lick Road, Mercersburg, PA 17236.

14. Defendant Center for Democratic and Environmental Rights is a nonprofit corporation incorporated in the State of Washington with its principal place of business 1320 North Hollis Street, Spokane, WA 99201.

## JURISDICTION AND VENUE

15. The Franklin County Court of Common Pleas, as a court of general jurisdiction, has subject matter jurisdiction to hear this case in law and equity based on breaches and violations of state law.

16. Venue is proper against a corporation defendant in "the county where its registered office or principal place of business is located" and is therefore proper against CELDF in Franklin County. Pa.R.C.P. 2179(a)(1).

17. Venue is proper in Franklin County against the individual defendants as well as their co-defendant, CELDF, because a civil action may be brought against all defendants facing joint

liability "in any county in which the venue may be laid against any one of the defendants."

Pa.R.C.P. 1006(c)(1).

## BACKGROUND
## A BRIEF HISTORY AND OVERVIEW OF CELDF

18. In 1995, Stacey Schmader and Thomas Linzey founded the nonprofit corporation

CELDF under the Pennsylvania Nonprofit Corporation Law of 1988, 15 Pa. Code § 5301 and

under § 501(c)(3) of the Internal Revenue Code.

19. CELDF is governed by: its Articles of Incorporation, which the Pennsylvania

Department of State accepted on March 13, 1995; its Third Amended Bylaws, adopted on July

12, 2019; and various resolutions of the Board of Directors.

20. The structure and operations of CELDF have evolved throughout the nonprofit's 25

years of existence, but not always with the transparency and accountability that CELDF's

Articles, Bylaws, and Board members' fiduciary duties require.

21. This corrupted evolution interferes with CELDF's altruistic mission of "provid[ing]

conservation-oriented community groups with affordable legal assistance in promotion of

sustainable development and preservation of open spaces and ecological diversity." Ex. A,

CELDF Articles of Incorporation, Art. III.

22. The Bylaws require three Officers: a President, a Secretary, and a Treasurer, chosen

biennially by the Board of Directors by a majority ballot vote. Ex. B, Third Amended Bylaws,

Art. II, §§ 1, 2.

23.

24. The Bylaws charge the Secretary and Treasurer to "conduct all of the administrative

duties" of CELDF and empower either or both Officers, "[u]pon the absence of the Executive

Director, or in the event of a vacancy in that position ... to carry on all of the activities of

[CELDF]." *Id.*

25.

26. Officers, Directors, and Advisors may not receive compensation for their work on behalf

of CELDF, although the corporation reimburses their travel expenses. *Id.* at V § 1.

27. The Executive Director receives an annual salary, approved by the Board, as do the

National Administrative Director, the Associate Director, and the National Organizing Director.

*Id.* at Art. V.

28. CELDF hires a total of 25 employees and independent contractors to perform the

substantive work of the organization: each state's organizer is a full time employee, the attorneys

are contactors, and other support staff are either contracted or employed. Ex. C, CELDF Current

Staff as of Nov. 26, 2019.

29. Grassroots groups in nearly 200 communities across the country have solicited and

received assistance from CELDF. *See* CELDF website, available at https://celdf.org/about-celdf/.

30. CELDF assists these grassroots community groups by providing them with ongoing

organizing and legal support in local democracy-building activities.

31. Communities pay practically nothing, contributing only occasional travel costs and filing

fees together with their own labor and expertise in addressing the problems they face.

32. CELDF organizers host workshops, facilitate meetings, solicit input and support for local

lawmaking, and are often the first point of contact for grassroots community groups seeking

CELDF's services.

33. The organizers maintain consistent communication with community members and

provide the logistical support and strategic thinking necessary for local lawmaking campaigns,

including navigating the campaigns' publicity and media coverage and linking the groups with CELDF contract attorneys.

34.  CELDF fully sponsors the legal support for this work, paying contracted attorneys to lead the drafting of local ordinances, ballot initiatives, and city and county charters, and advancing litigation to put measures on the ballot and defending them from legal attack.

35.  CELDF has also incorporated and supported Community Rights Networks (CRNs), statewide nonprofit organizations committed to advancing the right to local self-government and the rights of nature in the states where CELDF is actively organizing.

36.  These CRNs are not subsidiaries of CELDF, but rather are separate § 501(c)(3) tax-exempt nonprofits that operate largely at the discretion of their own boards.

37.  CELDF depends exclusively on donations to render its services freely accessible to grassroots community organizations and to pay its staff and contractors.

38.  To safeguard the integrity of donations as they transform into expenditures, "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Third." Ex. A, Art. V.

39.  Donors choose to support CELDF because they believe in its mission and the ways that CELDF organizers and litigators catalyze much needed change in client-communities.

40.  CELDF is committed, and legally required, to apply donations received to its specified charitable purposes and not to siphon off these gifts for the benefit of any one member of the organization.

## TIMELINE OF EVENTS GIVING RISE TO PLAINTIFFS' LEGAL CLAIMS

41. Since cofounding CELDF and until his fragmented resignation process throughout 2019, Defendant Thomas Linzey held the roles of Executive Director and President and has authored both the initial Bylaws and every subsequent amendment from 1995 through present day.

42. As the Executive Director, Defendant Linzey appointed three CELDF Board members: Defendants Tammy Belinsky, Fred Walls, and Edward Wells (together, "Defendants Board members").

43. Belinsky, Walls, and Wells were the only three Board members at the beginning of 2019, when the turmoil encompassed within this Complaint began.

44. On March 1, 2019, Plaintiffs Kai Huschke, Chad Nicholson, Tish O'Dell, and Michelle Sanborn, along with their supervisor (collectively, CELDF's "Organizing Team") emailed a letter to the CELDF Executive Committee proposing a meeting for all full-time staff.

45. The Organizing Team sought this meeting to address the "breach of trust and mutual respect" between the staff and CELDF leadership, specifically Defendant Linzey, and the harm that CELDF and its staff suffered as a result. Ex. D, March 1, 2019 Letter to Board.

46. On April 9th, 2019, Defendant Linzey indicated in an email to Plaintiff Schmader that he intended to resign as Executive Director, effective April 30, 2019. Ex. E, Linzey's April 9th, 2019 email.

47. On April 18, 2019, the Organizing Team again proposed a meeting between staff and Defendant Linzey, reiterating concerns that "current internal organizational health is compromised and that there has been a breach of trust and mutual respect with major leadership arenas of the organization which is affecting the work as well as the health and viability of the organization itself." Ex. F, Organizer Proposal, April 18, 2019.

48. The Executive Committee approved this request, scheduled a meeting for June 25th and 26th, 2019, and apprised Defendant Linzey that his attendance was expected. Ex. G, Executive Committee Email May 17, 2019.

49. On May 14, 2019, the Board accepted Linzey's resignation as Executive Director, decreeing that Linzey remain President "for now" but that he "shall be relieved of all management responsibilities" and that "the five member committee created to manage the organization shall assume the powers otherwise exercised by an Executive Director, until the Board decides that hiring a new Executive Director is necessary." Ex. H, Board Resolution, May 14 2019, §§ 2, 11.

50. Instead of working to resolve grievances raised by the organizing staff, the Board member Defendants also used the May 14th resolution, that Defendant Linzey drafted, to fire all of the full-time staff organizers, revoke all of their benefits, and outsource their financial arrangements to the CRNs by the end of 2019. *Id.* at §§ 3-5.

51. CELDF leadership presented the resolution to CELDF staff, at the June 25-26 gathering, who expressed frustration over its terms and over the Board excluding staff from input prior to adopting it.

52. The Organizing Team, CELDF then-Associate Director Mari Margil, Secretary and Treasurer Stacey Schmader, and Outreach and Communications Director Emelyn Lybarger met on June 25-26, 2019 as scheduled, and discussed this resolution along with other concerns outlined in previous letters to the Executive Committee.

53. Defendant Linzey declined to attend this meeting.

54. The contract attorneys and other CELDF staff began putting the pieces together about the amended bylaws, Defendant Linzey's resignation, and the obvious turmoil hiding behind Defendants' radio silence over the summer and early fall of 2019.

55. On September 30, 2019 Plaintiff Schmader exercised her authority under the bylaws to appoint members to the Board of Directors in the absence of an Executive Director to seat two additional Board members; Kat Walter and David Leeger. Ex. B, Art. III § 1.

56. On October 15, 2019, Defendant Linzey filed Articles of Incorporation in the State of Washington for a new organization, the Center for Democratic and Environmental Rights (CDER). Ex. I, CDER Articles of Incorporation.

57. On October 24, 2019, Defendant Linzey responded to an email in which Plaintiff Schmader noted that Defendant Linzey was extorting the Board of Directors. Ex. J, Linzey's Email Oct. 24 2019; Ex. R, Schmader's Email Oct. 24, 2019.

58. In Defendant Linzey's response, sent to all five members of the Board (including Plaintiff Schmader's new appointees), Defendant Linzey suggested that CELDF file a declaratory judgment action against Defendant Schmader to determine whether she had exceeded her powers under the Bylaws in appointing the new board members. *Id.*

59. On October 29, 2019, the Defendants Board members unanimously passed a resolution rescinding the provisions of the May 14th resolution which outsourced the Organizing Team to the state CRNs. Ex. K, Board Resolution, Oct. 29, 2019.

60. This resolution also shifted "day-to-day management" responsibilities to the Executive Committee for fourteen months, and appointed Daniel Brannen to the position of Executive Director. *Id.*

61. Thomas Linzey was re-appointed as Executive Director on or about November 30, 2019 by Defendants Board members. Ex. L, Linzey's email, Dec. 1, 2019.

## DEFENDANT LINZEY'S ACTIONABLE CONDUCT

62. During and following his tenure as Executive Director, Defendant Linzey has repeatedly expressed to staff, donors, prospective donors, clients, prospective clients, and to members of the general public that CELDF is an ineffective organization and is evolving in ways of which Linzey does not personally approve. *See, e.g.*, Ex. N, Linzey's email to Board of Directors, page 3 ("I have begun working with our primary donors to apprise them of the immediate situation, and if it continues, will advise them that their donations are better used elsewhere. They constitute half the operating budget of this organization.").

63. Defendant Linzey consistently enters late into strategic conversations and purports to mandate to staff how to carry out the business of CELDF, despite having no authority to do so in the bylaws, using his status as CELDF co-founder to assert that his views should dominate over the more informed views of staff who have a better understanding of the situation.

64. Defendant Linzey has not engaged with the organizers in any meaningful way despite repeated requests from the organizers for his engagement.

65. For example, he has declined to participate in any of CELDF staff's bimonthly calls used to update each other and to delve into the complexities that organizers face.

66. Despite having resigned as CELDF's Executive Director on April 9, 2019, Defendant Linzey continued to hold himself out as an executive officer in the months that followed.

67. On CELDF's website and on publications, Defendant Linzey titled himself as CELDF's Executive Director until at least October 2019[1], and in some instances until the time of this

---

[1] https://web.archive.org/web/20191006133855/https://celdf.org/about-celdf/celdf-board-staff/

complaint. Ex. N, Archived Copy of CELDF Website from Oct. 6, 2019; Ex. O, Current CELDF

Contacts webpage, accessed Dec. 9, 2019.

68. Defendant Linzey has changed his title on some forums, such as his email signature, to

CELDF's "Senior Counsel." Ex. P, Email from Linzey Sept. 4, 2019.

69. Defendants issued no formal statement discussing the changes in leadership and

governing structure; CELDF contract attorneys did not officially learn of Defendant Linzey's

resignation as Executive Director until August 2019 on a quarterly lawyer phone call.

70. Throughout the months of October and November, despite having left the position of

Executive Director over five months previously, Defendant Linzey pressured the three Defendant

Board members to agree to an agreement that Defendant Linzey drafted, unilaterally and

arbitrarily, promising him a severance package that included a very high six figure payment that,

upon information and belief, comprised 28.6% of CELDF's reserves, 59.6% of CELDF's 2019 annual

budget, and 71.4% of 2019 budget for staff, contractor and benefit costs (hereinafter referred to as

"severance payment"). Ex. Q, Board Meeting Notes, Oct. 29, 2019.

71. Defendant Linzey threatened that he would tell donors not to donate to CELDF should

CELDF staff continue to oppose his hefty severance package. For example, during a phone

conversation on October 21, 2019, Defendant Linzey commented to Plaintiff Schmader and

Defendant Walls, "Why wouldn't I, given what transpired over the last month and belief CELDF

is stuck in the mud, why not take the existing funders and do the work that needs to be done, help

Tammy sue the board - burn all of CELDF existing funders? Money question - needs to be sweet

enough." Ex. R, Schmader email Oct. 24, 2019.

72. Linzey has also threatened to sue CELDF if he does not get his severance package. Ex. J,

page 2 "I have no wish to destroy the organization that I created and helped to build. I have no

wish to 'threaten' that as an option … While I hope it does not come down to filing the lawsuit, it is the only option that Fred and Stacey have produced."

DEFENDANT BOARD MEMBERS' ACTIONABLE CONDUCT

73.  In an October 29, 2019 Board Resolution the Defendants members of the Board determined "that divisions between Mr. Linzey and others in the organization make it impossible to tend to either reorganization or strategic planning without first tending to Mr. Linzey's stated desire to depart the organization on amicable, negotiated terms" and appointed Daniel Brannen, CELDF's Managing Attorney and an ally of Defendant Linzey's, as Executive Director to negotiate Linzey's so-called amicable departure. Ex. K, *supra.*

74.  Upon receiving news of the Board's October 29, 2019 Resolution, all of the Plaintiffs along with other CELDF employees and contracting attorneys (15 people in all) sent a group letter containing their recommendations for negotiation of a departure agreement with Linzey in which they urged the Board to have its outside counsel negotiate on CELDF's behalf. Ex. S, Staff Letter Nov. 6. 2019, and Ex. T, Staff email Nov. 12, 2019.

75.  The staff urged the Defendants Board members not to use CELDF funds to purchase Defendant Linzey's separation from the organization because donor intentions would be frustrated; because Linzey intended to set up a competing organization; and that CELDF, not Linzey, would be blamed for violating the spirit and the legal, donative intention behind those contributions.

76.  On November 22, 2019, Defendants Belinsky, Walls, and Wells, acting in their capacities as CELDF's Board, voted to formally to dissolve the organization. This decision was not made in the best interests of CELDF, but was a retaliatory action made to punish staff for questioning the Board's actions. Ex. U, Board Statement to Staff, Nov. 22, 2019.

14

## APPLICABLE STANDARDS OF LAW
### STANDARDS FOR NONPROFIT CORPORATE OFFICERS AND DIRECTORS

77. Plaintiffs incorporate by reference and reallege as through rewritten herein the contents of the foregoing paragraphs 1 through 76.

78. Defendants Board members, as directors of a Pennsylvania nonprofit corporation, have responsibilities as fiduciaries of CELDF, which are delineated in 15 Pa. Code § 5712(a), Directors Standard of Care:

> (a) A director of a nonprofit corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, *in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.*

15 PA Cons Stat § 5712 (emphasis added).

79. The Board of Directors of a Pennsylvania nonprofit must act in good faith, have a duty of care and loyalty, and may not act in ways that a person of ordinary prudence would find to be against the best interest of that corporation.

80. Board members may face personal liability for breaching or failing to perform according to this standard of care, when this breach or failure amounts to "self-dealing, willful misconduct, or recklessness." *Id*. at § 5713(a).

81. Board members violate their duty to act in good faith when relying on information while having actual knowledge that contradicts that information. 15 Pa. C.S. § 5712(b).

82. Officers also have duties of good faith, care and loyalty, to perform their official duties:

> in good faith, in a manner [they] reasonably believe[] to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

15

A person who so performs his duties shall not be liable by reason of having been an officer of the corporation. *Id.* at § 5712(c).

83. The president of CELDF, as an officer of a nonprofit corporation, must not act on behalf of CELDF in ways that a reasonable person would find to be against CELDF's best interests.

## PLAINTIFFS HAVE STANDING

84. Plaintiffs have state statutory standing to challenge the validity of a corporate action by virtue of being "any person aggrieved" by the contested action. 15 Pa. C.S. § 5793.

85. A person facing a direct threat of pecuniary or proprietary injury is a "person aggrieved" absent a more specific statutory definition, for the purpose of standing. *Gen. Instrument Corp. of Del. v. Nu-Tek Electronics & Mfg. Inc.*, 197 F.3d 83, 87 (3d Cir. 1999).

86. As current employees of CELDF, Plaintiffs face direct pecuniary injury from the prospective dissolution and winding up of their employer and thus have standing to challenge the corporate actions that threaten their livelihoods.

## THE CONTESTED ACTIONS ARE APPROPRIATE FOR JUDICIAL REVIEW

87. Directors' and Officers' duties apply. and are subject to judicial review, when those parties engage in a "corporate action" as defined by 15 Pa. C.S. § 5791(a):

> [T]he term "corporate action" in this subchapter shall mean any of the following actions: (1) The election, appointment, designation or other selection and the suspension, removal or expulsion of members, directors, members of an other body or officers of a nonprofit corporation. (2) The taking of any action on any matter that is required under this subpart or under any other provision of law to be, or that under the bylaws may be, submitted for action to the members, directors, members of an other body or officers of a nonprofit corporation.

88. Pennsylvania courts routinely review contested corporate actions and issue orders enjoining or validating actions. *Bannister v. Eagle Lake Community*, 17 Pa. D. & C.4th 582 (Ct. Com. Pl. 1992) ("We agree generally with the association that a petition for review under section

16

5793 is the correct procedural vehicle for claims regarding questionable actions of officers and directors of nonprofit corporations.").

89. The acts of Defendants Board members, including the decision to dissolve CELDF and effectively terminate the employment of all staff including officers, are questionable corporate actions subject to judicial scrutiny.

## CAUSES OF ACTION

### Count One. Violation of Pennsylvania Law (15 Pa. Code § 5712 et seq.)

> **Defendants Board members, as individuals and as CELDF's Board of Directors, willfully violated their fiduciary duties to reasonably protect the interests of CELDF by acting at the behest of an officer with interests opposed to CELDF.**

90. Defendants Board members violated their fiduciary duties by passing resolutions that undermined CELDF's best interests for the emolument of Defendant Linzey: the attempted retaliatory firing of the entire Organizing Team, the hurried attempts to execute the severance agreement, and the unjustifiable vote to dissolve CELDF rather than remove the handful of corrupt individuals impeding its continued success.

91. Upon information and belief, Defendants Board members have passed each resolution mentioned in this complaint after receiving it from Defendant Linzey but without making any substantive changes or taking advice from outside counsel as to the actions' propriety.

92. These resolutions have included the resolution firing the entire Organizing Team on May 14th, the October 29th resolution appointing Daniel Brannen as Executive Director and attempting to pave a path forward to convey Defendant Linzey his high six figure exit fee, and the November 20th resolution to dissolve CELDF without justification.

17

93. On May 14, 2019, Defendants Board members passed a resolution, drafted by Defendant Linzey, to end the CELDF organizers' full-time employment and benefits. Ex. H, Board Resolution, May 14, 2019.

94. This resolution purported to outsource the organizers to the CRNs, which organizations CELDF would then provide with limited short-term, revocable funding to rehire the organizers as contractors. *Id.*

95. Defendants Board members excised the Organizing Team from CELDF as a direct response to the Organizing Team's repeated requests for a meeting with Defendant Linzey to air staff grievances and address poor communication.

96. These grievances continued to accumulate.

97. Throughout the month of October, with no input from outside counsel or CELDF staff, Defendant Linzey and Defendant Board members deliberated the proposal to convey the high six figure severance payment to Defendant Linzey for no legal or contractual reason.

98. The duty of good faith and fair dealing would require Defendants Board members to negotiate the terms of Defendant Linzey's departure from CELDF at arms-length, such as by involving legal counsel in the negotiations.

99. Defendant Board members did not seek advice from outside counsel until the newly appointed Executive Director, Dan Brannen, looped them into an email conversation in November of 2019 in which Brannen, unsuccessfully, sought for outside counsel to recommend that the proposed severance package needed no further review.

100. This third party law firm advised Brannen and the Defendants Board members to have outside counsel (and the Pennsylvania Attorney General) thoroughly review Defendant Linzey's parachute proposal:

18

Going through the Board review process as counsel advises, and having counsel review the transaction, and also requesting a non-objection letter from the AG, will be critical if CELDF wishes to proceed on solid legal footing and without court approval. Failure to do so could lead to more legal costs, reputational risk, personal liability for Board members, and disputes about the efficacy of future bequests and gifts. Ex. V, Cheshire and Brennan Emails, Nov. 12, 2019.

101.     The actual knowledge that the contemplated severance proposal puts CELDF at risk renders the Defendants Board members' reliance on Defendant Linzey's and Daniel Brannen's representations concerning the proposed monetary conveyance a violation of the Defendants Board members' duty of good faith. 15 Pa. C.S. § 5712.

102.     Defendant Linzey drafted the severance proposal himself and advocated for it during Board meetings, using his position and influence as President and counsel of the organization. No precedent or bylaw existing to show that an outgoing officer or director of a nonprofit should receive a share of the organization's assets upon departure. Since the cash parachute would come from donations earmarked for specific purposes, misappropriating those funds to the CDER would violate the donative intent.

103.     Cofounders of CELDF, like those of any nonprofit, have no proprietary claim to the financial resources or property of the organization; for the Defendants Board members to entertain a severance package that contemplates Defendant Linzey having a stake in the organization that he resigned from six months previously violates the Defendant Board members' fiduciary duties of loyalty to CELDF, to avoid wasting its resources.

104.     Absent the objection of the CELDF staff and organizers, by way of formal letters of opposition and repeated email requests to talk through the severance proposal on the phone, the Board of Directors would certainly have gone through with the dubious transfer. Ex. S, Staff Letter Nov. 6, 2019.

105.    On November 20, 2019, Defendants Board members passed a resolution drafted by Defendant Linzey, ordering the dissolution and winding up of CELDF. Ex. U, Board Response Nov. 22, 2019.

106.    Defendants Board members violated their fiduciary duties by formally resolving to dissolve and wrap up the affairs of CELDF without reasonable justification.

107.    CELDF at all times referenced in this complaint has functioned productively as a nonprofit corporation and a going concern without significant financial liabilities.

108.    The Defendants Board members' dissolution of CELDF had both retaliatory and pecuniary motives.

109.    In its "Board Statement of November 22, 2019," the CELDF Board stated in part:

> Since May 2019, a significant portion of the staff have worked to defeat efforts by the Board to reach an agreement with departing co-founder, Thomas Linzey. Such an agreement would have allowed for an amicable departure and continued operation of CELDF. The Board considered the cost of such an agreement the cost of goodwill. Without that agreement, there is no goodwill and it is the Board's belief that CELDF simply cannot survive the consequences. Combined with other organizational and management issues, it is the Board's conclusion that dissolution of CELDF and the reinvigoration of the CRN's is in the best interest of the organization. Ex. U.

110.    The resolution followed a letter that CELDF staff had sent two days before, asking Defendants Board members to refrain from shutting down CELDF and affirming their commitment to continuing the organization's activities. Ex. W, Staff Letter Nov. 20, 2019.

111.    Defendants Board members' stated justification for terminating the existence of CELDF was to avoid the "consequences" of denying Defendant Linzey's demand for the aforementioned exit payment. Ex. U, supra.

112.    By terminating CELDF, Defendants Board members are freeing up CELDF's assets, totaling more than $2,000,000, for distribution to other IRS Section 501(c)(3) tax-exempt nonprofit corporations according to CELDF's Articles of Incorporation.

20

113.     The top candidate to receive distribution of CELDF's assets is Defendant

Linzey's newly-founded Sect. 501(c)(3) nonprofit, Defendant CDER.

114.     Defendants Board members' decision to dissolve CELDF was retaliatory,

unreasonable, a capitulation to the demands of a CELDF officer who has a clear conflict of

interest, and as such, this decision violates Defendant Board members' duty of care and loyalty

to CELDF.

115.     A reasonable, informed person would not act to destroy the organization to which

they owe care and loyalty in order to fund another organization to which they owe no duties.

**Defendants Board members, as individuals and as a Board of Directors, willfully
violated their fiduciary duties by violating the Internal Revenue Code, thereby
unreasonably and in bad faith exposing CELDF to liability and a loss of goodwill.**

116.     Defendants Board members violated their fiduciary duties by exposing CELDF to

potential public embarrassment and monetary liability by considering the disbursement of the

aforementioned amount of money to Defendant Linzey in violation of the "excess benefit rule"

applicable to § 501(c)(3) public charities under § 4958 of the Internal Revenue Code.

117.     An excess benefit transaction is one in which an economic benefit is provided by

the organization to or for the use of a "disqualified person" and the value of the economic benefit

provided exceeds the value of consideration for the benefit. 26 CFR § 53.4958-4(a)(1).

118.     Defendants Board members and Defendant Linzey knew or should have known

that as a co-founder and officer of CELDF, Defendant Linzey exercised substantial influence in

the financial affairs of CELDF, and as such would be a "disqualified person" according to U.S.

Treasury Department regulations and be barred from receiving all or part of the aforementioned

benefit upon departing CELDF.

119.     All Defendants also knew or should have known that engaging in a transaction

with unusual tax consequences could place CELDF in danger of being exposed to IRS fines and

penalty liabilities on behalf of the Board and officers, as well as endangering the organization's continued tax-exempt status.

120.     When CELDF staff objected to the Board approving any disproportionate benefit for Defendant Linzey in exchange for his resignation, the Board responded instead by voting to dissolve and wind up CELDF as a going nonprofit business.

121.     Defendants Board members also violated their fiduciary duties by aiding and abetting the planned private inurement of the aforementioned money to Defendant Linzey from the general cash reserves of CELDF.

122.     The private inurement doctrine is predicated on the language of § 501 of the Internal Revenue Code. Only organizations wherein "no part of the net earnings of which inures to the benefit of any private shareholder or individual" may be deemed exempt under § 501(c)(3).

123.     A § 501(c)(3) organization that violates the private inurement doctrine fails to be operated exclusively for one or more exempt purposes and may be subjected to revocation of its exempt status. See Treas. Reg. § 1.501(c)(3)-1(c)(2).

124.     Defendants Board members breached their duty of care and loyalty by failing to investigate and protect CELDF from potential forfeiture if its tax-exempt status.

125.     Defendants Board members violated their fiduciary duties by formally resolving on behalf of CELDF to dissolve and wind up CELDF as a going concern nonprofit business operation and creating the circumstances to unjustly enrich Defendant Linzey and/or his business interests in a sum that may exceed proper amounts.

126.     Directors Belinsky, Walls, and Wells have breached their fiduciary duties owed to CELDF by failing to terminate Linzey's engagement with CELDF after Linzey threatened to take half of CELDF's funding with him if a severance agreement was not reached.

> **Defendant Linzey violated his fiduciary duties by using his position as an Officer of CELDF to suborn and prompt the Board of Directors to act against CELDF's best interests, and by meeting with funders in his capacity as an Officer to stymie CELDF's continued organizational success for personal gain.**

127.     Defendant Linzey violated his duty of loyalty to CELDF by engaging in self-dealing; using his intimacy with the Board of Directors that he had appointed and his position as President as leverage to convince the Board of Directors first to pay him the high six figure amount of severance notwithstanding the fact that the Board had accepted his resignation over six months prior and then, when this failed, by formally acting to dissolve the organization, leaving Defendant Linzey in position to take over the entirety of CELDF's assets.

128.     Under Pennsylvania law, a president and director of a corporation owes his or her undivided loyalty to that corporation. *Lutherland, Inc. v. Dahlen*, 53 A.2d 143, 147 (Pa. 1947).

129.     Defendant Linzey violated his fiduciary obligations to CELDF by remaining as a corporate officer (President, and later Executive Director) and as an employee while suborning or prompting board action to dissolve CELDF without any reasonable justification.

130.     Defendant Linzey violated his duty of loyalty to CELDF by using his actual authority as President and his fraudulent authority as Executive Director to set up meetings with long-standing CELDF donors.

131.     In November 2019, Defendant Linzey obtained approval from Defendants Board members of his plan, while an executive officer of CELDF, to tell existing CELDF donors that there were organizational problems, and to encourage those donors to support Defendant Linzey's new organization, Defendant CDER.

23

132.     CELDF contract attorneys called Defendant Linzey out directly for "threatening to take CELDF's funders in his departure from this organization." Ex.W, CELDF Attorneys' Email Oct. 25, 2019.

133.     Defendant Linzey's response did not refute the allegations against him, but did acknowledge that recent events surrounding his departure negotiations have "been kept secret from both the lawyers and the organizers for the Legal Defense Fund." *Id.*

134.     The CELDF Articles of Incorporation require distribution of the dissolved organization's assets to qualifying Sect. 501(c)(3) nonprofit corporations.

135.     Defendant Linzey incorporated the Center for Democratic and Environmental Rights as a nonprofit, Sect. 501(c)(3) tax-exempt corporation in the State of Washington on October 15, 2019. See Ex. I.

136.     The "whereas" clauses of the October Board resolution to negotiate with Defendant Linzey – which was authored by Linzey as shown in the document properties -- reveal his intentions at the time of creating a direct competitor to CELDF. See Ex. K.

137.     To the detriment of CELDF and in breach of the fiduciary duties he owes to CELDF, Defendant Linzey as a corporate officer of CELDF in October 2019 demanded that the CELDF Board grant him the aforementioned lopsided severance package that would cause the transfer of those monies to a new nonprofit organization that would duplicate the functions of CELDF; would subject CELDF to uncapped liability to indemnify Linzey in currently pending Pennsylvania Disciplinary Board proceedings; would redirect certain grant funds from CELDF related to a "Rights of Nature" Conference to be convened in Florida in early 2020; and would result in giving Linzey significant pieces of office equipment. Defendant Linzey further would be free to immediately begin solicitation of CELDF's proprietary financial supporters for the

24

benefit of his new nonprofit corporation and, upon information and belief, he has begun to do so. As of the date of this Complaint, Defendant Linzey remains a compensated employee of CELDF and has been reinstated as Executive Director.

138.   Defendant Linzey breached his fiduciary duties in October 2019 by making an extortionate demand to approve his separation proposal, or that he would retaliate by damaging CELDF's reputation with some of its donors. Defendants Board members violated their fiduciary duties by not rejecting the proposal, made on those terms.

139.   In September 2019, Plaintiff Schmader, in her capacity as Secretary with authority under the operative Bylaws of CELDF to do so, appointed two people to the CELDF Board. Defendants Board members neglected and refused to recognize the appointments and have continuously failed to give notice as required by the Bylaws to the appointees, nor have Defendants Board members solicited or included the appointees' involvement in any decisions made by the Board.

140.   Throughout November and December 2019, Defendant Linzey has ordered CELDF staff to not conduct annual fundraising solicitations of major and minor donors. He states that since the organization is being dissolved that donors must not be misled. Defendant Linzey's termination of funding solicitations comprises a breach of his fiduciary duties of care and responsibility owed to CELDF, and has caused a significant loss of income to CELDF which may run into hundreds of thousands of dollars.

**Count Two: Civil Conspiracy**

141.   Plaintiffs hereby incorporate by reference and reallege herein as through rewritten the contents of the foregoing paragraphs 1 through 140.

25

142.     Establishing a civil conspiracy requires a plaintiff to show that: "two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." *Burnside v. Abbot Lab.*, 351 Pa. Super 264, 277-78 (1984).

143.     A complaint alleging civil conspiracy in Pennsylvania must include proof that the defendants acted with malice. *Id.* at 278. Further, the unlawful intent must be without justification. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Additionally, an overt act is required in a claim for conspiracy. *GMH Associates Inc. v. Prudential Realty Group*, 752 A.2d 889, 905 (Pa. Super. 2000).

144.     Facts which Pennsylvania courts consider when finding that defendants have devised a "conspiratorial scheme" include that the defendants held meetings, conferences, telephone calls, and otherwise cooperated with each other beyond just happening to act negligently, contemporaneously. *Burnside* at 280.

145.     Here, all Defendants acted deliberately and in concert, often conducting meetings in the form of telephone conferences to formally enact corporate business, to enable Defendant Linzey to deplete one-half of CELDF's annual operating budget. When they abandoned that gambit, all Defendants then conspired, often using telephone conferences to enact corporate business, to terminate the existence of CELDF for false and improper reasons in order to turn substantially all of CELDF's assets over to a nonprofit organization founded and controlled by Defendant Linzey.

146.     The acts of the Defendants Board members constitute the conspiracy. Therefore, the requirement of two or more people is met. The meetings of the Board are the basis of the conspiracy; therefore, the requirements of an agreement and unlawful act are met.[2] The

---

[2] Additionally, since at least November 12, 2019, the Board members have held meetings without notifying Plaintiff, Schnader, who is Secretary of CELDF.

requirement of the overt act is met in that the Board knowingly took the actions described above, from which malicious intent may be inferred, in breach of their fiduciary duty to CELDF.

147.     Internal Revenue Service regulations at 26 C.F.R. § 53.4958-4 presume an "excess asset" distribution when it is made to a "disqualified person," meaning someone who for the most recent five years has had significant control or influence over fiscal matters for the organization. The IRS views an organization's founder as a prime example of someone who might have substantial influence over the organization and would thus be a "disqualified party" barred from receiving an "excess benefit."[3]

148.     Here, Defendant Linzey may receive a large amount of money that represents a significant amount of CELDF assets as a consequence of the dissolution and winding up of CELDF. It the distribution is found by the IRS to comprise an "excess benefit," could subject CELDF to monetary liability to indemnify its Board for their having contributed to the improper asset distribution.

**Count Three: Violation of the Racketeer Influenced & Corrupt Organizations Act (18 USC § 1962)**

149.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs 1 through 148.

150.     The citizen enforcement provision of the Racketeer Influenced & Corrupt Organizations (RICO) Act requires a "pattern of racketeering activity" which is at least two instances where defendant(s) have engaged in, *inter alia*, any act or threat involving extortion as well as any act which is indictable under 18 U.S.C. Section 1343 (relating to wire fraud). 18 U.S.C. § 1961(1).

---

[3]See IRS, "Intermediate Sanctions - Substantial Influence" (last updated March 26, 2019, available at https://www.irs.gov/charities-non-profits/charitable-organizations/intermediate-sanctions-substantial-influence).

151.    The defendant(s) do not have to have been charged with the underlying offenses, so long as facts show that they *could* be.

152.    Standing to bring a civil RICO suit requires only that the plaintiffs have suffered an injury as a result of the predicate or underlying acts, or from the racketeering itself.

153.    Wire fraud is 18 USC § 1343, and requires that a person devise or intend to devise any scheme or artifice for obtaining money or property, using the internet.

154.    False pretenses is enough to show a scheme. Dissolving CELDF because the staff disagrees with the Board and corporate officers was a pretextual reason to end CELDF's existence.

155.    Pennsylvania's Crimes Code defines extortion as, *inter alia*, obtaining or withholding property of another by threatening to inflict harm which would not benefit the actor. 18 Pa.C.S.A. § 3923(a)(7).

156.    Defendant Linzey threatened, if his demand for an $800,000 payment was not met, to "take the existing funders," "help [Defendant Belinsky] sue the board," and "burn all of CELDF's existing funders." *See* Ex. R.

157.    Defendant Linzey plainly threatened to inflict harm upon CELDF by taking CELDF's funding and suing the organization if his demand to obtain financial gain was not met.

158.    In an October 24, 2019 email, Linzey stated:

> [I]t is in the best interests of the organization to arrive at a settlement with the organization concerning my potential departure. As long as I remain with the organization, I have a fiduciary, officer, and legal counsel duty to ensure that the organization is acting pursuant to Pennsylvania law. **While I hope it does not come down to filing the lawsuit, it is the only option that Fred and Stacey have produced** ... . They have thus put the organization in peril; because once a lawsuit is filed, **word will circulate to donors and other supporters of the unstableness [sic] of the Legal Defense Fund.**

Ex. J at 2 (emphasis added).

28

159.     Here, again, Defendant Linzey made a threat to inflict financial harm to CELDF if he did not receive his severance payment in the aforementioned referenced high six figure amouont. This constitutes a separate instance of an extortion threat, adding to the "pattern of activity" required to be shown under the RICO statute.

160.     As noted in Count One, supra, after the October 21 threat, CELDF contract attorneys called Defendant Linzey out directly for "threatening to take CELDF's funders in his departure from this organization." Ex. X, CELDF Attorneys' Letter, Oct. 25, 2019.

161.     Defendant Linzey's response did not refute the allegations against him, but did acknowledge that recent events surrounding his departure negotiations have "been kept secret from both the lawyers and the organizers for the Legal Defense Fund." *Id.*

Count Four: Unjust Enrichment

162.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs 1 through 162.

163.     "Unjust enrichment" is essentially an equitable doctrine. *Styer v. Hugo*, 422 Pa.Super. 262, 619 A.2d 347 (1993). Pennsylvania courts have described the elements of unjust enrichment as "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super. 1986), overruled on other grounds, *Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991); see also *Burgettstown-Smith v. Langeloth*, 588 A.2d 43 (Pa. Super. 1991). The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, courts focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. *State Farm Mut. Auto. Ins. Co. v. Jim Bowe*

& Sons, Inc., 539 A.2d 391, 393 (Pa. Super. 1988), citing *Myers-Macomber Engineers v. M.L.W. Construction Corp. & HNC Mortgage and Realty Investors*, 414 A.2d 357 (Pa.Super. 1979).

164.    The most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is unjust. *Styer*, supra at 267, 619 A.2d at 350; *State Farm Mut. Auto. Ins. Co.*, supra. Where unjust enrichment is found, the law implies a contract, referred to as either a quasi contract or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit*. *Chesney v. Stevens*, 644 A.2d 1240 (Pa.Super. 1994); *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (Pa. 1969).

165.    Upon information and belief, Defendant Linzey has acquired or prospectively will acquire benefits in the form of cash and economic assets of CELDF for the personal benefit of himself and his estate, conferred by Defendants Board members. If Defendant Linzey accepts and retains such benefits under the circumstances alleged hereinabove, it would be inequitable for him to do so without payment of value to CELDF.

166.    Upon information and belief, Defendant Linzey has acquired or prospectively will acquire benefits in the form of cash and economic assets of CELDF for the benefit of himself as an officer of the Center for Democratic and Environmental Rights. If Defendant Linzey in his capacity as an officer of the Center for Democratic and Environmental rights accepts and retains such benefits under the circumstances alleged hereinabove, it would be inequitable for him to do so without payment of value to CELDF.

## PRELIMINARY INJUNCTION

167.     The "essential prerequisites for a preliminary injunction" that a plaintiff must show are: (1) "that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;" (2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceeding;" (3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;" (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits;" (5) that the injunction sought is reasonably suited to abate the offending activity; and (6) that the injunction will not adversely affect the public interest. *Summit Towne Ctr., Inc. v. The Shoe Show of Rocky Mount., Inc.*, 573 Pa. 637, 646-47 (2003).

168.     Here, a preliminary injunction is an appropriate and, indeed, essential remedy that will properly restore the status quo as it existed prior to Defendants' dissolution of the Community Environmental Legal Defense Fund.

169.     The first prerequisite is present: the challenged conduct threatens the very existence of CELDF and, as a one-of-a-kind charitable organization, no monetary damage could completely compensate for the harms to Plaintiffs of trying to replace the irreplaceable.

. 170.     Should Defendant Linzey continue disparaging CELDF to other donors, this would imperil the goodwill of the organization and threaten its vitality; should Defendants board members continue with their proposed dissolution, CELDF would no longer exist.

171.     Money damages are a woefully inadequate replacement for an organization that took 25 years to build.

31

178.     Finally, the sixth factor, that the injunction will not adversely affect the public interest, is also satisfied. The Pennsylvania Legislature, in enacting Pennsylvania's Nonprofit Law (15 Pa. Code § 5301), specified the duties of fiduciary responsibility and loyalty owed by directors and officers to the organization they represent. 15 PA Cons Stat § 5712. Here, to enjoin Defendants from continuing to breach those same fiduciary duties would be to uphold the public interest in good nonprofit governance.

CONCLUSION

179.     CELDF's Executive Director continues to manipulate the Board of Directors in an attempt to commandeer CELDF's assets for personal motives, arranging a transaction that is a clear conflict of interest and a betrayal of loyalty. The best interests of this nonprofit organization should govern the Board of Directors' actions and decisions. Defendants Board of Directors members continue to violate their fiduciary duties to CELDF as well. Defendants' collective abandonment of good faith has left CELDF vulnerable to being plundered and dissolved. Plaintiffs have filed suit to continue the work of this organization, free from Defendants' interference.

REQUESTED RELIEF

180.     WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

   a.  Find and declare that Thomas Linzey and the Defendant Board members breached the fiduciary duties to CELDF required of them by 15 PA Code § 5712;

   b.  Enter preliminary and permanent injunctions against all Defendants, as well as any CELDF officers, agents, employees or persons working in concert therewith to prevent the dissolution of CELDF as well as undertaking of any steps or proceedings that impair or circumvent CELDF's continued operations, including

33

transferring CELDF assets to the Center for Democratic and Environmental Rights and/or any other organization with which Defendant Linzey is affiliated;

c. Enter preliminary and permanent injunctions removing all individual Defendants from their positions in CELDF;

d. Enter preliminary and permanent injunctions against Defendant Linzey, any corporate officers, employees, agents and any persons working in concert with him either at CELDF and/or at the Center for Democratic and Environmental Rights, that bar him and them from soliciting CELDF donors to contribute resources to the Center for Democratic and Environmental Rights and further enjoining and preventing him and them from disparaging CELDF;

e. Enter preliminary and permanent injunctions to prevent all Defendants, or officers, agents, employees and persons working in concert with Defendants from firing any CELDF staff absent a showing of just cause;

f. Enter preliminary and permanent injunctions against the Center for Democratic and Environmental Rights from the receipt, possession, ownership and control of any monetary assets formerly owned by CELDF;

g. Award compensatory damages to Plaintiffs in an appropriate amount;

h. Award exemplary damages to Plaintiffs in an amount to be determined by jury;

i. Award Plaintiffs reasonable attorney's fees and costs; and

j. Grant such other and further relief at law and in equity as the Court may deem just and proper.

Demand is hereby made for a trial by jury as to all claims contained herein.

Dated: December 12, 2019

Respectfully submitted,

David M. Koller, Esq
Koller Law LLC
2043 Locust Street, Suite 1B
Philadelphia, PA 1910
Phone 215-545-8917
Fax 215-575-0826
davidk@kollerlawfirm.com
www.kollerlawfirm.com
Counsel for Plaintiffs

## VERIFICATION

Stacey L. Schmader verifies that she is the Secretary/Treasurer, Community

Environmental Legal Defense Fund; that she is authorized to sign this Verification on behalf of

Plaintiffs; and that the statements made in the foregoing Complaint are true and correct to the

best of her knowledge, information and belief. She understands that false statements herein are

made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to

authorities.

Date: 12|12|19

*Stacey L Schmader*
Stacey L. Schmader

# Exhibit A

Articles of Incorporation of the undersigned, a majority of whom are citizens of the United States, desiring to form a non-profit corporation under the Pennsylvania Non-Profit Corporation law of 1988, 15 Pa. C.S.A. section 5301, do hereby certify:

First: The name of the corporation shall be the Community Environmental Legal Defense Fund.

Second: The place in the state where the principal office of the Corporation is to be located is Harrisburg, Dauphin County at 510 Lawrence Drive, (717) 545-0124.

Third: Said corporation is organized exclusively for charitable purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code. Said corporation is being established to provide conservation-oriented community groups with affordable legal assistance in promotion of sustainable development and preservation of open spaces and ecological diversity.

Fourth: The names and addresses of the person who is the initial incorporator of the corporation is as follows:
    (1) Thomas Linzey, 510 Lawrence Drive, Harrisburg, PA 17109
        (717) 545-0124

Fifth: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Third hereof. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the association shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Sixth: Upon the dissolution of the corporation, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a Court of Competent Jurisdiction of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations as said Court shall determine,

PA DEPT. OF STATE

FEB 28 1995

PA DEPT. OF STATE

MAR 1 3 1995

9515-1191

which are organized and operated exclusively for such purposes.

Seventh: This corporation shall be organized upon a nonstock basis.

Eighth: This corporation is to have perpetual existence.

In witness whereof, I have hereunto subscribed my name this 24th Day of February, 1995.

Thomas Linzey, Incorporator

# Exhibit B

## THIRD Amended Bylaws of
## The Community Environmental Legal Defense Fund, Inc.

### ARTICLE I
### Name and Purpose

Section I -The name of the corporation shall be the COMMUNITY ENVIRONMENTAL LEGAL DEFENSE FUND.

Section 2 - The purposes of the corporation are exclusively charitable and educational, and shall include, but not be limited to, the provision of legal and other services to community organizations and municipal governments otherwise unable to afford services equivalent to those provided by the corporation.

### ARTICLE II
### Officers

Section 1 - The Officers of the Fund shall consist of a President, a Secretary, and a Treasurer.

Section 2 - The President, Secretary, and Treasurer shall be chosen by the Board of Directors by ballot every two years. The first election shall occur on the last Sunday in April 1996, with subsequent elections held at meetings of the Board of Directors occurring every two years. A majority vote of the Board shall be sufficient to elect an officer if a quorum of the Board is present and voting.

Section 3 - The duties of the Officers shall be as follows:

The President shall be responsible for developing the Board of Directors and creating a pool of qualified candidates to serve as Directors, in consultation with the Executive Director and other Board members. The President may be called upon, from time to time, to assist CELDF staff.

The Secretary and Treasurer shall conduct all of the administrative duties of the Fund, including accounting of all revenues and expenditures, correspondence with the Board of Directors to provide updates on Fund activities, accounting activities concerning the expenditure of Fund monies, and general correspondence with individuals and groups contacting the Fund.

Upon the absence of the Executive Director, or in the event of a vacancy in that position, the Secretary and/or Treasurer are authorized to carry on all of the activities of the Fund.

### ARTICLE III
### Board of Directors

Section 1 - The Board of Directors shall consist of between three and seven members at all times, who shall be appointed by the Executive Director for a term of two years. In the event of a vacancy in the position of Executive Director, the Board of Directors shall be appointed by the Secretary of the corporation. The Board shall have the power to transact the

general business of the corporation, except that the Board shall have no legal powers to directly oversee or control the day-to-day litigation activities of the Fund. The Board shall meet at least once per annum. Additional meetings of the Board shall be held at the discretion of the Board, and may be held via teleconference. In addition, Board members may vote via electronic mail on issues deemed urgent by the Board of Directors or Officers of the corporation. Those votes shall be ratified at the next scheduled Board meeting. Board members shall be entitled to an update on Fund activities or an accounting of revenues and expenditures at any time, upon written request to the Secretary and/or Treasurer.

Section 2 - For purposes of carrying on the business of the Legal Defense Fund, the presence of a majority of Directors shall constitute a Quorum. A majority vote by those Directors is necessary for the adoption of resolutions. For a decision or resolution to be considered adopted, a quorum of directors must be present during the meeting, and for the actual vote.

Section 2.5 – There shall be a Chair of the Board of Directors. The Chair shall call Board meetings to order and facilitate the meetings, and shall serve as the primary liaison between the Officers of the corporation and the Board. The Chair shall be the Board member with seniority, unless the Board selects a different Board member for the position of Chair.

Section 3 - Each Board member must avoid the appearance of any impropriety or potential conflict of interest. It is incumbent on each Board member to disclose any real, potential, or perceived conflict of interest to the Chair of the Board or the Executive Director. The disclosure shall be made through a formal, written communication to the Secretary of the Fund. Board members with substantial conflicts may be removed by a majority vote of the Board of Directors. A "substantial conflict" shall include, but not be limited to, a conflict of interest that prevents, or seriously interferes with, the exercise of objective or impartial decision-making by a Board member.

Section 4 - Portions of data, documents, and discussions between Board members and CELDF staff may contain confidential or proprietary information. Data, material, or information identified as either confidential or proprietary is not available for public disclosure. If a Board member is uncertain about the status of any data, information, or material, then the Board member shall contact the Executive Director, or the Managing Attorney, for an opinion prior to disclosing subject matter.

Section 5 - A Board member wishing to retire or otherwise withdraw from service on the Board shall give the Board notice of that retirement or withdrawal as early as possible, but in any event, no later than sixty (60) days prior to the planned retirement or withdrawal.

Section 6 - The retirement, withdrawal, or removal of a Board member prior to the expiration of that Board member's original term of office shall require the remaining Board of Directors to select a new Board member at the first meeting following that Board member's retirement, withdrawal, or removal. Such selected Board member shall serve for the remainder of the original Board member's term.

## ARTICLE IV
## Board of Advisors

Section 1 - There may be a Board of Advisors, consisting of an unlimited number of members. The Board of Advisors shall be nominated by any Officer and approved by the

Board of Directors.

Section 2 - Anyone chosen to serve on the Board of Advisors shall be able to disassociate from the Board of Advisors upon giving written notice to the Secretary of the organization.

Section 3 - The Advisors shall be chosen to advise the Fund on any matters relevant to the work of the Fund. They shall be selected based on their expertise in a particular field.

## ARTICLE V
## Fund Employees and Compensation

Section 1 - There shall be no financial compensation for any Officers, Directors, or Advisors to the Fund. However, Officers, Directors, or Advisors to the Fund shall be reimbursed for their travel and lodging expenses for their attendance of Board meetings or other meetings at which their attendance is required.

Section 2 - There shall be an Executive Director for the Fund, and that individual shall be compensated with an annual salary approved by the Board of Directors. The Executive Director shall be an attorney, and, in that capacity, shall oversee and supervise all day-to-day litigation activity carried out by the Fund. The Executive Director shall also hold the title of senior counsel for the Fund. In the event of a vacancy in the position of Executive Director, the Managing Attorney shall oversee and supervise all day-to-day litigation carried out by the Fund.

Section 3 -There shall be a Director of the National Democracy School for the Fund, who shall also serve as the National Administrative Director for the Fund, and that individual shall be compensated with an annual salary approved by the Board of Directors.

Section 4 - There shall be an Associate Director responsible for program development and fundraising operations, and that individual shall be compensated with an annual salary approved by the Board of Directors. The Associate  Director shall also hold the title of program development director.

Section 5 - There shall be a National Organizing Director, and that individual shall be compensated with an annual salary approved by the Board of Directors.

Section 6 - Other employees and independent contractors may be hired by the corporation to fulfill the goals of the Legal Defense Fund pursuant to contracts not to exceed one year in duration. Such contracts shall allow for the termination or change of contract terms should the financial situation of the Fund require such termination or alteration.

Section 7- All monies disbursed from the Fund for employees and independent contractors shall be approved by both the Executive Director and the Treasurer of the corporation, and shall not exceed the prevailing hourly rate for the securing of equivalent services obtainable through similar organizations.

## ARTICLE VI
## Liability and Indemnification

The members of the Board of Directors, the Officers, and the members of the Board of Advisors shall not be personally liable for monetary damages for any action taken, or any failure to take any action, to the fullest extent permitted by law. The Corporation shall indemnify any member of the Board of Directors or Board of Advisors or Officer of the Corporation, as such, to the fullest extent permitted by law.

In addition, the Board of Directors shall be covered by adequate Directors and Officers ("D&O") Insurance, under a policy purchased by the Legal Defense Fund, which shall remain in effect for the pendency of the operation of the corporation.

## ARTICLE VII
## Amendments

Amendments to the By-Laws may be made at any meeting of the Board of Directors, provided due notice of twenty (20) days has been given to the Board of Directors and the Officers of the Fund that an amendment is being considered. Amendments shall be added to these bylaws upon the majority vote of the Board of Directors.

The Bylaws for the Community Environmental Legal Defense Fund (CELDF) consist of this page and the three preceding pages of this document, contained in Articles I through VII.

Agreed to this ___12th___ day of ___July___ 2019.

_____
Tammy Belinsky, Board Member

_____
Ed Wells, Board Member

_____
Fred Walls, Board Member

## CERTIFICATION

Stacey Schmader, Secretary/Treasurer of the Community Environmental Legal Defense Fund, hereby certifies that this is a complete and accurate copy of the By-Laws of the Community Environmental Legal Defense Fund.

By/Stacey L. Schmader on this ___12th___ Day of ___July___, 2019.

_____

6

# Exhibit C

**CELDF Current Staff**

**NH**
Michelle Sanborn – NH Community Organizer (employee)
Kira Kelley – NH attorney (contractor)

**PA**
Chad Nicholson – PA Community Organizer (employee)
Ben Price – National Organizing Director (employee)
Stacey Schmader – Sec/Treas, Administrative Director, Financial Officer, National Democracy
School Director (employee)
Malinda Clatterbuck – PACRN Coordinator (contractor)
Karen Hoffmann – PA Attorney (contractor)
Holly Coldsmith – Administrative Assistant (employee)
Lina Blount – PA Communications Coordinator (contractor)

**OH**
Tish O'Dell – OH Community Organizer (employee)
Emelyn Lybarger – Outreach and Communications Director (employee – submitted resignation)
Lisa Kochheiser – OH Coordinator (contractor)
Markie Miller – Foundation and Donor Outreach Assistant (contractor)
Crystal Jankowski – Social Media Coordinator (contractor)
Terry Lodge – OH Attorney (contractor)

**NY**
Simon Davis-Cohen – Research and Communications Associate
**NM**
Dan Brannen – Interim Executive Director/Managing Attorney (contractor)

**WA**
Thomas Linzey – Ex Executive Director, Ex President, current General Counsel? (employee)
Mari Margil – Associate Director (employee)
Kai Huschke – WA/OR Community Organizer (employee)
Lindsey Schromen-Wawrin – WA Attorney (contractor)
Nancy Ward – OR Community Organizer (contractor)

**OR**
Patti Gouveia – ORCRN fundraiser (contractor)

**UT**
Will Falk – Attorney (contractor)

**CO**
Karen Breslin – Attorney (contractor)

# Exhibit D

March 1, 2019

Dear CELDF Executive Committee,

The organizing team is submitting a request as a result of numerous discussions over the last few months regarding incidents (transpiring over a number of years) that have been experienced individually and collectively. Through those discussions, we realize that our current internal organizational health is compromised.

At some point it will be necessary to address the specific issues/incidents that led to our discussions, however the central issue we urgently desire to be addressed is our experience of a breach of trust and mutual respect with major leadership arenas of the organization. Real harm has been experienced by members of the organizing team and other staff within the organization.

The cumulative impact has taken a physical and emotional toll on the health of the organizing team and other staff in the organization. This in turn is affecting the work as well as the health and viability of the organization itself. All of this is happening on top of the exterior pressures felt by each of us on a daily basis from engaging in the difficult work that we do, which adds to the impact on our health and wellbeing in various additional ways.

We are very motivated to figure out together how to navigate these serious issues in the organization. We fully understand working through these matters may not achieve the positive change desired, but an effort must still be made. We also understand that without a real commitment and willingness from everyone to work towards healing trust and relationship issues, a resolution may not be possible.

We make this request with genuine care and connection to one another as colleagues, friends, and with an understanding that we are all unique people. Our intention is not about attacking one another or any individual. Rather, our intention is about asking for space and a process in order to bring forward the seriousness of the trust and mutual respect issues, and ideally begin the healing process.

Further, our sense is that this will mean a process whereby we can share the toll this work takes, not as a conversation to get mired in, but to help foster understanding of how complicated this is - multiple layers intersecting to create heightened emotions and higher psychological stakes. We also believe it means a process whereby we can share our perspective and experience of how trust is compromised between the major leadership arenas of the organization. Most importantly, we think this process, to be successful, must include setting some groundwork on how to rebuild what has been broken or damaged, as well as how to strengthen what *is* working.

Because of the seriousness of the situation, we suggest the following:

1. Seek unbiased outside professional assistance (organizational consultant) to help us navigate to a healthier place
2. Schedule (as soon as feasible) an in-person gathering as part of the process in which an outside facilitator would be present

For the in-person gathering the thinking is to include full time staff only. As to the timing, we should gather at the earliest possible convenience ideally this spring. The organizing team is of the unanimous opinion that this is serious enough to the future of the organization that we should not delay meeting until the staff retreat.

Please know that this is a difficult request to make, and we realize this is likely a difficult request to receive. We also recognize conversations must take place before any decisions are made, including budgetary discussions. With that said, it bears repeating that we believe these issues cannot be ignored. Our heartfelt concerns must be dealt with or they will continue to adversely affect the abilities of the organization to do what we are poised to do, and individuals within the organization will continue to be harmed.

Thank you,
CELDF Organizing Team

Case 1:20-cv-00067-JRW   Document 1-3   Filed 01/13/20   Page 47 of 108

# Exhibit E



Stacey Schmader <stacey@celdf.org>

## Resignation as Executive Director

**Thomas Alan Linzey, Esq.** <tal@pa.net>                                    Tue, Apr 9, 2019 at 7:06 PM
To: Stacey Schmader <stacey@celdf.org>, Mari Margil <mmargil@celdf.org>

Stacey and Mari,

So, I will be resigning as Executive Director of CELDF. It's been a long time coming, but recent events with the staff and lawyers have made me arrive at this conclusion. I don't want to have anything to do with management of the organization anymore. I'll be resigning from the Finance Committee as part of my decision.

I still think I have some contributions to make. I would like to begin to write more, speak more, do more workshops. Not sure what kind of title that means, but happy to have whatever title, or none at all. I still want to help make the dream of CELDF a reality; I just can't do it in my current role.

So, thoughts and comments welcome here. I would like my last day, as Executive Director, to be April 30th of this month.

-Thomas

**Thomas Alan Linzey, Esq., Executive Director**

**Community Environmental Legal Defense Fund**

**P.O. Box 360**

**Mercersburg, Pennsylvania 17236**

**(717) 498-0054**

**www.celdf.org**

**info@celdf.org**

**NOTICE: This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional responsibility, and the workproduct doctrine, by virtue of this client's engagement of the Community Environmental Legal Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this communication to render those services to the client pursuant to that engagement.**

# Exhibit F
 Gmail

**Kai Huschke <kaihuschke@gmail.com>**

---

## Proposal for June get together
1 message

---

**Kai Huschke** <kai@celdf.org>                                   Thu, Apr 18, 2019 at 3:34 PM
To: Chad Nicholson <chad@celdf.org>, Ben Price <benprice@celdf.org>, Mari Margil <mmargil@celdf.org>, Stacey
Schmader <stacey@celdf.org>

Below is the proposal for the EC to review on Tuesday.

Cheers,
Kai

**PROPOSAL**
The letter from the organizing team to the executive committee, dated March 1, 2019,
stated that *our current internal organizational health is compromised* and that there has
been *a breach of trust and mutual respect with major leadership arenas of the
organization* which *is affecting the work as well as the health and viability of the
organization itself.*

The organizing team still believes that this is a critical organizational issue needing to be
worked on and through.

In addition to and equally critical because of how interconnected they are to the trust
issue are two other organizational issues:

1. Organizational decision making authority and process
2. Organizational formulation and function based on external pressures/realities

All three issues are ones that have not been adequately dealt with. The impact, as such,
has been that we continue to struggle and/or underperform as an organization.

It was also suggested in the original letter that the organization subscribe to the
following:

1. Seek unbiased outside professional assistance (organizational consultant) to
   help us navigate to a healthier place
2. Schedule (as soon as feasible) an in-person gathering as part of the process in
   which an outside consultant/facilitator would be present

That request of outside assistance and a timely coming together still hold for all three
organizational issues. And though it may be difficult and perhaps not the best idea to
attempt to work through all issues in one setting necessity, time, and cost all point to
attempting to do so.

As to the suggestion of an outside organizational consultant the reasons for that are to:

- Help provide a means and space for effectively addressing and working through trust issues between individuals and decision making bodies of the organization
- Facilitate a discussion and working session on how best to physically structure CELDF; and through that ideally gain clarity on what CELDF will do and how to do it because of/or despite of external realities
- Guidance on coming to agreements on how the major operational bodies of the organization will interrelate with each other including on responsibilities and decision making authority

The nature of this discussion, the recent success of LEBoR and the difficulty of decision making that followed, the continuing lack of clarity on the decision making structure, and the overall fatigue of unresolved or unaddressed internal issues along with external realities warrant a coming together now. In addition to the urgency, having such a gathering soon will help in informing how the larger staff gathering in September could be formulated.

**TIMING + DURATION**
The suggestion is to meet in mid to late June for two days most likely in PA. This would mean coming in the evening before, working through two full days, and departing the morning following.

**INVITEES**
In addition to an organizational consultant the CELDF staff to be invited would be those in leadership and senior positions in the organization. They would include:

Michelle - New Hampshire
Stacey - Pennsylvania
Ben - Pennsylvania
Chad - Pennsylvania
Tish - Ohio
Emelyn - Ohio
Dan - New Mexico
Thomas - Washington
Mari - Washington
Lindsey - Washington
Kai - Washington

**BUDGET CONSIDERATIONS**
Actual costs have not yet been researched here but the projected break down is as follows. The biggest unknown in the overall budget is what a consultant will cost:

Travel = $4500
Lodging = $3000
Food/drink = $1700
Organizational consultant = $3500
Misc. = $800

Projected total budget = $13,500

--
Kai Huschke
CELDF Northwest + Hawaii Organizer
kai@celdf.org
509-607-5034

*This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional responsibility, and the workproduct doctrine, by virtue of this client's engagement of the Community Environmental Legal Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this communication to render those services to the client pursuant to that engagement.*

# Exhibit G

 Gmail

**Kai Huschke <kaihuschke@gmail.com>**

---

## June Gathering
1 message

---

**Stacey Schmader** <stacey@celdf.org>                                          Fri, May 17, 2019 at 1:40 PM
To: Thomas Linzey <tal@pa.net>
Cc: Chad Nicholson <chad@celdf.org>, Kai Huschke <kai@celdf.org>, Ben Price <benprice@celdf.org>, Mari Margil <mmargil@celdf.org>

Thomas,

It's our understanding that, at this point, you've declined to attend the June staff gathering.

We'd like to reiterate a couple points:
-While originating with a letter from the organizers, the decision to hold the gathering (with an outside facilitator) was approved by the Executive Committee, with an expectation that all staff would attend.
-The gathering will be dealing with many issues, including internal trust and process, as well as organizational structure and decisionmaking moving ahead. As Executive Director, both in terms of your history with CELDF as well as your leadership role within the organization, it is critical for you to be there for these discussions and decisions.

If there was confusion over whether or not your presence was a request, we apologize. If the dates are a problem, we can consider something else; however, given that those dates currently work for the rest of the staff, it is our strong preference that we hold the gathering on those dates.

The date for the meeting is June 25-26, with arrival on the 24th and departure on the 27th. The meeting will either be held in PA or OH.

If you'd like to discuss any of this further, please let us know and we can chat about it on the next ExComm call.

Executive Committee

Stacey Schmader
Financial Officer
CELDF
PO Box 360
Mercersburg, PA 17236
717-498-0054
www.celdf.org



This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional responsibility, and the work product doctrine, by virtue of this client's engagement of the Community Environmental Legal Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this communication to render those services to the client pursuant to that engagement.

# Exhibit H

~~DRAFT~~ **Board Resolution**
*To be Considered Tuesday, May 14, 2019 at a Board of Directors' Meeting*

**The Community Environmental Legal Defense Fund, Inc. (CELDF)**

*Whereas*, the Community Environmental Legal Defense Fund ("CELDF") has grown exponentially over the last twenty-four years and its growth has required a significant shift in our work and focus; and

*Whereas*, that shift in work and focus, coupled with a change in personnel, now requires that a change occur in the organization's structure and management; and

*Whereas*, the expansion of organizing in CELDF's key states of Ohio, Pennsylvania, New Hampshire, and Oregon makes the state-based Community Rights Networks (CRNs) in those states a critical part of the continued growth of the community rights work;

*Therefore*, the Board of Directors of the Community Environmental Legal Defense Fund resolves the following:

1. That the resignation of Thomas Linzey as Executive Director of the organization be accepted, with recognition of Thomas' role in guiding the organization over the last twenty-four years;
2. That Thomas continue as President, for now, and to work for the Legal Defense Fund in a different capacity, focusing on speaking, developing strategy, writing, and serving as senior advisor to the staff, but that he shall be relieved of all management responsibilities;
3. That the Legal Defense Fund provide "block funding" to the New Hampshire, Oregon, Pennsylvania, and Ohio Community Rights Networks ("CRN's"), to enable those organizations to employ, at current levels of funding, the organizers that are currently employed by the Legal Defense Fund within those states;
4. That the funding for the CRNs be contingent upon the signing of an annual agreement between the individual CRNs and CELDF, which requires those monies to be expended for organizer salaries and related administrative expenses, and which requires the CRN to attain certain strategic goals established by CELDF;
5. That CELDF provide administrative support to the CRNs to enable those organizations to become capable of paying and managing employees and independent contractors, and to manage their own financial situations;
6. That a Center for Community Rights and Democracy be established within CELDF, which will serve as a hub for CELDF organizing, joining the International Center for the Rights of Nature, as the two hubs under which CELDF work is conducted;
7. That Dan Brannen will formally assume the position of Managing Attorney, thus managing the day-to-day activities of the lawyers who work for CELDF, and managing litigation undertaken on behalf of CELDF clients;
8. That a committee of five CELDF individuals be created to carry out the day-to-day management of CELDF, with those five to be the Managing Attorney, the National Organizing Director, the Associate Director, the Communications and Outreach Director,

1

and the National Administrative Director. The group shall meet once a week to discuss organizational issues, and while the group shall strive for consensus on decisions, if consensus cannot be reached, binding decisions shall be made by majority vote. The committee shall designate one individual annually to make organizational decisions in between the meetings of the committee. The committee shall make decisions via electronic mail as needed;

9. That the Finance Committee consist of three permanent members, the Associate Director, the National Organizing Director and the Administrative Director. Within the Finance Committee, a Personnel Committee shall be created for all personnel decisions. That committee shall consist of the Associate Director and the Administrative Director. They shall be responsible for negotiating employment of potential employees, and shall be privy to salary or other compensation packages paid to employees, independent contractors, or attorneys compensated by the organization.

10. That the members of the Personnel Committee shall sign a confidentiality and non-disclosure agreement, in which the Associate Director and the Administrative Director agree to keep confidential, and not disclose, any information concerning salaries or compensation packages, or information concerning employment negotiations, to any individual or entity other than the Board of Directors of the organization, and to any governmental agency or donor requiring such information;

11. That the position of Executive Director remain vacant, and that the five member committee created to manage the organization shall assume the powers otherwise exercised by an Executive Director, until the Board decides that hiring a new Executive Director is necessary;

12. That the transition outlined within this Resolution be complete by January 1, 2020.

**Signed this 14ᵗʰ Day of May, 2019.**

_____
Tammy Belinsky, Board Member

_____
Ed Wells, Board Member

_____
Fred Walls, Board Member

**Authenticated:**

_____
Stacey L. Schmader, Corporate Secretary

2

# Exhibit I

FILED

Secretary of State
State of Washington
Date Filed: 10/18/2019
Effective Date: 10/18/2019
UBI No: 604 522 686

### Articles of Incorporation for
## The Center for Democratic and Environmental Rights

**Articles of Incorporation of the undersigned, a majority of whom are citizens of the United States, desiring to form a non-profit corporation under 24.03 RCW *et seq.*, do hereby certify:**

### ARTICLE ONE
*Identification*

*Section 1.01. Name.* The name of the Corporation is "The Center for Democratic and Environmental Rights".

*Section 1.02. Effective Date of Filing.* These articles of incorporation shall be effective upon filing by the Secretary of State.

### ARTICLE TWO
*Purpose and Powers*

*Section 2.01. Purpose.* The purpose for which the Corporation is formed is the transaction of any or all lawful business for which non-profit corporations may be incorporated under the laws of Washington. The specific purpose of this corporation shall be to support a movement to secure the rights of people and nature.

*Section 2.02. Powers.* The Corporation shall have the same powers as an individual to do all things necessary or convenient to carry out its business and affairs, subject to any limitations or restrictions imposed by applicable law or these Articles.

*Section 2.03. Purpose.* The Corporation is organized exclusively for charitable, educational, religious, or scientific purposes, within the meaning of §501(c)(3) of the Internal Revenue Code (or corresponding section of any future Federal tax code), including for such purposes, the making of distributions to organizations that qualify as exempt organizations under §501(c)(3) of the Internal Revenue Code, or the corresponding section of any future Federal tax code.

### ARTICLE THREE
*Registered Office and Registered Agent*

*Section 3.01. Registered Office and Agent.* The name of the registered agent and the street address of the registered office of the Corporation are as follows:

Thomas Alan Linzey
1320 North Hollis Street
Spokane, Washington 99201
(717) 729-2271 (cell); tal@pa.net (email)

1

Work Order #: 2019100900499032 - 1
Received Date: 10/17/2019
Amount Received: $30.00

I, Thomas Alan Linzey, hereby consent to serve as Registered Agent in the State of Washington for the named entity. I understand it will be my responsibility to accept Service of Process, notices, and demands on behalf of the entity; to forward mail to the entity; and to immediately notify the Office of the Secretary of State if I resign or change the Registered Office Address.

| | | |
|---|---|---|
| _(signature)_ | THOMAS LINZEY | Oct. 15, 2019 |
| Signature of Agent | Printed Name | Date |

## ARTICLE FOUR
*Directors*

*Section 4.01. Number and Qualification.* The number of directors of the Corporation shall be specified, from time to time, by the Code of Bylaws, which number may be increased or decreased from time to time by amendment of the Bylaws. The initial Director of the Corporation shall be:

Thomas Alan Linzey
1320 North Hollis Street
Spokane, Washington 99201

## ARTICLE FIVE
*Incorporator*

*Section 5.01. Name and Address.* The name and address of the Incorporator of the Corporation are as follows:

Thomas Alan Linzey
1320 North Hollis Street
Spokane, Washington 99201

This record is hereby executed under penalties of perjury, and is, to the best of my knowledge, true and correct.

| | | |
|---|---|---|
| _(signature)_ | THOMAS LINZEY | Oct. 15, 2019 |
| Signature of Incorporator | Printed Name | Date |

## ARTICLE SIX
*Code of Bylaws; Indemnification; Amendments of Articles*

*Section 6.01. Code of Bylaws.* The Board of Directors of the Corporation shall have the power to make, alter, amend, or repeal the Bylaws of the Corporation, subject to the restriction that a majority vote of the Directors is necessary to take these actions.

2

Work Order #: 2019100900499032 - 1
Received Date: 10/17/2019
Amount Received: $30.00

*Section 6.02. Indemnification.* The Corporation shall indemnify a director or officer of the Corporation who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director or officer was a party because the director or officer is or was a director or officer of the Corporation, against reasonable expenses incurred by the director or officer in connection with the proceeding.

### ARTICLE SEVEN
*Limitations on Activities*

*Section 7.01. Limitations.* No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Two hereof. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of, or in opposition to, any candidate for public office. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on by (a) a corporation exempt from federal income tax under §501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) a corporation, contributions to which are deductible under §170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

### ARTICLE EIGHT
*Dissolution*

*Section 8.01. Dissolution.* Upon the dissolution of the corporation, assets shall be distributed for one or more exempt purposes within the meaning of §501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a Court of competent jurisdiction of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

### ARTICLE NINE
*Non-Stock*

*Section 9.01. Non-Stock Basis.* This corporation shall be organized upon a nonstock basis.

### ARTICLE TEN
*Existence*

*Section 10.01.* This corporation is to have perpetual existence.

3

Work Order #: 2019100900499032 - 1

Received Date: 10/17/2019

Amount Received: $30.00

*This document is hereby executed under penalties of perjury; consists of the prior three pages, and is, to the best of my knowledge, true and correct.*

Executed this ___15TH___ Day of ___OCTOBER___ 2019

Thomas Alan Linzey, Incorporator
1320 North Hollis Street
Spokane, Washington 99201

**Contact Person to call if questions:**

Thomas Alan Linzey, Incorporator
(717) 729-2271 (cell)

**Return Address for this Filing:**

Attention to: Thomas Alan Linzey, Esq.
Email: tal@pa.net
Address: 1320 North Hollis Street, Spokane, Washington 99201
City: Spokane
State: Washington
Zip: 99201

4

Work Order #: 2019100900499032 - 1
Received Date: 10/17/2019
Amount Received: $30.00

Community Environmental Legal Defense Fund Mail - Stacey's Earl...     https://mail.google.com/mail/u/0/?ik=9043441b1b&view=pt&search=...

# Exhibit J



Stacey Schmader <stacey@celdf.org>

---

## Stacey's Earlier E-mail
3 messages

---

**Thomas Alan Linzey, Esq.** <tal@pa.net>                                    Thu, Oct 24, 2019 at 8:15 PM
To: Stacey Schmader <stacey@celdf.org>, Fred Walls <lockhartandfriends@gmail.com>, kat walter
<kat@volksmail.com>, Dave Leeger <daveleeger@hotmail.com>, Edward Wells <ewells@wilson.edu>, Tammy
Belinsky <tambel@hughes.net>

Dear Stacey, Fred, Kat, Dave, Ed, and Tammy,

I was recently made aware of an e-mail that circulated earlier today to all of you from Stacey.

Stacey, Fred, and I had scheduled a conference call for this evening (**Thursday, October 24th**) as a
second call to discuss my potential departure from the organization. I was left on the call for fifteen minutes
without either Stacey or Fred. No e-mail or text had mentioned cancellation of the call, while in fact, both Fred and
Stacey had asked for the call to occur this evening.

On the first call, I gave Fred and Stacey an opportunity to argue to me why I should not depart the
organization without the negotiation of an amicable agreement for my departure. They had none to offer. They
asked for more time to think about what an agreement might look like, and wanted to schedule a call for this
evening. I clarified for them what it would mean for me to be forced to leave the organization without an
agreement, given that I currently assist in raising half of the organization's annual revenue, and given that I carry
out program and grant-related work.

I continue to believe that such an agreement is in the best interest of CELDF, as well as any future
work. I have no wish to leave the organization under conditions which will affect the work of CELDF, or any future
work. I reiterated that on the earlier call with Fred and Stacey.

As I relayed above, even though Fred and Stacey both asked for a second call to talk about that
agreement, **they never appeared on the call or gave me notice that the call was not happening.**

Not only that, but Stacey did not include me on the e-mail sent around earlier, despite the fact that I am
still an unquestioned officer (President) of the organization.

From my vantage point, Stacey and Fred are out of their element here. Tough negotiations are one
thing; fleeing the negotiation table, with the stakes as they are, is quite another.

If there is anyone else who would like to step forward to negotiate an amicable departure and agreement,
I would welcome the opportunity to talk. I, too, would like to close out this chapter in a way that is satisfying to
everyone involved.

For now, organizationally speaking, here is the situation. Stacey's actions in attempting to appoint two
new board members to CELDF's board have created a situation in which the board's identity has been
questioned. An effort to hire a **third party independent lawyer** ended abruptly when Fred suggested an
unqualified attorney (who handles dog bite and other personal injury cases), and when unable to get that attorney
hired, then **reversed position** and explained that he didn't think a third party independent attorney was
necessary.

He then said **"the organization is running just fine without a board."**

21

The only problem with that is legally, state and federal law **require** that the organization have a board of directors. Specifically, Pennsylvania law requires that the organization have a legally responsible board of directors at all times, which is capable of making legal and fiduciary decisions. **This is Law 101.**

Because there has (disingenuously) been a decision not to move forward with a third party independent lawyer, even after agreement by Tammy and Ed to do so (even to the point of saying, let's put qualified lawyers in a hat and draw one out), there's only one other option to pursue.

That option means using **Chapter 55, section 5793** of the Pennsylvania Statutes dealing with nonprofit corporations. It authorizes a declaratory judgment action to be brought against an officer or board member when it is alleged that the officer or board member has exceeded his/her powers pursuant to the Articles of Incorporation and/or Bylaws for the organization. This would mean a declaratory judgment filed against Stacey as a Defendant (as the appointer of the new board members) and against the claim by the new potential board members for their seating on the board. For legal reasons, it may also require naming the two potential new board members, as any remedy delivered within the contours of that action will have to operate against them. The law gives the power to bring that particular lawsuit to anyone "affected" by the challenged actions.

That is, at this point, **the only way to resolve the current situation**, unless (1) a third party independent legal opinion is agreed to, the board agrees to be bound by the decision of that third party, or (2) Stacey acknowledges that her appointments were not legally done pursuant to the Bylaws, and withdraws those appointees. Either of those would make legal action unnecessary.

There is simply no other option under the law, except to operate with a paralyzed board, which is, in itself, **illegal under Pennsylvania law.**

As we discussed on the prior board call, most lawyers who have reviewed the situation have arrived at the conclusion that Stacey did not have the authority to appoint board members pursuant to the **Board's own Resolution giving that power to the Executive Committee**, and for various other reasons listed explicitly within the Bylaws under which the current corporation is operating. In attempting to appoint Board members, Stacey is running afoul of the very Board Resolution that she assisted the Board of Directors to adopt, thus undermining the authority of that larger body, the Executive Committee.

I see no need for a third party legal opinion, for those reasons (I think the law is clear) but given Stacey's unwillingness to reasonably resolve this situation, I support the hiring of a qualified corporate attorney to deliver an opinion which is binding on all parties. I have no doubt that he/she will return an opinion which establishes the three current board members as the validly operating board.

I have no wish to destroy the organization that I created and helped to build. I have no wish to "threaten" that as an option. What I do have is the wish to be treated fairly, and to have it acknowledged that my current value to the organization means that it is in the best interests of the organization to arrive at a settlement with the organization concerning my potential departure. As long as I remain with the organization, **I have a fiduciary, officer, and legal counsel duty** to ensure that the organization is acting pursuant to Pennsylvania law. While I hope it does not come down to filing the lawsuit, it is the only option that Fred and Stacey have produced, simply by eliminating all other options. They have thus put the organization in peril; because once a lawsuit is filed, word will circulate to donors and other supporters of the unstableness of the Legal Defense Fund.

After all, who wants to give money to an organization unable to determine who its own decisionmakers are?

In my personal opinion, neither Stacey or Fred have any business running an organization, let alone a nonprofit corporation. It's as if they think that by simply ignoring the situation, that it will somehow conveniently go

away.

In short:

Doing nothing here is simply not an option.

Refusing to get on a call is not an option.

Refusing to understand the legal and true situation that currently exists is not an option.

Saying "no" to everything that could resolve the situation is not an option.

So, again, if there are any adults in the room who care about the future work of the Legal Defense Fund, and would like to work to hammer out an agreement that allows that work to move forward in a way that is amicable and productive, my cell phone number is 717-729-2271.

Best,

Thomas

**Thomas Alan Linzey, Esq., Senior Counsel**

**Community Environmental Legal Defense Fund (CELDF)**

**P.O. Box 360**

**Mercersburg, Pennsylvania 17236**

**(717) 498-0054**

**www.celdf.org**

**info@celdf.org**

*"Calling ourselves environmentalists without advocating for the rights of nature would be like living in the 1840's, and calling ourselves abolitionists without talking about the rights of slaves."*

23

# Exhibit K

## Board Resolution

**Whereas**, on May 14, 2019, the Board of Directors of the Community Environmental Legal Defense Fund (CELDF) adopted a reorganization plan for the organization. The plan included accepting the resignation of the organization's Executive Director, Thomas Linzey, while also approving the organization's continuing working relationship with Mr. Linzey. The plan also included constituting an Executive Committee to carry out the day-to-day management of the organization; and

**Whereas**, in September 2019, the Executive Committee asked this Board to put the reorganization plan on hold to allow the organization first to engage in a substantive strategic planning process, to include examining our mission, goals, objectives, organizational management and structure, and strategies; and

**Whereas**, it is the sense of the Board that divisions between Mr. Linzey and others in the organization make it impossible to tend to either reorganization or strategic planning without first tending to Mr. Linzey's stated desire to depart the organization on amicable, negotiated terms; and

**Whereas**, the Board finds that given recent actions and ambiguities concerning the composition of this Board and appointments thereto, it is necessary to stabilize the organization by appointing an Executive Director, so the Board can tend to Mr. Linzey's departure, and then tend to reorganization and strategic planning, without distraction;

**Therefore**, the Board of Directors of the Community Environmental Legal Defense Fund resolves to amend the May 14, 2019, Resolution with the following:

1. Sections 3 to 6 of the May 14, 2019, Resolution are hereby rescinded.

2. Section 8 of the May 14, 2019, Resolution is rewritten entirely to now read: That an interim committee of five CELDF individuals be created to carry out the day-to-day management of CELDF while the organization undertakes substantial strategic planning, not to exceed a period of fourteen (14) months, with those five to be the Executive Director (or in the event of a vacancy in the Executive Director position, the Managing Attorney), the National Organizing Director, the Associate Director, the Communications and Outreach Director, and the National Administrative Director. The group shall meet twice a week to discuss organizational issues, and while the group shall strive for consensus on decisions, if consensus cannot be reached, binding decisions shall be made by majority vote. The Executive Director shall make organizational decisions in between the meetings of the committee, as needed. The committee may make decisions via electronic mail as needed.

3. The Board hereby appoints _____ to serve as Executive Director of the organization for a period of fourteen (14) months from the date of this resolution, effective immediately. The Board and _____ shall negotiate a contract for the salary called for by the Bylaws and other terms as required by both parties. The Executive Director shall carry out all duties of Executive Director called for by the Bylaws of the organization, and shall serve on the Executive Committee provided for by paragraph 2 above.

Signed this _____Day of October, 2019

_____

Tammy Belinsky, Chair

_____

Ed Wells, Director

_____

Fred Walls, Director

Authenticated By:

_____

Stacey Schmader, Secretary

# Exhibit L
 Gmail

Kira Kelley <kakelley436@gmail.com>

---

## Appointment as Executive Director

1 message

---

**Thomas Alan Linzey, Esq.** <tal@pa.net>                                    Mon, Dec 2, 2019 at 11:25 AM
To: celdf-staff-internal <celdf-staff-internal@googlegroups.com>
Cc: Edward Wells <ewells@wilson.edu>, Tammy Belinsky <tambel@hughes.net>, Fred Walls
<lockhartandfriends@gmail.com>

Greetings CELDF Staff,

Two items of note:

First, at last night's board of directors' meeting (12/1), the Board formally accepted Dan Brannen's resignation as
Executive Director.

Second, and also at last night's board of directors meeting, the Board then appointed me as Executive Director, by a
unanimous vote, and I agreed to the appointment.

As we work through the next several weeks, I will be contacting each of you individually to talk about next steps.

-Thomas

**Thomas Alan Linzey, Esq., Senior Counsel**

**Community Environmental Legal Defense Fund (CELDF)**

**P.O. Box 360**

**Mercersburg, Pennsylvania 17236**

**(717) 498-0054**

**www.celdf.org**

**info@celdf.org**

*"Calling ourselves environmentalists without advocating for the rights of nature would be like living in the 1840's, and calling
ourselves abolitionists without talking about the rights of slaves."*

**NOTICE: This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional responsibility, and the workproduct doctrine, by virtue of this client's engagement of the Community Environmental Legal Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this communication to render those services to the client pursuant to that engagement.**

--
You received this message because you are subscribed to the Google Groups "CELDF staff internal" group.
To unsubscribe from this group and stop receiving emails from it, send an email to celdf-staff-internal+unsubscribe@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/celdf-staff-internal/006101d5a92d%242914a920%247b3dfb60%24%40pa.net.

# Exhibit M

> invited the previously approved members to join the board.  Please
> provide an explanation.
>
>
>
> Fred, Ed and I had a Board meeting last week.  In addition to
> affirming the two board members who should already be serving, we
> voted to rescind the raise approved for Emelyn in early September and
> to refer the matter to the Financial Committee where the request
> should have been vetted instead of with the Board.
>
>
>
> Please include this message in the Board meeting minutes.
>
>
>
> Tammy Belinsky
>
>
>
> ---------------------------------------------------------------------
>
> *From: *"Stacey Schmader" <stacey@celdf.org <mailto:stacey@celdf.org>>
> *To: *"Fred Walls" <lockhartandfriends@gmail.com
> <mailto:lockhartandfriends@gmail.com>>, "Edward Wells"
> <ewells@wilson.edu <mailto:ewells@wilson.edu>>, "Tammy Belinsky"
> <tambel@hughes.net <mailto:tambel@hughes.net>>, "kat walter"
> <kat@volksmail.com <mailto:kat@volksmail.com>>, "Dave Leeger"
> <daveleeger@hotmail.com <mailto:daveleeger@hotmail.com>>
> *Cc: *"Thomas Alan Linzey, Esq." <tal@pa.net <mailto:tal@pa.net>>
> *Sent: *Monday, September 30, 2019 4:52:09 PM
> *Subject: *Board Appointments
[Quoted text hidden]
> www.celdf.org <http://www.celdf.org>
[Quoted text hidden]

---

**Stacey Schmader** <stacey@celdf.org>                    Mon, Sep 30, 2019 at 11:01 PM
To: "Thomas Alan Linzey, Esq." <tal@pa.net>
Cc: Tammy Belinsky <tambel@hughes.net>, Fred Walls <lockhartandfriends@gmail.com>, Edward Wells
<ewells@wilson.edu>, kat walter <kat@volksmail.com>, Dave Leeger <daveleeger@hotmail.com>

Dear Board Members,

I'm writing to clarify two points on the process here.

First, Thomas did not appoint Merrily Mazza and John Olivas to the Board
prior to his resignation as Executive Director (resignation approved by
the Board on May 14).

Thomas emailed me and Mari on May 25 stating "We need to fill out the
board. Attached is my suggestion for new board members, which I would
propose circulating to the current board." Attached to that email was
the "Proposals for the Addition of New Board Members.docx" that Tammy
just circulated. (I'll forward this May 25 email to you subsequently)

Thomas again emailed me on June 11 with the same attachment saying "This

is ready to go - suggestion of adding Merrily and John to the board of directors." (I'll forward this email as well)

The Board accepted Thomas' resignation as Executive Director on May 14. As of June 11, Thomas was still suggesting adding Merrily and John to the board. Clearly, Thomas had not - as he now alleges - "previously appointed Merrily Mazza and John Olivas to the Board of Directors prior to my resignation as Executive Director." If he had done so, he wouldn't have been circulating their bios as "Proposals for the Addition of New Board Members" almost a month after resigning.

Second, while the President (Thomas) is responsible for cultivating a pool of Board candidates, the Bylaws do not limit who can be appointed to the Board. While the Bylaws task the President with "responsib[ility] for developing the Board of Directors and creating a pool of qualified candidates to serve as Directors," the Bylaws do not then require appointment of Board Members from that pool. Any argument to the contrary is making up language that does not exist in the Bylaws.

Kat and Dave, as sitting board members, must be included in all Board of Director emails, or emails from Officers to the Board of Directors.

Thank you

Stacey

Stacey Schmader
Financial Officer
CELDF
PO Box 360
Mercersburg, PA 17236
717-498-0054
www.celdf.org



This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional responsibility, and the work product doctrine, by virtue of this client's engagement of the Community Environmental Legal Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this communication to render those services to the client pursuant to that engagement.

[Quoted text hidden]

---

**Thomas Alan Linzey, Esq.** <tal@pa.net>
To: Stacey Schmader <stacey@celdf.org>
Cc: Tammy Belinsky <tambel@hughes.net>, Fred Walls <lockhartandfriends@gmail.com>, Edward Wells <ewells@wilson.edu>

Tue, Oct 1, 2019 at 2:14 AM

CELDF Board Members,

I'm sending this to the existing CELDF Board, as I don't believe that the two members that Stacey is attempting to appoint have been appointed properly pursuant to the Bylaws.

To argue that there is a process for creating a "qualified pool" of Directors, and then argue that appointments can be done outside of that process, is nonsensical, and from a legal perspective, simply does not bear scrutiny.

As for John and Merrily's appointment to the board, Stacey is well aware that John and Merrily's name had previously circulated to the Board, and that the bios for those Board members had been requested by individual Board members themselves. This is evidenced by the *Board's vote at the most recent Board meeting to seat Merrily and John*.

I cannot see this as anything else than a naked power grab by Stacey to seize control of the board. Along with her unusual request for a salary increase, her positioning of her friend Emelyn for a salary increase – outside of the processes of the internal system that she herself helped to establish – and other abnormalities, including not consulting the Board about appointees that she has attempted to "shotgun" without even communicating with the Board; and urging a halt in seating new board members (apparently so that she could "appoint" her own) that have emerged since I resigned as Executive Director, I fear for the future of the organization at this point. I have begun working with our primary donors to apprise them of the immediate situation, and if it continues, will advise them that their donations are better used elsewhere. They constitute half the operating budget of this organization.

Stacey is incapable of continuing in this role. I would suggest that the Board act to re-establish a proper role for her in the management system, and recognize the Board as responsible for selecting and managing new Board members.

This is the final email that I will send to the existing board on this situation. I hope that it is remedied soon.


-Thomas




**From:** Stacey Schmader [mailto:stacey@celdf.org]
**Sent:** Monday, September 30, 2019 8:02 PM
**To:** Thomas Alan Linzey, Esq. <tal@pa.net>
**Cc:** Tammy Belinsky <tambel@hughes.net>; Fred Walls <lockhartandfriends@gmail.com>; Edward Wells <ewells@wilson.edu>; kat walter <kat@volksmail.com>; Dave Leeger <daveleeger@hotmail.com>
**Subject:** Re: Board Appointments




Dear Board Members,

[Quoted text hidden]
[Quoted text hidden]

10/24/2019, 5:16 PM

# Exhibit N

 **COMMUNITY ENVIRONMENTAL LEGAL DEFENSE FUND**

# BOARD & STAFF

The CELDF board and staff are composed of dedicated individuals whose mission is the protection of communities and nature and the advancement of community rights.

## CELDF STAFF

**Thomas Linzey, Esq., Executive Director**. Thomas is a co-founder of the Community Environmental Legal Defense Fund and serves as chief legal counsel. Contact: **info@celdf.org (https://web.archive.org/web/20191006133855/mailto:info@celdf.org)** and 717-498-0054

**Stacey Schmader, Administrative Director and National Democracy School Director**. Stacey is a co-founder of CELDF. She administers the Democracy School program and is CELDF's financial officer. Contact: **stacey@celdf.org (https://web.archive.org/web/20191006133855/mailto:stacey@celdf.org)** and 717-498-0054

**Mari Margil, Associate Director**. Mari runs our international program, working in Nepal, India, Australia, and other countries to advance the Rights of Nature. She also leads CELDF's outreach and development efforts. Contact: **mmargil@celdf.org (https://web.archive.org/web/20191006133855/mailto:mmargil@celdf.org)** and 717-498-0054

**Ben Price, National Organizing Director**. Ben leads our organizing nationwide. Before moving into the national director position, he led our work across Pennsylvania, where over 100 communities have enacted CELDF-drafted laws. Ben is a Democracy School lecturer. Contact: **benprice@celdf.org (https://web.archive.org/web/20191006133855/mailto:benprice@celdf.org)** and 717-254-3233

**Emelyn Lybarger, Communications and Outreach Director**.  Emelyn leads our donor and foundation outreach, and coordinates CELDF communications, including our website and social media. Contact: **emelyn@celdf.org (https://web.archive.org/web/20191006133855/mailto:emelyn@celdf.org)**.

**Chad Nicholson, Pennsylvania Community Organizer**. Chad joined our staff in 2010, after working with Envision Spokane. He now lives and organizes in Pennsylvania, assisting communities to engage in rights-based organizing to protect themselves from harmful corporate activities. Contact: **chad@celdf.org (https://web.archive.org/web/20191006133855/mailto:chad@celdf.org)** and 207-541-3649

**Kai Huschke, Northwest and Hawaii Community Organizer**. Kai is a board member of Envision Spokane and is working to organize other communities in Washington, Oregon, and Hawaii. Contact: **kai@celdf.org** **(https://web.archive.org/web/20191006133855/mailto:kai@celdf.org)** and 509-607-5034

**Tish O'Dell, Ohio Community Organizer**. Tish co-founded the grass-roots organization in Broadview Heights, OH, that successfully campaigned to adopt a Home Rule Charter amendment creating a Community Bill of Rights banning shale gas drilling and fracking. Contact: **tish@celdf.org** **(https://web.archive.org/web/20191006133855/mailto:tish@celdf.org)** and 440-838-5272

**Michelle Sanborn, New Hampshire Community Organizer**. Michelle co-led the effort to protect her hometown of Alexandria, NH, from industrial wind turbines through a Community Bill of Rights Ordinance, which was adopted by her community in 2014. Michelle is organizing across New Hampshire and supporting the work of the New Hampshire Community Rights Network, building a statewide network of communities to expand our grassroots organizing and move our organizing framework to the state level. Contact: **michelle@celdf.org** **(https://web.archive.org/web/20191006133855/mailto:michelle@celdf.org)** and 603-524-2468

**Lisa Kochheiser, OHCRN Coordinator**.  Lisa is helping expand our grassroots organizing, community education, and outreach across Ohio.  Contact: **lisa@celdf.org** **(https://web.archive.org/web/20191006133855/mailto:lisa@celdf.org)**

# CELDF BOARD OF DIRECTORS

## Tammy Belinsky, Esq., Virginia
Attorney, The Environmental Law Group, PLLC

## Fred Walls, Pennsylvania
Retired Dairy Farmer
Former Board Member of Friends and Residents of St. Thomas Township

## Edward Wells, Pennsylvania
Professor and Chair of Environmental Studies, Wilson College

# BOARD OF ADVISORS

## Kenny Ausubel, CEO & Co-Founder, **Bioneers**
**(https://web.archive.org/web/20191006133855/http://www.bioneers.org/)** (New Mexico)

Kenny Ausubel is an award-winning social entrepreneur, author, journalist, and filmmaker.  He is the CEO and Co-Founder of Bioneers, a nationally recognized nonprofit dedicated to disseminating practical and visionary solutions for restoring Earth's imperiled ecosystems and healing our human communities.  Ausubel launched the annual National Bioneers Conference in 1990 with his producing partner and wife, Nina Simons, Bioneers Co-Founder.

His work has been recognized by the Buckminster Fuller Institute's Challenge Award as well as awards from the Rainforest Action Network and Global Green, among others. He serves as executive producer and co-writer of the award-winning annual radio series, "The Bioneers: Revolution From the Heart of Nature," which airs on 500 U.S. outlets and 60 more in 12 other nations. He co-founded the company Seeds of Change, the first national organic seed company dedicated to "backyard biodiversity."

Ausubel has produced several documentary films including the award-winning feature documentary film*Hoxsey: How Healing Becomes a Crime*. The movie played theatrically and garnered the highest viewer response at the time it aired on HBO and later on Bravo. The film had a special screening for members of Congress at the Kennedy Center. He founded and operates Inner Tan Productions, a visionary film development company. He acted as a central advisor to Leonardo DiCaprio on his feature documentary*The 11th Hour*, and appears in the film.

Ausubel has written several books – *Dreaming the Future: Reimagining Civilization in the Age of Nature*(2012); *When Healing Becomes a Crime: The Amazing Story of the Hoxsey Cancer Clinics and the Return of Alternative Therapies* (2000); *The Bioneers: Declarations of Interdependence* (1995); and *Seeds of Change: The Living Treasure* (1994).

## Spencer Beebe, Founder, Ecotrust

(https://web.archive.org/web/20191006133855/http://www.ecotrust.org/) (Oregon)

Spencer Beebe is a fourth generation Portlander with a lifetime commitment to wilderness and new approaches to conservation, social justice, and development – both domestically and internationally. Mr. Beebe spent 14 years with The Nature Conservancy before creating Conservation International with 50 others in 1987. In 1991, he founded Ecotrust to bring global perspectives on rain forest conservation to the temperate rain forest bioregion of North America. He chairs Ecotrust and Ecotrust Forest Management, Inc. In his book Cache, Mr. Beebe shares stories from a 40-year adventure exploring new ways to integrate social, economic, and ecological well being. In the Foreword to Cache, Tom Brokaw wrote, "His pilgrimage is a journey to be relished and emulated, a commitment to be encouraged and shared, a life to be honored."

## Anneke Campbell, Writer, producer, and activist (California)

Anneke Campbell has worked as a midwife, nurse, yoga teacher, college teacher of English, and writer in a number of genres. She has won awards for poetry, journalism and a television script. She writes and co-produces videos for environmental and social justice organizations, and co-wrote with Thomas Linzey a manual for activists,*Be The Change: How To Get What You Want in Your Community*. In 2010, she edited an anthology on women's leadership: *Moonrise: The Power of Women Leading from the Heart*. She works as a community activist in Los Angeles and is completing doctoral studies at the California Institute for Integral Studies, researching models for participatory leadership towards sustainability.

# Leila Conners, Tree Media

(https://web.archive.org/web/20191006133855/http://www.treemedia.com/)(California)

Leila Conners founded Tree Media Group in August 1996.  With a background in international politics, Leila set out to build a production company that creates media to support and sustain civil society by telling inspiring stories. Currently, Leila is writing and directing *We the People 2.0* about nature rights, and directing the short film on climate, *Last Hours*.  Her longtime project, *Into Eden*, is about how we can change our society and ourselves in the face of disintegrative forces that threaten everything from the biosphere to our economic system.

Leila most recently produced a documentary film on the explosion of urban farming in Detroit called *Urban Roots*. Leila's first feature-length documentary, The *11th Hour*, was co-created with Leonardo DiCaprio.  The film included 54 leading thinkers and scientists about the state of the world and the state of the human condition.  She has written two short films with Leonardo DiCaprio on the environment called *Global Warning* and *Water Planet*, and a feature film script for Ridley Scott's Scott Free Productions on the state of the oceans. Leila has also been published in newspapers and magazines around the world including the*International Herald Tribune, Los Angeles Times, Yomiuri Shimbun,* and *Wired Magazine*, among others.  Projects over the last 10 years with Tree Media Group include work with the Council on Foreign Relations, NASA, JPL, Norman Lear, Green Cross International, Harvard University, and Hollywood studios, among others.  Her article on "Death and American Culture" was published in *War, Media and Propaganda*, published by Rowan and Littlefield.

Prior to Tree Media, Leila was Associate Editor of *NPQ/New Perspectives Quarterly*, an international journal of social and political thought, and Associate Editor of Global Viewpoint of the Los Angeles Times Syndicate, an internationally distributed op-ed column that reaches 200 papers.  At NPQ, she interviewed thinkers and policy makers including: Kofi Annan, Nafis Sadik, Betty Friedan, Hans Bethe, Rigoberta Menchu Tum, and Boutros Boutros Ghali, among others.  She is now Editor-at-Large for *NPQ*.  In 1991, Leila translated Jacques Attali's book from the French for Random House entitled, *Millennium*.  Leila is often invited to speak on issues of sustainability and the environment and has served on panels nationally and internationally.

# Josh Fox, Director, *Gasland*

# *(https://web.archive.org/web/20191006133855/http://www.hbo.com/doc* (New York)

Josh Fox (born 1972) is an American film director and environmental activist, best known for his Oscar-nominated 2010 documentary, *Gasland*.  He followed that up with the HBO production of *Gasland Part II*, which premiered on July 8, 2013.  In addition to these films, he is one of the most prominent public critics of hydraulic fracturing, also known as "fracking."  In February 2012 he was arrested during a U.S. House of Representatives subcommittee hearing on hydraulic fracturing when he attempted to videotape the proceedings.  Fox graduated from Columbia University in 1995.

**Karenna Gore**, Director, **Center for Earth Ethics**
**(https://web.archive.org/web/20191006133855/https://centerforearthethics.or**
(New York)

Karenna Gore is the founding director of the Center for Earth Ethics (CEE)at Union Theological Seminary. The Center for Earth Ethics bridges the worlds of religion, academia, politics and culture as we discern and pursue the changes that are necessary to stop ecological destruction and create a society that values life. Before founding CEE, Ms. Gore worked as the director of Union Forum at Union Theological Seminary, where she helped organize Religions for the Earth, a conference of over 200 religious and spiritual leaders from around the world, with the goal to reframe climate change as a moral issue and galvanize faith-based activism to address it.

Ms. Gore's previous experience includes work as a lawyer at Simpson Thacher & Bartlett and in the legal center of Sanctuary for Families, as well as serving as director of Community Affairs for the Association to Benefit Children (ABC). She has also worked as a writer and is the author of Lighting the Way: Nine Women Who Changed Modern America. Ms. Gore is a graduate of Harvard College, Columbia Law School and Union Theological Seminary. She lives in New York City with her three children and serves on the boards of the Association to Benefit Children (ABC) and Riverkeeper.

# **Jerry Greenfield**, Co-Founder of **Ben & Jerry's Ice Cream**

**(https://web.archive.org/web/20191006133855/http://www.benjerry.com/)** (Vermont)

Jerry Greenfield and his long-time friend and business partner Ben Cohen are the men behind one of the most talked about and least conventional success stories in American business.  Co-founder of Ben & Jerry's Homemade, Inc., Greenfield has helped to build a store front venture into an ice cream and business marvel by making social responsibility and creative management strengths, rather than weaknesses.

Greenfield was born four days before his future business partner in Brooklyn, New York.  He grew up and went to school in Merrick, Long Island.  It was there that he first met Cohen in junior high school.  After graduating from high school with a National Merit Scholarship under his belt, Greenfield enrolled at Oberlin College.

In 1976, he moved in with Cohen and the two decided to pursue their dream of starting a food business together. They eventually settled on ice cream, and in May 1978, opened Ben & Jerry's Homemade ice cream parlor in Burlington, Vermont.

Today a model for American business success, Greenfield and Cohen have been recognized for fostering their company's commitment to social responsibility by the Council on Economic Priorities and by the U.S. Small Business Administration.  They have also received the James Beard Humanitarians of the Year and the Peace Museum's Community Peacemakers of the Year Awards.

Today, Greenfield's official title at the company is Co-Founder.  He is involved in promoting the social and environmental initiatives that Ben & Jerry's undertakes.  He is also President of the Ben & Jerry's Foundation.

## Randy Hayes, Founder, Rainforest Action Network

**(https://web.archive.org/web/20191006133855/http://ran.org/)**(Washington, D.C.)

Randy Hayes has been described in the *Wall Street Journal* as "an environmental pit bull." He is Executive Director of Foundation Earth, a new organization fostering the big rethink to help protect the planet's life support systems. This requires a new human order, including economic models for deep long-term sustainability, earth jurisprudence, eco-technology policy, biospheric literacy, and environmental health. Hayes calls for a "True Cost Economy" that accounts for ecological externalities and honors carrying capacity limits. Hayes, a former filmmaker, is a veteran of many high-visibility corporate accountability campaigns and has advocated for the rights of indigenous peoples throughout the world. He served for five years as president of the City of San Francisco Commission on the Environment, and for two-and-a-half years as director of sustainability in the office of Oakland Mayor Jerry Brown (now governor). Hayes founded Rainforest Action Network and is emeritus on the board of directors. He is an advocate of general systems theory and deep ecology. As a wilderness lover, Hayes has hiked and camped in the rainforests of the Amazon, Borneo, Central Africa, Southeast Asia, and Australia, as well as the High Sierras and the Canadian Rockies.

Hayes has an undergraduate degree from Bowling Green State University and a Master's degree in Environmental Planning from San Francisco State University. His master's thesis, the award-winning film*The Four Corners*, won the Academy of Motion Picture Arts and Sciences award for "Best Student Documentary" in 1983. He contributed to *Alternatives to Economic Globalization: A Better World is Possible*, published by San Francisco: Berrett-Koehler Publishers, Inc., in 2004. Not satisfied with short-term thinking, his 500-year plan offers a vision of a sustainable society and how to get there. Randy Hayes was honored by his corporate campaign activists peers in 2008 with an Individual Achievement Award, given by the Business Ethics Network. In 2010 he was San Francisco State University's Alumni of the Year and inducted in the Alumni Hall Fame. Additionally, he was one of the original set of inductees in the National Environmental Hall of Fame.

## Derrick Jensen, Author

**(https://web.archive.org/web/20191006133855/http://www.derrickjensen.org/)**, *Endgame* and *A Language Older Than Words* (California)

Hailed as the philosopher poet of the environmental movement, Derrick Jensen is author of twenty-two books, including *A Language Older Than Words, The Culture of Make Believe, and Endgame*. He was named one of *Utne Reader's* "50 Visionaries Who Are Changing Your World." His book *Thought to Exist in the Wild* won the Eric Hoffer Award and was second place in the Animal category of the Independent Press IPPY Awards. In 2008, he led Press Action's "Dynamic Dozen" and in 2006 he was the Press Action Person of the Year. He writes for *Orion, Audubon*, and *The Sun Magazine*, among many others. He holds a degree in creative writing from Eastern Washington University, a degree in mineral engineering physics from the Colorado School of Mines, and has taught at Eastern Washington University and Pelican Bay State Prison. He has packed university auditoriums, conferences, and bookstores across the nation, stirring them with revolutionary spirit.

## Jeremy Kagan, Filmmaker (California)

36

Jeremy Kagan is an internationally recognized director/writer/producer of feature films and television, and a tenured professor. Some of his feature credits include the box-office hits *HEROES*, the political thriller *THE BIG FIX*, *THE CHOSEN* from Chaim Potok's classic novel (2 time Grand Prize winner),and *THE JOURNEY OF NATTY GANN* (Gold Prize Moscow Film Festival). Among his many television shows are*KATHERINE: the Making of an American Revolutionary*, and HBO's *CONSPIRACY: THE TRIAL OF THE CHICAGO 8* (ACE Award for Best Dramatic Special). His film *ROSWELL,THE UFO CONSPIRACY* garnered a Golden Globe nomination and he directed the pilot for the popular series *DR. QUINN: MEDICINE WOMAN*. Other television films include, for Showtime *COLOR OF JUSTICE* about racism, *BOBBIE'S GIRL* about a lesbian couple, and *CROWN HEIGHTS* about the 1991 riots in Brooklyn which won the NAACP Outstanding Television Movie Award and the Humanitas Award for "affirming the dignity of every person." Kagan has won an EMMY for Dramatic Series Directing, and directed *West Wing* and Steven Spielberg's *Taken*. He has made films for The Doe Fund, which is the most successful program in America helping the homeless, for The Bioneers which organizes leaders in ecology and social justice, and TreePeople. Professor Kagan teaches graduate courses at the University of Southern California in directing, and has created the Change Making Media Lab, which has made projects on cancer prevention, obesity and ADHD. Kagan has served as the Artistic Director of Robert Redford's Sundance Institute, serves on the National Board of the Directors Guild, and is Chairperson of its Special Projects serving its 15,000 members. His books *DIRECTORS CLOSE UP, Vol. 1 & 2*, are published by Scarecrow Press. A Graduate Fellow of the American Film Institute, he has an M.F.A. from NYU and a B.A. from Harvard University. He has taught master seminars on filmmaking in Hong Kong, Hamburg, Hanoi, France, Lebanon, Israel, Ireland and India, and written an ebook on his near death experience called *MY DEATH: A Personal Guidebook*. He and his wife Anneke Campbell have made videos for the Community Environmental Legal Defense Fund.

## Winona LaDuke, White earth reservation anishinaabe akiing
(https://web.archive.org/web/20191006133855/http://whiteearth.com/)

Winona LaDuke is an Anishinaabekwe (Ojibwe) enrolled member of the Mississippi Band Anishinaabeg who lives and works on the White Earth Reservations, and is the mother of three children. She is also the Executive Director of Honor the Earth, where she works on a national level to advocate, raise public support, and create funding for frontline native environmental groups. In 1994, Winona was nominated by *Time*magazine as one of America's fifty most promising leaders under forty years of age. She was awarded the Thomas Merton Award in 1996, the BIHA Community Service Award in 1997, the Ann Bancroft Award for Women's Leadership Fellowship, and the Reebok Human Rights Award with which she began the White Earth Land Recovery Project. A graduate of Harvard and Antioch Universities, Winona has written extensively on Native American and environmental issues. She is a former board member of Greenpeace USA and serves as co-chair of the Indigenous Women's Network, a North American and Pacific indigenous women's organization. In 1998, *Ms.* Magazine named her Woman of the Year for her work with Honor the Earth. She is the author of six books, including *The Militarization of Indian Country* (2011), *Recovering the Sacred: the Power of Naming and Claiming* (2005), the non-fiction book *All our Relations: Native Struggles for Land and Life* (1999, South End Press), and a novel – *Last Standing Woman* (1997, Voyager Press).

## Jules Lobel, Former President, Center for Constitutional Rights
(https://web.archive.org/web/20191006133855/http://ccrjustice.org/)

Professor Jules Lobel is the Bessie McKee Wathour Endowed Chair at the University of Pittsburgh School of Law.

Lobel co-authored the award winning book *Less Safe, Less Free: Why America is Losing the War on Terror* (2007), with Professor David Cole, which won the first Roy C. Palmer Civil Liberties Prize for exemplary scholarship exploring the tension between civil liberties and national security. He is also the author of *Success without Victory: Lost Legal Battles and the Long Road to Justice in America* (2003), and editor of several books on civil rights litigation as well as the U.S. Constitution.

He has authored numerous articles on international and constitutional law in publications including *Yale Law Journal*, *Harvard International Law Journal*, *Cornell Law Review*, *University of Pennsylvania Law Review* and *Virginia Law Review*. Lobel's article, *Preventive Paradigm and the Perils of Ad Hoc Balancing*, was selected by Oxford University Press as one of the Top Ten Global Justice Law Review Articles in 2007.

Lobel is the recipient of the University of Pittsburgh Chancellor's Distinguished Public Service Award (2002), and the Chancellor's Distinguished Teaching Award (1993). In 2006, he received the Allegheny County Bar Foundation's Career Achievement Award for Pro Bono Service, and in 2001 he was named by the School of Law as a Distinguished Faculty Scholar.

Lobel has also testified on various occasions before Congressional committees, most recently on the issue of the constitutional allocation of war powers before a subcommittee of the House of Representatives Foreign Affairs Committee. He advised the Nicaraguan government on the development of its constitution, and has also advised the Burundi government on constitutional law issues. He has participated in various human rights delegations abroad, including being named the sole U.S. participant in a delegation consisting of prominent European former diplomats and human rights scholars to Israel.

Lobel is former President of the Center for Constitutional Rights, a national human and constitutional rights organization headquartered in New York City. He has litigated numerous cases involving Constitutional and Human Rights issues in United States courts and has represented members of Congress challenging various Presidents' – both Democrat and Republican – assertions of executive power to unilaterally initiate warfare. Lobel has been involved in various cases challenging aspects of U.S. policy toward suspected terrorists, including *Rasul v. Bush*, arguing for habeas corpus rights for Guantanamo detainees, *Arar v. Ashcroft*, seeking damages for a Canadian citizen who alleged that he was wrongfully rendered to Syria to be tortured by high U.S. officials, and *Holder v. HLP*, a Supreme Court case challenging aspects of the material aid to terrorism statute as violative of the First Amendment. In all of these cases, Lobel involved his students in the litigation, giving them firsthand exposure to the constitutional litigation of important and complex issues.

## **John Olivas**, Environmental Activist/Organizer; Executive Director, **Collaborative Visions** **(https://web.archive.org/web/20191006133855/http://ourmora.org/visit-mora/local-resources/collaborative-visions/)** (New Mexico)

John Olivas is the Executive Director of Collaborative Visions in Mora, New Mexico. He organizes cooperatives to establish local sustainable economic development entrepreneurs in his community. He also spends some of his time as a grassroots organizer/activist working to conserve federally owned public land as Wilderness or other

conservation measure. In 2013 he was part of a coalition that led the effort to create the Rio Grande Del Norte National Monument which includes the Rio Grande Gorge in Taos County, New Mexico. John is currently working with a coalition to expand the Pecos Wilderness in north central New Mexico within the Santa Fe and Carson national Forests.

From January 1, 2010 – December 31, 2014 John sat on the board of the Mora County Commission. As Chairman, John Championed the first county wide fracking ban. At the time, it was the first countywide fracking ban in the United States banning industry from oil gas extraction within its borders. In late 2014 the ordinance was challenged in federal district court and ruled invalid. A new county commission came in and repealed the ordinance in early 2015.

## Jim Sheehan, Founder, **Center for Justice**

(https://web.archive.org/web/20191006133855/http://www.cforjustice.org/)(Spokane, Washington)

Jim Sheehan graduated from Santa Clara University in 1966. He then served for three years as an officer in the United States Army, attended Gonzaga Law School, and worked for more than twenty years as a public defender in Eastern and Western Washington until he received a windfall inheritance. He decided that, in this next unexpected chapter of his life, he would put his money to work for the greater good. In 1999, he founded the Center for Justice, a nonprofit law firm dedicated to protecting human rights, alleviating poverty, preserving the earth, and holding the government accountable to the principles of democracy. In addition, he also restored the old Saranac Hotel in downtown Spokane, which became the first LEED Platinum certified building in the region. Additionally, he renovated the Community Building, the Main Market Co-op, and the Saranac Commons in order to provide affordable, beautiful homes for area nonprofit offices and small businesses in downtown Spokane. Despite all these accomplishments, Jim feels most lucky to have a healthy, supportive family, including his daughter Katy, his son Joe, and his partner Mary.

## Douglas Shields, President & Member, **Pittsburgh City Council**

(https://web.archive.org/web/20191006133855/http://pittsburghpa.gov/council/)(2004-2011)

During his tenure on Pittsburgh's City Council as a staffer and Member (1992-2011), he was recognized for his expertise on government financing, land use and zoning, legislative writing ability, and taking on social issues few others would.

He introduced and enacted laws on matters such as domestic violence within the city police force, prevailing wages for service workers on city funded projects, protection from harassment at women's reproductive health facilities, reporting of lost/stolen firearms, and an LGBT registry to help facilitate same-sex benefits for the private sector.

In August 2010, he introduced a CELDF-drafted Community Rights Ordinance in the Council. On November 16, 2010, with a unanimous 9-0 vote, it became law, banning shale gas drilling in Pittsburgh – the first place in the world to do so.

39

Today, Doug is a consultant, an adjunct professor, and a dedicated activist in the fight to move away from fossil fuels to sustainable energy.  He's also appeared in Josh Fox's films, *The Sky Is Pink* and *Gasland Part II*.


## John Stauber, Founder, **Center for Media and Democracy**
**(https://web.archive.org/web/20191006133855/http://www.prwatch.org/books/tsigfy.html)**
(Wisconsin)

John Stauber has worked for over forty years as an independent organizer, investigative writer, author, and democracy activist.  In 1993, Stauber created the Center for Media and Democracy (CMD) to expose the business of organized propaganda.  He ran CMD for 16 years raising funding for the organization, hiring and managing staff, editing and writing hundreds of articles, and co-authoring six books.  John now lives off-the-grid in Wisconsin's sublime Driftless Region clinging to his Green Bay Packer tickets and passport, addicted to his digital devices, and enjoying his chainsaw, sauna, and sea kayak.


## Bill Twist, President, **The Pachamama Alliance**
**(https://web.archive.org/web/20191006133855/http://www.pachamama.org/)**(California)

Bill Twist is a co-founder of The Pachamama Alliance (TPA) and its President since TPA's inception in 1996.  TPA is a non-profit organization based in San Francisco, USA, that works on rainforest preservation and indigenous rights in the western Amazon basin and also on global social transformation.  TPA is the creator of the Awakening the Dreamer Symposium and the UP to US Initiative, both global efforts to bring about a socially just, environmentally sustainable, spiritually fulfilled human presence on this planet.  Bill has also been active in international efforts to build a Rights of Nature movement and currently serves on the steering council of the Global Alliance for the Rights of Nature.

Bill has a background in business, having worked in management consulting and later in the financial services and investment banking fields from 1969 until 1995.  Bill has a bachelor's degree in engineering from Stanford University and a Master's degree in business administration from Northwestern University.

---

Posted on August 4, 2015 (https://web.archive.org/web/20191006133855/https://celdf.org/about-celdf/celdf-board-staff/)   Updated on August 8, 2019   Print this page
(https://web.archive.org/web/20191006133855/https://celdf.org/about-celdf/celdf-board-staff/)

 **Exhibit O**

**CELDF COMMUNITY ENVIRONMENTAL LEGAL DEFENSE FUND**

# CONTACT

*If your community needs help, please contact us now.*

## MAIN OFFICE

Community Environmental Legal Defense Fund
P.O. Box 360
Mercersburg, PA 17236

(717) 498-0054

info@celdf.org

## PRESS CONTACT

Mari Margil
mmargil@celdf.org
(503) 381-1755

## KEY CONTACTS

Thomas Linzey, Executive Director: **info@celdf.org (mailto:info@celdf.org)** and 717-498-0054

Stacey Schmader, Administrative Director and National Democracy School Director: **stacey@celdf.org (mailto:stacey@celdf.org)** and (717) 498-0054

Mari Margil, Associate Director: **mmargil@celdf.org (mailto:mmargil@celdf.org)** and 717-498-0054

Ben Price, National Organizing Director: **benprice@celdf.org (mailto:benprice@celdf.org)** and 717-254-3233

Kai Huschke, Northwest and Hawaii Organizer: **kai@celdf.org (mailto:kai@celdf.org)** and 509-607-5034

12/9/19, 9:43 PM

Chad Nicholson, Pennsylvania Organizer: **chad@celdf.org (mailto:chad@celdf.org)** and 207-541-3649

Tish O'Dell, Ohio Organizer: **tish@celdf.org (mailto:tish@celdf.org)** and 440-838-5272

Michelle Sanborn, New Hampshire Organizer: **michelle@celdf.org (mailto:michelle@celdf.org)** and 603-524-2468

Posted on August 4, 2015 (https://celdf.org/about-celdf/contact/)   Updated on September 30, 2015       Print this page (https://celdf.org/about-celdf/contact/)

# Exhibit P

  

## Hartmann Show  Inbox

 **Thomas Alan Linzey, Esq.** Sep 4
to Emelyn, Markie, me



Emelyn,


FYI, the Thom Hartmann show contacted me earlier today about appearing on Thom's national nightly show to talk about the Ohio Chamber of Commerce/LEBOR stuff. I told them that it would likely be better to have someone from Toledo, so I've connected them to Thom's producer. The segment would either be taped tomorrow or Friday. I'm cc:ing both Markie and Crystal on this e-mail.


Best,


Thomas


**Thomas Alan Linzey, Esq., Senior Counsel**

**Community Environmental Legal Defense Fund (CELDF)**

**P.O. Box 360**

**Mercersburg, Pennsylvania 17236**

**(717) 498-0054**

www.celdf.org

info@celdf.org

# Exhibit Q

Board Conference Call 10/29/19

Attending: Dan, Thomas, Fred, Ed, Tammy, Stacey

Agenda

1. Retain Cheshire
2. May 14th Resolution amendment vote – remove 3-6, amend 8
3. Appoint ED – Dan


Tammy – for minutes, state that the Cheshire Law group has given advice that the appointments by Stacey were not valid. Cheshire has not been hired by the board, just talked to CELDF. Gave them a $5k retainer – less than $1,500 spent thus far.

Fred – should we hire them to represent the board/organization?

Tammy – this is the way they put it, that they would work for the organization. This is there area of expertise. Karen Hoffman found them. They are perfectly qualified.

Fred – will we need them when and if we move forward

Tammy – this is on the agenda tonight. Also on the agenda is resolution for Thomas to leave organization.

Fred – what all will they do? If we have a question, we take it them if we can't resolve?

Tammy – severance – interest is that it be transparent – having a 3rd party look at it will help with the stability of the process.

Fred – who will negotiate with severance

Tammy – Dan to serve temporarily as ED and the ED could do some of this work. Cheshire wants every board member input. Cheshire wants each of the boards signatures, not sure what they were told to make them do this.

Fred – severance approved by the board and then Cheshire to say it is legal, etc

Tammy – they can give advice on whether or not it is legal. The purpose is to get their advice, but we can disagree with their advice. We will have this issue with the bylaws too. Governing an organization by committee may not be okay under PA law. We have intended to do this, but there is a question as to whether or not this is legal under PA law. Still governed by committee unless it is not allowed by law. We will need assistance to help us do that.

Fred – we all agree that we want celdf to survive

Tammy – absolutely

Tammy – what to tackle first, Agree to hire Cheshire. Circulate the letter for them to sign via electronic signature.

Fred – agree with Cheshire representing celdf

Tammy – all to sign electronically and respond – check to see if they are okay if it comes separately or if all signatures need to be on one document.

Vote to retain Cheshire – Motion by Fred to hire Cheshire to represent CELDF and board – Ed 2nd , all in favor.

Prosed resolution to temporarily appoint Dan as ED

Fred – how long? 14 months, with EC?

Tammy – yes, both there

Fred – he is already on the EC?

Tammy – yes, ED, Nat Org Dirc, Comm Dire, Admin Dire, Asso Dire

Fred – question – can a committee run instead of appointing Dan? Can we ask Cheshire first? Before appointing him?

Tammy – good question. Some things have already come up concerning this. Thomas flagged a potential problem with the law.

Thomas – specifically, committees have to have a BOD member on the committee. Only the ED can make binding decisions. Specific section dealing with committees established by the board.

Tammy – having an ED could solve this problem?

Tal – maybe, EC is advisory to the degree that the board wants, binding with ED and then presents to the board

Fred – take Dan off of EC, and appoint Board member to the committee

Tal – not necessarily needed, b/c the EC would have to need board approval anyway. Cheshire is needed to navigate this. ED is the direction we need to travel.

Tammy – The ED is where the buck stops and without that then the committee is not lawful unless there is a board member on the committee to be present for binding decisions.

Tal – band aid – EC – advisory only unless there is a board member on the committee and then the Board ratifies the decisions  – difference between governing and managing. Need Cheshire to look at everything. To be lawful under the nonprofit act, needs to appoint ED to be legal. Bridge decision – need something in place that comes in alignment and then take the 14 months to bring it closer in alignment.

Fred – Board will have final say over ED, correct?

Tal – final soverign authority over all decisions.

Tammy – do things need to be made more clear? Staff will ask

Fred – yes, for those of us who are not attorneys and who have not read the nonprofit code

Tammy – clause in here about the board being engaged in substantive issues or as needed? Does it help guide over the next 14 months? Example: administrative decision made that the EC would give the ED guidance?

Dan – Recent example – Michelle S, NH organizer, express and desire to do work in ME and the EC considered it and made the decision to approve that request. Managerial decision that the BOD would not want to be part of. Difference between governance and managerial.

Appointment of the ED can't supercede any of the boards authority under the act. Board asking the EC to deal with the day to day management of the organization. The EC has been doing this already and that there is a need to have an ED for some things. The recent story around appointing board members is another example. The way the bylaws are written there is a question around the secretary can appoint and whether they have to be appointed by the pool.

Tammy - any other questions? Or anything needed to be added to the resolution?

Fred - I would like to see board members to be approved for a candidate for board members

Tammy - next order of business to deal with this. Do we have to agree on a process, set of bylaws or both in order to get the board recruitment process going. This may be something for our next call. We may need Cheshire for this.

Tal - my departure stuff is first. b/c I don't think these decisions can be made with my current position.

Tammy - come back to bylaws and structure of organization. Thomas leaving and bylaws.

Fred - makes sense to work on these two together? What happens? Thomas is president of organization and will he still be president?

Tammy - do you want to be president?

Tal - no, doesn't want to be president. Memo will deal with both President and Senior Counsel role departure

Tammy - any other questions about this resolution

Fred - thinks Dan should be the ED over the next 14 months and work with Stacey and board on issues and the EC would help as well

Dan - that is the idea  - idea is to get past Thomas' departure - work as a whole organization on what doesn't the LDF want to look like and do moving forward. The appointment would be immediate and would not have anything to do with Thomas' departure. The point is that it is temporary and to allow an ED act as a bridge between where we are now and where we plan to get to over the next 14 months.

Fred - willing to stay on as the managing attorney too?

Dan - would be necessary to hire someone from the current attorneys to take over the managing of the attorneys, can't do both

Fred - what about after the 14 months

Tammy - 14 months is the bridge - organization put to a test during this time period. Not telling where things will be in 14 months

Fred - can it be done in 14 months?

Tammy - we will have to work hard to make this happen. Feel that it is a need to say out loud, not going to discount Stacey's interest in being ED, not discounting this at all, just need to stabilize. Would be wholeheartedly in favor of Stacey pursuing career development in this direction. Anything I can do to correct any bad feelings, perfectly willing to discuss this. Non

judgmental as well. Don't judge people and thick skinned. And would like to do whatever we need to do to fix this.

Fred – timeframe for Thomas' departure?

Thomas – as soon as humanly possible, with caveaut that Cheshire review separation / settlement agreement. 3-4 pages, not a lot of moving parts, but big decisions need to be made

Fred – Back to the question of ED, managing attorney, should the managing attorney be on?

Tammy – what about this?

Dan – as written it is a 5 person committee. The managing attorney would only serve in the case of the vacancy of the ED. The bylaws require the ED to be an attorney, supervising the managing attorney and kept up to speed on what the attorneys are doing.

Fred – thought he was on twice, but now I understand

Fred – making a motion to adopt this resolution, Ed 2nd, all in favor

Stacey – sending around via snail mail to all members to get signatures and using today's date

Tammy – what is the process of dealing with Thomas? Thomas to us first then formulate questions and then going to the lawfirm?

Tal – finished this week or early next week. Draft settlement agreement to the board for review and then need to decide if you want a call with me first and then come to the next draft, then send to Cheshire, their role is to make sure this is legal. Meeting of the minds between me and the board.

Fred – plain language?

Tal – 4 parts – make sure it is understood, creating a new organization, collaborative, no disparagement, amicable, celdf honoring on going commitments, part about my commitments, assisting celdf with the work, resign as pres and senior council, financial resources from celdf to new organization.

Fred – set a time to meet after seeing the proposal. One problem, Pat and I leave for Cowan's gap state park on Friday – no signal zone – 6 weeks. Reception not good. May not get back in a timely fashion.

Tammy – schedule a time to talk to give enough time for the email and to discuss this information? Can't be available until Thursday anyway b/c of the election. Next call – November

Thomas to have draft out by Friday – Call next Thursday, November 7th at 5pm EST.

Dan – if the board wants me on the call, I'm available.

Board wants him on the call.



# Exhibit R

Stacey Schmader <stacey@celdf.org>

---

## Conversation with Thomas on Monday
15 messages

---

**Stacey Schmader** <stacey@celdf.org>                     Thu, Oct 24, 2019 at 9:30 AM
To: Fred Walls <lockhartandfriends@gmail.com>, kat walter <kat@volksmail.com>, Dave Leeger
<daveleeger@hotmail.com>, Edward Wells <ewells@wilson.edu>, Tammy Belinsky <tambel@hughes.net>

Hello Everyone,

It is my duty as an officer of this organization to inform you about a conversation that Fred and I had with Thomas on
Monday. I have excluded Thomas from this email as this information directly pertains to him.

On Monday, Thomas, Fred and I had a conference call at 7pm EST. Thomas had requested the call to discuss his
"amicable departure" from the organization. Instead, Thomas chose to open the conversation with a question to Fred
and I. That question is as follows:

Why wouldn't I, given what transpired over the last month and belief celdf is stuck in the mud, why not take the
existing funders and do the work that needs to be done, help Tammy sue the board – burn all of celdf existing
funders? Money question – needs to be sweet enough – cash reserve or existing funders.

While this quote is from my notes and this not exact, I checked with Fred and he confirmed that this is what he
heard Thomas say.

I believe the board needs to know about this as it is a direct threat to the organization. The board needs to take
action against this threat by an officer of CELDF.

Stacey

Stacey Schmader
Financial Officer
CELDF
PO Box 360
Mercersburg, PA 17236
717-498-0054
www.celdf.org



This communication is confidential, and exempt from disclosure, under the attorney-client privilege, the rules of professional
responsibility, and the work product doctrine, by virtue of this client's engagement of the Community Environmental Legal
Defense Fund for legal services and other related services, and the Community Environmental Legal Defense Fund's use of this
communication to render those services to the client pursuant to that engagement.

---

**Edward Wells** <ewells@wilson.edu>                       Thu, Oct 24, 2019 at 10:13 AM
To: Stacey Schmader <stacey@celdf.org>

Hi Stacey:

# Exhibit S

November 6, 2019

TO: CELDF Board Members Tammy Belinsky, Fred Walls and Ed Wells; Stacey Schmader

FROM: Malinda Clatterbuck, Simon Davis-Cohen, Will Falk, Karen Hoffmann, Kai Huschke, Crystal Jankowski, Kira Kelley, Lisa Kochheiser, Terry Lodge, Markie Miller, Chad Nicholson, Tish O'Dell, Ben Price, Michelle Sanborn, Lindsey Schromen-Wawrin

SUBJECT: CELDF Staff and Attorney recommendations for negotiation of departure agreement with Thomas Linzey

========================================================================

We, CELDF staff, organizers and attorneys, state below our positions relative to the forthcoming negotiation by CELDF of a proposed departure arrangement with Thomas Linzey, as announced in Tammy's October 31 email to the staff.

We recommend a slow, deliberative process to negotiate a departure agreement with Thomas. The Cheshire firm should have meaningful time to review and advise the Board. The Board must not finalize an agreement with Thomas without thorough advice and discussion, especially discussion outside of Thomas's presence. Tammy announced that the Board will "consult" with Cheshire Law Group, but the Board should instead *authorize Cheshire to negotiate on CELDF's behalf.*

There should be no conflicting roles manifested by Thomas and the Board. All members of the Board are enjoined by Article III, § 3 of CELDF's Bylaws to "avoid the appearance of any impropriety or potential conflict of interest" with CELDF as an entity. The Bylaws state that a "substantial conflict" is one that "prevents, or seriously interferes with, the exercise of objective or impartial decision-making by a Board member." Thomas is simultaneously CELDF's President, with attendant fiduciary responsibilities, and claims to be counsel to the organization, all of which precludes negotiating on his own behalf the financial terms of his departure. Tammy is presently acting as some sort of unofficial legal advisor to the Board while also being a member of it. Upcoming Board deliberations over any proposal should take place without Thomas' presence, perhaps by invoking the power for the Board to meet in executive session.

From what we know of Thomas's intentions through the original May 2019 Resolution, he aims to establish a new, competing organization to CELDF, tasked to promote the rights of nature and local democracy initiatives. He's been actively disparaging CELDF and threatening to take CELDF donors with him. He attempted to cripple CELDF's organizing program. He's been organizing with the Florida group since LEBOR passed in February, and is planning a RON Conference in February, all with no communication about either to CELDF board or staff organizers. It's not at all clear what good would come from creation of a neo-CELDF organization. It would seem to duplicate the existing CELDF mission, fragment and confuse existing and potential donors, touch off potentially damaging competition between CELDF and

Page 1 of 3

neo-CELDF, and confuse citizens we serve who seek organizing and litigation assistance for democracy building and the rights of nature. CELDF is simply not responsible for supporting or funding a competitor organization. The Board's priority obligation is to protect CELDF, not to provide Thomas with the means of competing head-to-head with CELDF.

Blessing Thomas' departure with a cash parachute will possibly contradict the purposes for which those funds were originally donated to CELDF, which was to achieve certain organizing and/or litigation aims, not to finance a departure arrangement that reinvents and rebrands the wheel. The Board may possibly be committing a breach of its fiduciary responsibilities by even considering such an arrangement. CELDF's ability to continue to seek support from its present donors may be seriously crippled by the publicity in the foundation world of such an agreement. CELDF, not Thomas, would be blamed for violating the spirit and/or legal, donative intention that came with those contributions.

Aside from the question of the legality and ethical responsibility to funders, it is important to remember that the co-founders of CELDF have no personal proprietary claim to the financial resources or property of the organization. It would seem to violate the board's duties for the board to treat those resources as if the founders own them, or some portion thereof. A departure agreement with Thomas might be appropriate, but a deal to split the organization, with some other significant percentage for Thomas and the rest for everybody else, would be ludicrously unjust on its face.

In regards to the upcoming settlement agreement in the Grant case and the ongoing Pennsylvania disciplinary board hearing against Thomas, given CELDF's commitment to back its lawyers, it is still incumbent on the Board to assess the economics and set aside monetary resources to cover that obligation. The Board must work with Cheshire (or other independent legal counsel) to be given a complete understanding of what is financially at stake for CELDF, what specific items would be paid by CELDF, and what say CELDF has in any proposed resolution of it. The Board also must acquire a thorough understanding of what is at stake for CELDF because CELDF's image may also suffer when the expected sanctions resolution becomes public knowledge. The likelihood of public discipline of Thomas also must be assessed because that relationship between CELDF and Thomas could continue for some time to come and may involve a trial-type process and the expense certainly must be identified (and the possibilities should have been identified and money earmarked and budgeted before now).

In this instance, as well as throughout this process, the Board and the organization should hold Thomas to the same standards as any staff member, officer, contract employee, or client. CELDF must respect the autonomy of each contributor to the community rights movement. This means supporting each other with care and deliberation wherever possible, but ultimately allowing each of us to embrace the risks inherent in meaningful organizing.

There must be language in the departure arrangement covering future solicitation of existing and prospective donors, particularly if there is no restriction on Thomas' taking donors with him. Those terms should include detailed disclosure by Thomas, in writing, of what contacts

Page 2 of 3

he has already made with CELDF donors, including any electronic or other communications he has made. The Board must have a comprehensive understanding of whether disparagement of CELDF may have already taken place. CELDF would gain nothing from a proposal that places no limitation, by time or identity, on donors Thomas may solicit. If there is no protection of funding sources to which CELDF may lay claim, essentially unrestricted competition between the organizations is clearly contemplated and that should be a factor in deciding how much compensation Thomas is owed for his departure. Any agreement in which CELDF pays a large sum to Thomas in exchange for no guarantees would be a sham agreement, and a sham agreement would have implications for the adequacy of the Board's discharge of its fiduciary responsibilities.

The Board has the power to remove Thomas from his officer role as President and to also end Thomas' employment. Doing so would impose effectively no limits on Thomas, if he wishes to compete with CELDF, so there is certainly good cause to consider an agreed departure. But any agreement with Thomas should provide more benefit to CELDF than what CELDF would achieve if he were simply dismissed by the Board. Certainly, an agreed departure should not be *worse* for CELDF; that defeats the entire purpose of negotiating.

It bears noting that there is no bylaw authority for *any* departure proposal. Even assuming some arrangement is desirable from the standpoint of CELDF, we are very concerned that the continued existence of CELDF might well be at stake in negotiations, due to previous comments made by Thomas to Stacey and other staff, and that its importance may be downplayed. CELDF's ongoing relevance militates in favor of cautious Board deliberations with the full participation of independent counsel retained by CELDF.

And CELDF staff should be informed of the deliberations as they proceed. Despite considerable turmoil caused to CELDF by this too-prolonged parting of the ways, the work of the organization continues to get done, and will be ongoing. The hands of the organizers must be "untied" to include the ability to work with existing and new communities as CELDF's interaction with its many citizen communities must remain as the utmost focus and priority for the Board. Ironically, after the whole staff agreed to no new organizing last fall (a proposal that Thomas made), Thomas appears to be the only staff person who has violated that organizational policy with his new work in Florida. The staff must have, at the very least, assurances of stopgap budgeting for 2020, including money dedicated to legal/organizing in the core states, as well as litigation.

We request commitment by the Board to recurring meetings with the staff to discuss the status of negotiations. The Board and Thomas should agree that the terms of Thomas' departure will not be resolved in a week, or even, possibly, within a month. We urge the Board, with active leadership from Cheshire, to take the time to reach an agreement that protects CELDF's interests, not only Thomas.' The Board should not discuss any terms with Thomas and should promptly authorize Cheshire to negotiate his departure.

Page 3 of 3



**Exhibit T**

Michelle Sanborn <michelle@celdf.org>

---

## Attorney and Staff Concerns

**Kira Kelley** <kakelley436@gmail.com>                                                         Tue, Nov 12, 2019 at 9:25 AM
To: lockhartandfriends@gmail.com, Edward Wells <ewells@wilson.edu>, Tammy Belinsky <tambel@hughes.net>, Malinda Clatterbuck
<malinda@celdf.org>, Will Falk <falkwilt@gmail.com>, Terry Lodge <tjlodge50@yahoo.com>, Karen Hoffmann <karen@syrenalaw.com>,
Tish O'Dell <tish@celdf.org>, Chad Nicholson <chad@celdf.org>, Michelle Sanborn <michelle@celdf.org>, Lisa Kochheiser
<lisa@celdf.org>

Hello CELDF Board of Directors,

The attorneys and staff who signed the letter sent to you on November 6th remain concerned about the considerable risks that Thomas's departure and
surrounding negotiations might pose to the rules of law and ethics. Lack of transparency over the past year surrounding leadership transitions and
governing structure has sown mistrust into our relationships with each other. We believe fervently in the movements we're building and in the theory
of change that this organization advances. Let's apply those principles, of relationship-building and bottom-up leadership, of making fully informed
decisions based on compassion and logic, and of putting the needs of the community above all else. Assuming that this letter will be discussed at the
next board meeting, will you let those who signed it know when you will be meeting so that we may participate in this conversation?

With gratitude for your commitment to the work we do.

Kira Kelley, Malinda Clatterbuck, Will Falk, Karen Hoffmann, Lisa Kochheiser, Chad Nicholson, Tish O'Dell, Michelle Sanborn, Terry Lodge

# Exhibit U

**BOARD STATEMENT OF NOVEMBER 22, 2019**
**Community Environmental Legal Defense Fund, Inc.**

After struggling to resolve various organizational and management issues which have plagued CELDF, CELDF's Board of Directors unanimously voted to initiate dissolution proceedings under Pennsylvania law to dissolve the nonprofit corporation, at a board meeting held on November 20, 2019. The dissolution resolution envisions that some of CELDF's assets, remaining after its debts and obligations are satisfied, may be distributed to support the work of the National and State-based Community Rights Networks (CRN's).

Since May 2019, a significant portion of the staff have worked to defeat efforts by the Board to reach an agreement with departing co-founder, Thomas Linzey. Such an agreement would have allowed for an amicable departure and continued operation of CELDF. The Board considered the cost of such an agreement the cost of goodwill. Without that agreement, there is no goodwill and it is the Board's belief that CELDF simply cannot survive the consequences. Combined with other organizational and management issues, it is the Board's conclusion that dissolution of CELDF and the reinvigoration of the CRN's is in the best interest of the organization.

Dan Brannen, who tendered a resignation from the ED position at the Board meeting, has now had time to see the Board's Resolution, to which he was not privy beforehand. Because he finds the Resolution to be a reasonable plan under CELDF's unfortunate circumstances, he has reconsidered and now agreed to serve as both the Managing Attorney and the ED through the dissolution process. The Board also decided that Thomas Linzey will continue to serve as General Counsel through December 31, 2019, to assist the Board and Dan with the dissolution process.

The Board is committed to distributing assets to the CRN's as soon as possible so that organizing work may continue. Addressing CELDF's outstanding litigation commitments will take more thought and planning, as the dissolution process unfolds.

Now that the Board of Directors has initiated dissolution for the nonprofit corporation, no new debts or obligations may be incurred by the organization. This means that no new representation or engagement agreements will be entered into, and no new fundraising can occur that commits CELDF to doing new work.

The Board will be taking further actions over the coming months to effectuate the dissolution process.

###

# Exhibit V

Subject: Fwd: Re: CELDF - authority re court review
To: Stacey Schmader <stacey@celdf.org>


Hello Stacey-- Here is the whole thread. The portion with the 5 points is in the middle.

I consider emails with Cheshire to be privileged communications, so I am not sending them to Thomas, who is on the other side of this deal. I would appreciate you treating them as privileged too.

Thank you. --Dan

-------- Forwarded Message --------
Subject: Re: CELDF - authority re court review
   Date: Tue, 12 Nov 2019 13:03:31 -0700
   From: Daniel E Brannen Jr <dbrannen@brannenlawllc.com>
     To: Morgen Cheshire <morgen@cheshirenonprofitlaw.com>
    CC: Lisa Muench <lisa@cheshirenonprofitlaw.com>, Tammy Belinsky <tambel@hughes.net>,
       lockhartandfriends@gmail.com <lockhartandfriends@gmail.com>, ewells@wilson.edu <ewells@wilson.edu>


Hello Morgen-- Thank you for the clarification on the AG issue. As you know, if CELDF requests the AG opinion, makes the transfer, and then later gets a negative opinion, that would be a mess for CELDF. I will speak with the Board about this.

On the Orhpan's Court issue, you are not saying CELDF needs Court approval currently, correct? You are saying, if there are any gifts to CELDF documented in writing now, to take place in the future, when that future arrives, CELDF might have to get approval to get those gifts?

Thank you. --Dan

On the On 11/12/2019 11:34 AM, Morgen Cheshire wrote:

Dan,


Sorry for the negative inference – I certainly didn't intend to insinuate that you would not have us do due diligence, or that the Board would not follow the steps outlined below.


To address your question, yes, it is our opinion and recommendation that in order to meet its fiduciary duties, CELDF's Board must at the very least write to the AG's office *requesting* a letter of non-objection. I think the circumstances here compel it and that the Board would be putting CELDF at more risk (and the Board would be breaching its fiduciary duties) if it did not so request it. Whether CELDF receives that letter of non-objection before the transfer is made is a different matter. As I noted, the timing issues can be explained to the AG. I hear what you are saying about CELDF's reputation and its exposure, but failure to disclose the transfer to the AG would only heighten that risk if the AG were to be informed about the transfer through some other source (e.g., if the lawyers for CELDF were to file a report and oppose the transfer and the AG were to open an investigation).


As we explained on our call, based on the authority below, the law actually requires CELDF to obtain Orphans' Court approval (and not AG approval) before making the transfer in order to preserve certain rights to future bequests, gifts and grants, but as we explained, in lieu of obtaining court approval, we believe that the Board may responsibly fulfill its compliance obligations at this time by writing to the AG's

office to explain the situation and the legal basis for the proposed transfer, and to request a letter of non-objection on the basis discussed below (and providing the requisite substantiation) – this would help the Board to fulfill its duties as close to the letter of the law as possible without incurring the time and expense that court approval would require.  As I explained on our Friday call, requesting the AG's letter of non-objection would be the first step to obtaining court approval anyway, and this approach of writing to the AG is a commonly accepted convention in PA, especially when there is a credible basis for arguing that a proposed transfer is not a diversion of property committed to charitable purposes for which they were granted.

I cannot advise, even in the face of the risks that you propose, that the Board members would be fulfilling their duties as fiduciaries if they proceed without notifying the AG of their proposed solution. In doing so, under the present facts and circumstances, I think they would put CELDF at more risk by failing to communicate with the AG's office.

I hope this is helpful, good luck with your meeting this evening and let us know how you'd like to proceed and if we can do anything more to assist with next steps.

Morgen

**MORGEN CHESHIRE | ESQ**



Historic Germantown

Clarkson-Watson House

5275 Germantown Avenue

Philadelphia, PA 19144

267-331-4157 ext 104

Visit our website!

Follow us on twitter!

*Cheshire Law Group is certified as a Woman-Owned Small Business (WOSB) by the Women's Business Enterprise National Council (WBENC).*

*This e-mail and any attachments it may have may contain confidential or legally privileged information. If you are not the intended recipient, please reply to this message to notify me that you believe that you received this*

*message in error, then delete it without reading it or forwarding it to others. Thank you.*

**From:** Daniel E Brannen Jr <dbrannen@brannenlawllc.com>
**Sent:** Tuesday, November 12, 2019 11:16 AM
**To:** Morgen Cheshire <morgen@cheshirenonprofitlaw.com>
**Cc:** Lisa Muench <lisa@cheshirenonprofitlaw.com>; Tammy Belinsky <tambel@hughes.net>;
lockhartandfriends@gmail.com; ewells@wilson.edu
**Subject:** Re: CELDF - authority re court review

Hello Morgen-- You and I seem to be having communication issues. As your firm repeatedly seems to
insinuate (in your email below and on our call last week) that I am asking you to write an opinion letter
for Thomas' proposed agreement without anything else. I am not.

On our call last week, you said that your firm's conditions for writing an opinion letter included: (1)
transfer must be to a 501(c)(3) or fiscal sponsor; (2) full disclosure to you and the Board of CELDF's
financial position; (3) full disclosure to you and the Board of donor letters to be sure there are no
restrictions that would prevent transfer; (4) the Board making its own determination of whether the
proposed deal is in CELDF's best interests based on all the information available to it. I will be speaking
with the Board today about these issues, and I imagine they will be entirely acceptable to the Board.

Your final condition was: (5) that CELDF ask the AG for an opinion. I am asking only whether your firm
absolutely requires this condition for you eventually opine that the Board, if it does everything else
above, has satisfied its fiduciary duties. Please understand a couple of things. First, CELDF is a
politically controversial entity in PA. The AG has sued townships to overturn laws CELDF helped with.
There is a political risk that asking the AG for an opinion letter about CELDF could backfire for CELDF,
and be turned into a political opportunity for the State to make trouble for an entity that is unpopular with
the State. I cannot recommend this step to the Board based on what you have said so far, that it might
be advisable, but is not absolutely legally required.

Second, you said the AG might never respond to a request for an opinion. CELDF is imploding. Lawyers
abandoned a Retreat. Staff sent a letter to the Board asking the Board to consider firing Thomas. This is
insubordination. The Board and I are trying to find a way to save CELDF, despite the implosion and
insubordination. Time is a factor here, not because we are trying to push something through for Thomas,
but because we are trying to avoid extreme solutions that we might eventually have to consider if we
cannot stabilize in the very near term.

I have a meeting with the Board today at 6pm eastern. If you can respond to this email before then, we
will have the information we need to consider next steps.

Thank you. --Dan

On 11/11/2019 9:00 PM, Morgen Cheshire wrote:

Hello Dan,

If you are asking our Firm to write an opinion letter that advises CELDF's Board that AG approval is not necessary, I am not sure that we can opine on that issue in a way that will ultimately be helpful to CELDF and its Board, either as an effective shortcut or expense-saving measure. An opinion letter could not be issued by our Firm without us first doing more due diligence. Additionally, the letter would have to provide a significant number of caveats. For this reason, writing an opinion letter would be considerably more expensive than would our drafting a letter to the AG. By writing to the AG, CELDF and its Board could significantly minimize its risk; conversely, by bypassing this step, CELDF and its Board increase the risk exposure (even if legal counsel drafts an opinion letter because an opinion letter is not an appropriate substitute for AG/court review if it is determined by the AG/court that the AG/court should have been given the opportunity to review the transaction). For these reasons, we believe the Board is very likely better off simply having us write to the AG disclosing CELDF's position that the transfer ought to be approved and requesting a letter of non-objection.

Keep in mind, too, that this proposed transaction could ultimately also be viewed as a *division*, which is another variety of a fundamental transaction that requires review and approval. The failure to obtain this review could have hidden implications for future gifts and grants to the organizations; and the cost of resolving those issues in the future would be much higher if AG approval is not obtained now.

At this present time, even if we assume the facts that you have presented are true, we are not in a position to draw the conclusion that AG (and court) review is not required. As I mentioned above, this transaction could be construed as a division, and the analysis is not as simple as it seems it should be, as you suggest below.

To respond to your first statement below - while a transfer of funds to another 501(c)(3) would presumably be for a charitable purpose, that's not the current proposal on the table. The new organization referenced in the draft agreement does not yet have its (c)(3) status, nor has it even been incorporated. Even if it did have its (c)(3) status (or used a fiscal sponsor to accept the funds in the interim), the analysis would not end there, as Lisa and I explained on our Friday call. The documents and correspondence accompanying the grants or gifts of funds to CELDF would all have to be reviewed so that CELDF can establish for the record that the funds were in fact transferrable and any restrictions would have to be addressed, and CELDF itself would have to set certain parameters or restrictions on the funds to help ensure that the funds would be used for the charitable purposes for which they were originally committed to CELDF.

Second, to opine on the issue of the amount also requires more inquiry. I would not feel comfortable looking simply at the assets without also considering: 1) the substantiation for the amounts; 2) CELDF's liabilities that would remain with CELDF (as well as CELDF's anticipated future liabilities as a result of the transfer); 3) whether goodwill is in fact being transferred under the circumstances here; and 4) the transfer of any of CELDF's other non-cash assets (such as funder relationships, contacts, and mailing lists, etc.).

Timing concerns aside, which can be addressed in correspondence with the AG, we see no real downside for CELDF (and its Board) to write to the AG's office seeking a letter of non-objection.


Morgen

**MORGEN CHESHIRE | ESQ**



Historic Germantown

Clarkson-Watson House

5275 Germantown Avenue

Philadelphia, PA 19144

267-331-4157 ext 104

Visit our website!

Follow us on twitter!


*Cheshire Law Group is certified as a Woman-Owned Small Business (WOSB) by the Women's Business Enterprise National Council (WBENC).*


*This e-mail and any attachments it may have may contain confidential or legally privileged information. If you are not the intended recipient, please reply to this message to notify me that you believe that you received this message in error, then delete it without reading it or forwarding it to others. Thank you.*


**From:** Daniel E Brannen Jr <dbrannen@brannenlawllc.com>
**Sent:** Monday, November 11, 2019 4:26 PM
**To:** Morgen Cheshire <morgen@cheshirenonprofitlaw.com>
**Cc:** Lisa Muench <lisa@cheshirenonprofitlaw.com>
**Subject:** Re: CELDF - authority re court review


Hello Morgen-- I am a bit confused now. First, transfering funds to a 501(c)(3) is clearly for a charitable purpose.

Second, "All or substantially all" must at a minimum mean more than half, and likely means well more than half. There is no possible rationale for less than half to be substantially all. In this case, CELDF would be transfering less then 30 %. CELDF is not transfering any good will at all. Thomas is departing, CELDF is not responsible for that.

Given this, is requesting an AG opinion that might never come through, and thus might never allow for release of the funds, an absolute requirement for your involvement? --Dan

On 11/11/2019 10:21 AM, Morgen Cheshire wrote:

Dan,

Good to talk with you, too.  Following up on your request below, see below for authority on the issue we raised on our Friday call. CELDF would want to argue that it is not transferring "substantially all" of its assets, nor "diverting [assets] from charitable purposes," and it should lay that position out in a letter to the Office of the Attorney General, explaining its reasoning and explaining this as the basis for why court review is unnecessary – and it should request that the AG's office issue a letter of non-objection.

The Office of Attorney General and the PA courts interpreting the statutory language below have taken a very broad view of what the phrase "committed to charitable purposes" means, and because "substantially all" has not been clearly defined in case law and can be a subjective measure (e.g., assets can include good will and relationships, etc., which are exceptionally hard to value), I would certainly not advise CELDF to proceed on counsel's review alone (especially not with the probable staff opposition that CELDF faces). Going through the Board review process as counsel advises, and having counsel review the transaction, and also requesting a non-objection letter from the AG, will be critical if CELDF wishes to proceed on solid legal footing and without court approval.  Failure to do so could lead to more legal costs, reputational risk, personal liability for Board members, and disputes about the efficacy of future bequests and gifts.  See below for relevant extracts from PA's Nonprofit Corporation Law.

I am happy to discuss this further once you have had a chance to review.

Morgen

**§ 5547.  Authority to take and hold trust property.**

(a)  **General rule.**--Every nonprofit corporation incorporated for a charitable purpose or purposes may take, receive and hold such real and

personal property as may be given, devised to, or otherwise vested in such corporation, in trust, for the purpose or purposes set forth in its articles. The board of directors or other body of the corporation shall, as trustees of such property, be held to the same degree of responsibility and accountability as if not incorporated, unless a less degree or a particular degree of responsibility and accountability is prescribed in the trust instrument, or unless the board of directors or such other body remain under the control of the members of the corporation or third persons who retain the right to direct, and do direct, the actions of the board or other body as to the use of the trust property from time to time.

(b) **Nondiversion of certain property.**--Property committed to charitable purposes shall not, by any proceeding under Chapter 59 (relating to fundamental changes) or otherwise, be diverted from the objects to which it was donated, granted or devised, unless and until the board of directors or other body obtains from the court an order under 20 Pa.C.S. Ch. 77 (relating to trusts) specifying the disposition of the property.

### § 5550.  Devises, bequests and gifts after certain fundamental changes.

A devise, bequest or gift to be effective in the future, in trust or otherwise, to or for a nonprofit corporation which has:

(1)  changed its purposes;

(2)  sold, leased away or exchanged all or substantially all its property and assets;

(3)  been converted into a business corporation;

(4)  become a party to a consolidation or a division;

(5)  become a party to a merger which it did not survive; or

(6)  been dissolved;

after the execution of the document containing the devise, bequest or gift and before the nonprofit corporation acquires a vested interest in the devise, bequest or gift shall be effective only as a court having jurisdiction over the assets may order under 20 Pa.C.S. Ch. 77 (relating to trusts) or other applicable provisions of law.

### § 5930.  Voluntary transfer of corporate assets.

(a) **General rule.**--A sale, lease, exchange or other disposition of all, or substantially all, of the property and assets, with or without goodwill, of a nonprofit corporation, if not made pursuant to Subchapter F of Chapter 3 (relating to

division), may be made only pursuant to a plan of asset transfer. The property or assets of a direct or indirect subsidiary corporation that is controlled by a parent corporation shall also be deemed the property or assets of the parent corporation for purposes of this subsection. The plan of asset transfer shall set forth the terms and consideration of the sale, lease, exchange or other disposition or may authorize the board of directors or other body to fix any or all of the terms and conditions, including the consideration to be received by the corporation. Any of the terms of the plan may be made dependent upon facts ascertainable outside of the plan if the manner in which the facts will operate upon the terms of the plan is set forth in the plan. The plan of asset transfer shall be proposed and adopted, and may be amended after its adoption and terminated, by a nonprofit corporation in the manner provided in this subchapter for the proposal, adoption, amendment and termination of a plan of merger. A copy or summary of the plan shall be included in, or enclosed with, the notice of the meeting at which members will act on the plan. In order to make effective any plan so adopted, it shall not be necessary to file any articles or other document in the department, but the corporation shall comply with the requirements of section 5547(b) (relating to nondiversion of certain property).

**MORGEN CHESHIRE | ESQ**



Historic Germantown

Clarkson-Watson House

5275 Germantown Avenue

Philadelphia, PA 19144

267-331-4157 ext 104

Visit our website!

Follow us on twitter!

*Cheshire Law Group is certified as a Woman-Owned Small Business (WOSB) by the Women's Business Enterprise National Council (WBENC).*

*This e-mail and any attachments it may have may contain confidential or legally privileged information. If you are not the intended recipient, please reply to this message to notify me that you believe that you received this message in error, then delete it without reading it or forwarding it to others. Thank you.*

-----Original Message-----
From: Daniel E Brannen Jr <dbrannen@brannenlawllc.com>
Sent: Friday, November 8, 2019 10:12 PM
To: Morgen Cheshire <morgen@cheshirenonprofitlaw.com>
Subject: Fundamental Change


Hello Morgen-- Good to talk to you today. Please send over the
Fundamental Change citation when you can. Thanks. --Dan


--

Daniel E. Brannen Jr.

Brannen Law LLC

3 Caliente Road, #5

Santa Fe NM 87508

telephone 505.466.3830

website www.brannenlawllc.com


Confidentiality Notice


The information contained in this electronic communication and any
document attached hereto or transmitted herewith is attorney-client
privileged, work product, or otherwise confidential and intended for the
exclusive use of the individual or entity named above. If the reader of this
message is not the intended recipient or the employee or agent responsible
for delivering it to the intended recipient, you are hereby notified that any
examination, use, dissemination, distribution, or copying of this
communication or any part thereof is strictly prohibited. If you have received
this communication in error, please immediately notify the sender by
telephone or reply e-mail and destroy this communication. Thank you.


--

Daniel E. Brannen Jr.

Brannen Law LLC

3 Caliente Road, #5

Santa Fe NM 87508

telephone 505.466.3830

website  www.brannenlawllc.com


Confidentiality Notice


The information contained in this electronic communication and any
document attached hereto or transmitted herewith is attorney-
client privileged, work product, or otherwise confidential and
intended for the exclusive use of the individual or entity named
above. If the reader of this message is not the intended recipient
or the employee or agent responsible for delivering it to the
intended recipient, you are hereby notified that any examination,
use, dissemination, distribution, or copying of this communication
or any part thereof is strictly prohibited. If you have received
this communication in error, please immediately notify the sender
by telephone or reply e-mail and destroy this communication. Thank
you.


--

Daniel E. Brannen Jr.

Brannen Law LLC

3 Caliente Road, #5

Santa Fe NM 87508

telephone 505.466.3830

website  www.brannenlawllc.com


Confidentiality Notice


The information contained in this electronic communication and any document
attached hereto or transmitted herewith is attorney-client privileged, work
product, or otherwise confidential and intended for the exclusive use of the
individual or entity named above. If the reader of this message is not the
intended recipient or the employee or agent responsible for delivering it to
the intended recipient, you are hereby notified that any examination, use,
dissemination, distribution, or copying of this communication or any part
thereof is strictly prohibited. If you have received this communication in

# Exhibit W

## CELDF Continues to Move Forward

Dear CELDF Board of Directors,

The undersigned CELDF staff see tremendous opportunity for our work to grow and expand in the United States and beyond.

The people that make up CELDF are effectively advancing the organization's mission to build "a movement for Community Rights and the Rights of Nature to advance democratic, economic, social, and environmental rights – building upward from the grassroots to the state, federal, and international level." CELDF staff have been achieving CELDF's mission, and we have the capacity and vision to do much more, if we can resolve the current impasse. Our mission is unique. No other organization is doing this work. We believe in the inherent Rights of Nature and Local Self Government, and we will continue to advance these rights in the communities and ecosystems we serve.

Undersigned staff have made this a boon year for the movement and for CELDF itself. The Lake Erie Bill of Rights, Denver's Right to Survive ordinance, seeing community rights advocates elected to city council in Colorado, introducing constitutional change in Pennsylvania, new law making and introduced constitutional change in New Hampshire, implementing law in Oregon, revising the Democracy School curriculum and offering two pilot classes, starting a new campaign and coalition in Washington, filing numerous legal briefs, defending basic democratic institutions like the local ballot process in Ohio, seeking to enforce the right of initiative as a federally-protected right, initiating legislative coalitions, creating promotional and educational videos with high production value, and numerous other developments have made 2019 a year to remember. We have achieved international and national notoriety like never before, and been featured in publications and productions like The New York Times, VOX, Democracy Now!, CNN, The Intercept, The Guardian, Le Monde, The Daily Show, CBC News, Mother Jones, Bloomberg, Salon, among numerous independent and local outlets. The undersigned staff and our community partners have catalyzed and shaped these efforts into meaningful change. We are dedicated to the principles we fight for: we live them in practice as well as theory, and we commit to growing this movement in the years to come.

The present turmoil within CELDF is hamstringing us from continuing this work and scaling up. Thomas is no longer fundraising for CELDF, actively undermining the effectiveness of CELDF, courting CELDF funders, and threatening to collapse CELDF if his demands are not met. In a normal situation Thomas would merely leave. Instead, his oppositional stance has created an unnecessary and volatile situation.

But there is a smart next step forward.

As mentioned, Thomas has already been interacting with funders in his own interest and against the interests of CELDF, and will be taking funders with him when he departs. It is in everyone's best interest for CELDF's work to continue and for this situation to resolve promptly. This means prioritizing CELDF's successful transition and retaining current staff so we can continue our work and expand it into new realms. Intelligently safeguarding CELDF through this transition is of the utmost importance and is the Board's legal responsibility.

CELDF's existing staff has advanced this work for decades and demonstrated the capacity to expand the reach to new audiences. (See staff bios below.) Our experienced organizing, legal, media, and fundraising capabilities will write the next chapter of the CELDF story. We recognize that you possess the authority to decide whether CELDF will remain in existence and we want you to know that we are eager and ready to continue this work. Thomas is perfectly welcome to walk; but an agreement with him is not necessary at this time.

We recognize and appreciate all the time and energy you have put into CELDF. The situation you are in, we see, is not enviable, and we appreciate your continued commitment. We ask that you take these vital actions regarding Thomas' departure with the utmost seriousness and commitment to what's best for this organization and ultimately this movement.

Respectfully,

**Simon Davis-Cohen** - Since coming on in May, Simon, an experienced investigative journalist, has developed a long term media strategy to assert CELDF's leadership on core issues like preemption and corporate rights, built media contacts, laid the groundwork for grassroots media campaigns, helped continue our blogging efforts, and gotten CELDF staff published in Common Dreams, The Ecologist, Truthout, The Guardian, PennLive, Earth Island Journal, In These Times, and Scalawag. Before joining CELDF he worked directly with CELDF staff like Gail Darrell to record lessons-learned essays, and covered CELDF's work in numerous media outlets including Fusion, The Nation, In These Times, Truthout, Common Dreams, DeSmogBlog, Jacobin, Earth Island Journal, and local outlets.

**Will Falk** - Will Falk, a lawyer, cut his teeth on rights of nature work when he helped to file the first-ever American federal lawsuit seeking rights for a major ecosystem, the Colorado River, in 2017. His book *How Dams Fall,* narrating his experiences with the lawsuit, was published in August, 2019. Will began helping CELDF in May 2018 with various research and writing projects. And, in March 2019, Will was assigned to assist CELDF's Ohio efforts. He has published many essays on Rights of Nature with platforms such as the San Diego Free Press, CATALYST Magazine, Canary Literary Magazine, Earth Island Journal, and the Deep Green Resistance News Service, among others.

**Malinda Harnish-Clatterbuck** - Malinda was introduced to CELDF's work through her work founding Lancaster Against Pipelines, which used non-violent civil disobedience to resist a transmission line. Malinda joined the executive board of the Pennsylvania Community Rights Network five years ago and has been promoting the work of Community Rights ever since. She

came on board working with CELDF two years ago, speaking alongside Chad Nicholson to communities and legislators throughout Pennsylvania, and helping build a coalition of support for a constitutional amendment for the Rights of Local Self Government, including allies in the House of Representatives who have introduced the amendment. Malinda has worked as a pastor, and demonstrated consistent and strong support for CELDF's work in her personal and professional lives. She has published with Earth Island Journal, and been featured in media venues on a national and international scale over the past few years.

**Karen Hoffmann** - Since joining CELDF in 2017, Karen, an attorney, has defended Grant Township's Home Rule Charter before the Commonwealth Court of Pennsylvania, as well as representing Grant  through its Third Circuit appeal and mediation of an attorney's fees judgment of more than $100,000, which resulted in a favorable settlement for the Township. She also worked with Pennsylvania organizer Chad Nicholson to help Todd Township draft an ordinance protecting the Rights of Nature and local self-government in the face of corporate factory farms.

**Crystal Jankowski** - A core community activist behind LEBOR and social justice organizer, Crystal has overhauled CELDF's social media strategy and presence online, works on special projects, and provides staff with artistic and technical assistance.

**Kira Kelley** - Since joining CELDF as a contract attorney in January 2018, Kira has defended Rights Based Ordinances across New Hampshire; appearing in court, at the State House, and before municipal boards. Kira has deep roots in activist networks all over New England, and incorporates the sentiments behind rights-based organizing into the work she does in her capacity as President of the Vermont National Lawyers Guild.

**Lisa Kochheiser** - Since learning about Community Rights six years ago, Lisa has helped start five Community Rights/Rights of Nature initiatives in Northwest Ohio, including in Waterville and Toledo. She is a founding board member of both the National Community Rights Network and the Ohio Community Rights Network. She helped write the NCRN's federal constitutional amendment, as well as OHCRN's two state constitutional amendments. Lisa helps document CELDF's history in real time, and recently wrote an article about the corporate state's opposition to Rights of Nature in Ohio, for Truthout. Her duties include fundraising and grant writing, organizing OHCRN's 2018 statewide conference, advancing Community Rights and Rights of Nature through graphic design, advertising, and writing on social media.

**Lindsey Schromen-Wawrin** - Lindsey, an attorney, has led and supported litigation for dozens of communities CELDF works with, blogged for CELDF, has published scholarly articles and presentations to lawyers, and is leading the drafting of CELDF's Community Rights Do-It-Yourself Guide to Local Lawmaking.

**Markie Miller** - A lead organizer and spokesperson for LEBOR, Markie works on grant writing and researching, communications with funders and supporters, and works on special projects. She is also an ambassador for the Lake Erie Bill of Rights and Rights of Nature, speaking at the United Nations and appearing on The Daily Show and in numerous media outlets.

**Chad Nicholson** - PA Organizer. Involved with rights-based work since 2009, as campaign coordinator for the first Envision Spokane effort. Lead rights-based organizer in PA since 2013, which includes assisting Grant Township and numerous other local rights-based efforts. Work in Grant Township includes assisting with the first-in-the-nation rights-based local constitution,

ecosystem attempt to intervene in a lawsuit,and law legalizing nonviolent direct action to protect rights. Chad has also appeared in *Rolling Stone* on Grant Township, as well as a recent documentary on Grant Township, *Invisible Hand*. Co-author, with Ben Price, of the PA Community Rights Cookbook. Recent work includes directly assisting with the introduction of the RLSG constitutional amendment into the PA House, in 2019. National Democracy School lecturer.

**Terry J. Lodge** - With nearly 50 years' experience as an activist, civil and environmental rights litigator, Terry has filled much of his past six years with CELDF filing countless briefs  in support of direct democracy in Ohio,Community Rights, and Rights of Nature. Steeped in antiwar activism from the Vietnam era, he's long opposed nuclear power and nuclear weapons, corporate welfare, mountaintop removal, fracking, and other desecratory insults to nature. He also has litigated free speech and diversity in the workplace and public life. He is a recipient of the Alliance for Nuclear Accountability's "Unsung Heroes" award (2018), the Toledo Access to Justice Award (2003), and an ACLU Civil Liberties Champion trophy (2006). Terry believes the return to democratic roots is essential for us to move together to resist climate chaos and move closer to an equitable society.

**Tish O'Dell** - Since joining CELDF in 2013 after the passage of the first CBOR in Ohio by initiative in her community of Broadview Heights, Tish has worked to assist other community members in more than a dozen counties make over 40+ attempts to pass CELDF-drafted laws. She also worked very closely with the Toledo group since 2016 to get the Lake Erie Bill of Rights passed and has worked with the OHCRN to develop an Ohio Community Rights Workshop, two state constitutional amendments, and coordinate the first statewide community rights conference, titled Growing Roots and Rights for Just Communities. She has appeared in numerous media outlets, been featured in the film We the People 2.0, and has assisted in the drafting of new Democracy School curriculum, the Common Sense Newsletter, multiple CELDF blogs and op-eds, CELDF's Community Rights videos, and countless presentations throughout Ohio.

**Ben Price** - Current National Director of Organizing, first community organizer for CELDF, beginning in 2004. Worked with scores of municipalities in PA and around the country to draft and enact community bills of rights; assisted Tamaqua Borough to become the first community on Earth to recognize rights for ecosystems in law; worked with Pittsburgh City Council and neighborhood assemblies to enact a community bill of rights that recognizes Rights of Nature and bans gas extraction in the city; long-standing Democracy School lecturer and contributor to several of its incarnations; op-ed writer and author of 2019 book "How Wealth Rules the World: Saving Our Communities and Freedoms from the Dictatorship of Property."

**Kai Huschke** - Northwest + Hawaii organizer - Centrally involved in the first-in-the-nation Community Bill of Rights, Worker Bill of Rights, and Voter Bill of Rights campaign efforts in Spokane, Washington. Centrally involved in the first law banning pesticide spraying in Oregon. Centrally involved in the second-in-the-nation and first-in-Hawaii rights of nature conservation easement. Chief advisor to the Oregon Community Rights Network and the effort to constitutionalize local self-government in Oregon. National lecturer for Democracy School.

**Michelle Sanborn** – New England Organizer & NHCRN President. Michelle led a successful local rights-based law making effort in early 2014 that banned industrial wind turbines. She then

joined CELDF as the NHCRN Coordinator, and became CELDF's New England Organizer in 2015, succeeding Gail Darrell. Michelle has nurtured relationships with state representatives, helping New Hampshire to become the first state in the nation to move the Community Rights Amendment three times, in 2016, 2018, and 2019. She has continued to expand the Community Rights Movement throughout New Hampshire, Vermont, and Maine by assisting local law making efforts, including the first New Hampshire Right to a Healthy Climate law in Exeter, and Barnstead's first-in-the-nation law securing religious freedom. Most recently, she has begun outreach at the congressional level to discuss the need for federal recognition of Community Rights.

# Exhibit X


Kira Kelley <kakelley436@gmail.com>

## Please see enclosed correspondence from CELDF attorneys

3 messages

**Terry Lodge** <tjlodge50@yahoo.com>                                          Fri, Oct 25, 2019 at 2:27 PM
Reply-To: Terry Lodge <tjlodge50@yahoo.com>
To: Thomas Linzey <tal@pa.net>, "Daniel E. Brannen Jr" <dbrannen@brannenlawllc.com>, Tammy Belinsky
<tambel@hughes.net>
Cc: Lindsey Schromen-Wawrin <lindsey@shearwaterlaw.com>, Will Falk <falkwilt@gmail.com>, Karen Hoffmann
<karen@syrenalaw.com>, Kira Kelley <kakelley436@gmail.com>

Thomas, Dan, Tammy,

We have collectively decided to not attend the lawyers' retreat. We would like to flesh out better strategies
around the right of local community self-government and rights of nature; however, this is not the time for that
discussion. There are issues affecting  the continuation of CELDF's existence and work that should occupy the
highest priority right now.

We understand that Thomas has been threatening to take CELDF's funders in his departure from this
organization. Additionally, he has repeatedly refused to meet with CELDF's community organizers, both before
and since his resignation as Executive Director. Thomas is threatening the future of the organization, rather than
departing as Executive Director in a way that allows the organization to continue its forward momentum.

We support the idea of getting together to discuss where we are going – as an organization, and as a movement.
But that meeting is not the lawyers' retreat. The appropriate gathering should include organizers and other core
staff and board members, and should not ignore the existential issues and power dynamics.

We firmly believe in the work we do at CELDF: furthering the Community Rights movement, where people
gather together and make decisions about how to structure their society in ways that best protect the common
good. We, along with the organizers who bring these ideals to life in the communities we serve, want open and
transparent conversations about how we can put our energy and compassion to best use. Unilateral decisions
about how CELDF operates threaten and undermine our organizers and our communities, and go against the very
heart of what our organization stands for. We would be remiss if we, through complicit silence, allowed this
organization to deviate from the theory of change that brought us all together in the first place.

Respectfully,

Lindsey

Karen H.

Kira

Terry

Gmail - Please see enclosed correspondence from CELDF attorneys                    12/10/19, 1:00 PM

Will

---

**Thomas Alan Linzey, Esq.** <tal@pa.net>                    Fri, Oct 25, 2019 at 2:41 PM
To: Terry Lodge <tjlodge50@yahoo.com>, "Daniel E. Brannen Jr" <dbrannen@brannenlawllc.com>, Tammy Belinsky <tambel@hughes.net>
Cc: Lindsey Schromen-Wawrin <lindsey@shearwaterlaw.com>, Will Falk <falkwilt@gmail.com>, Karen Hoffmann <karen@syrenalaw.com>, Kira Kelley <kakelley436@gmail.com>

Terry,


Thanks for including me in this conversation. All I can say is that you have less than half the story about what has been occurring; and the fact that you have not spoken to me directly about any of these issues is disappointing, to say the least.


I have worked for the past several months to engage the Board of the organization in negotiations surrounding my departure from the organization. Apart from the fact that the Board is currently paralyzed due to the actions of others, there has been no good faith effort to engage me in those negotiations. I am disappointed and saddened by this turn of events; most of which has been kept secret from both the lawyers and the organizers for the Legal Defense Fund.


So I would encourage you, and others, to understand that there are several sides to any story, and that the current "narrative" that is circulating about my continuing role in the organization is not the whole story.


And also to note that the Executive Committee itself voted to move forward with this lawyers' retreat; and that in deciding not to collectively attend, that you are undermining the very Executive Committee that is ostensibly making decisions on behalf of the organization. And that was after Lindsey specifically made his plea to the Committee to cancel the event.


Saddened and disappointed by this turn of events,


-Thomas

[Quoted text hidden]

---

**tambel** <tambel@hughes.net>                    Fri, Oct 25, 2019 at 4:09 PM
To: "Thomas Alan Linzey, Esq." <tal@pa.net>, Terry Lodge <tjlodge50@yahoo.com>, "Daniel E. Brannen Jr" <dbrannen@brannenlawllc.com>

Cc: Lindsey Schromen-Wawrin <lindsey@shearwaterlaw.com>, Will Falk <falkwilt@gmail.com>, Karen Hoffmann <karen@syrenalaw.com>, Kira Kelley <kakelley436@gmail.com>

All,

The lawyers who decided not to attend the retreat want the staff, contractors and board members to convene to discuss the direction of the organization.

The lawyers fail to acknowledge the underlying disagreement about which bylaws currently govern the organization and who are valid board members.  The organization is crippled without a governance structure.  The organization cannot continue to operate for long without a valid board.  With disagreement over who is on the board, no decisions have been made.  So I do not understand the misplaced reference to unilateral decisions.  If I thought that Ed Wells and I could make decisions that would not be challenged, believe me, those decisions already would have been made.

Various proposals have been put forth to resolve the bylaws-conflict without involvement of the court.  At every step, the proposals have been rejected by Fred Walls and Stacey Schmader who have been side-dealing with one or more of the contract lawyers.  Fred and Stacey never give rational explanations nor do they suggest rational alternatives to proposals from Thomas, Ed Wells, and me.  Fred Walls thinks the corporation can operate without a board, which is illegal.

In this crisis, I have consistantly advocated for a revision to the bylaws that would put into action the plans for decisions to be made by committee, because that's the direction the staff indicated it wants to go.

The only unilateral decisions that have been made that work against the democratization of the organization were made by Stacey.  If I am wrong about that, please correct me.  All of my efforts in the last month have been focused on fixing the authoritarian versions of the bylaws that Stacey misinterprets and has misused.  I have proposed replacing the bylaws with a structure that reflects collective decision making.  The only caveat in that proposal was a 15 month test period with reporting back to the board in 12 months with further recommendations in regard to governance.  I proposed an interim set of bylaws to which Stacey and Fred, and whom ever is giving them direction, never responded one way or the other.  Stacey and Fred have only said no, said nothing productive, or said nothing at all throughout the conflict.

Thomas and I both care very deeply about the health of the organization so there seems to be a misunderstanding in that regard.

Instead, it seems what is really sought by the staff is anarchy because the staff has rejected leadership in every form.  And it is not sustainable.

Tammy Belinsky
[Quoted text hidden]