**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Stacey L. Schmader, Leticia O'Dell, Chad Nicholson, Kai Huschke, Markie Miller, Michelle Sanborn, Malinda Clatterbuck, Crystal Jankowski, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:20-cv-00067-JPW |
| v. | ) ) ) | |
| Thomas Alan Linzey, in his Individual and Official Capacities; Tammy Belinsky, in her Individual and Official Capacities; Fred Walls, in his Individual and Official Capacities; Edward Wells, in his Individual and Official Capacities; Community Environmental Legal Defense Fund and the Center for Democratic and Environmental Rights; | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTIVE RELIEF
AND MOTION FOR PRELIMINARY INJUNCTION WITH JURY DEMAND
ENDORSED HEREON**

## INTRODUCTION

Plaintiffs seek relief from the unfaithful, arbitrary, and illegal actions of their nonprofit employer's Board of Directors and Executive Director. After months of written and verbal attempts to rectify the officers' and director's blatant disregard for fiduciary duties, met only with retaliation, the employees must now turn to the courts to save their livelihoods and preserve their ability to continue furthering the mission of a nonprofit organization they have built from the ground up. Plaintiffs seek preliminary and permanent injunctions so that the Board of Directors can no longer undermine the work of the organization, or worse, destroy it for the benefit of an executive director who all along has shown loyalty only to himself.

## PARTIES

1.   Plaintiff Stacey L. Schmader is a natural person residing at 10914 Clay Lick Road, Mercersburg, PA 17236.

2.   Plaintiff Leticia O'Dell is a natural person residing at 7976 McCreary Road, Broadview Heights, OH 44147.

3.   Plaintiff Chad Nicholson is a natural person residing at 107 Center St., East Pittsburgh, PA 15112.

4.   Plaintiff Kai Huschke is a natural person residing at 2711 S. Oak Street, Spokane, WA 99224.

5.   Plaintiff Markie Miller is a natural person residing at 3754 Grantley Rd, Toledo, OH 43613.

6.   Plaintiff Malinda Clatterbuck is a natural person residing at 550 Tucquan Glen Road, Holtwood, PA 17532.

7.   Plaintiff Michelle Sanborn is a natural person residing at 102 Lakeview Heights, Alexandria, NH 03222-6562.

8.   Plaintiff Crystal Jankowski is a natural person residing at 6030 Vistamar Rd, Toledo, OH 43611.

9.   Defendant Thomas Alan Linzey is a natural person residing at 1320 North Hollis Street, Spokane, WA 99201.

10. Defendant Tammy Belinsky is a natural person residing at 9544 Pine Forest Road, Copper Hill, VA 24079.

11. Defendant Fred Walls is a natural person residing at 8048 Lincoln Way West, St. Thomas, PA 17252.

12. Defendant Edward Wells is a natural person residing at 1881 Scotland Avenue, Chambersburg, PA 17201.

13. Defendant Community Environmental Legal Defense Fund (CELDF) is a nonprofit corporation incorporated in Pennsylvania and with its principal place of business 10914 Clay Lick Road, Mercersburg, PA 17236.

14. Defendant Center for Democratic and Environmental Rights (CDER) is a nonprofit corporation incorporated in the State of Washington with its principal place of business 1320 North Hollis Street, Spokane, WA 99201.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331 (federal question) and 18 U.S.C. § 1965(a) (Racketeer Influenced & Corrupt Organizations Act).

16. Pursuant to 28 U.S.C. § 1441(a), venue is proper in this Court as it is the district court of the United States for the district and division embracing the place where the state court action is pending: the Court of Common Pleas of Franklin County, Pennsylvania. Lead Plaintiff Stacey Schmader is a resident of Franklin County; Defendant CELDF is located in Franklin County; and the events giving rise to the instant Complaint arose in Franklin County.

## BACKGROUND
## A BRIEF HISTORY AND OVERVIEW OF CELDF

17. In 1995, Stacey Schmader and Thomas Linzey founded the nonprofit corporation CELDF under the Pennsylvania Nonprofit Corporation Law of 1988, 15 Pa. Code § 5301 and under § 501(c)(3) of the Internal Revenue Code.

18.  CELDF is governed by: its Articles of Incorporation, which the Pennsylvania Department of State accepted on March 13, 1995; its Third Amended Bylaws, adopted on July 12, 2019; and various resolutions of the Board of Directors.

19.  The structure and operations of CELDF have evolved throughout the nonprofit's 25 years of existence, but not always with the transparency and accountability that CELDF's Articles, Bylaws, and Board members' fiduciary duties require.

20.  This corrupted evolution interferes with CELDF's altruistic mission of "provid[ing] conservation-oriented community groups with affordable legal assistance in promotion of sustainable development and preservation of open spaces and ecological diversity." Ex. A, CELDF Articles of Incorporation, Art. III.

21.  The Bylaws require three Officers: a President, a Secretary, and a Treasurer, chosen biennially by the Board of Directors by a majority ballot vote. Ex. B, Third Amended Bylaws, Art. II, §§ 1, 2.

22.  The Bylaws charge the Secretary and Treasurer to "conduct all of the administrative duties" of CELDF and empower either or both Officers, "[u]pon the absence of the Executive Director, or in the event of a vacancy in that position … to carry on all of the activities of [CELDF]." *Id*.

23.  Officers, Directors, and Advisors may not receive compensation for their work on behalf of CELDF, although the corporation reimburses their travel expenses. *Id.* at V § 1.

24.  The Executive Director receives an annual salary, approved by the Board, as do the National Administrative Director, the Associate Director, and the National Organizing Director. *Id*. at Art. V.

25.  Prior to the start of litigation, CELDF employed 25 full-time staff and independent contractors to perform the substantive work of the organization: each state's organizer is a full time employee, the attorneys are contactors, and other support staff are either contracted or employed. Ex. C, CELDF Current Staff as of Nov. 26, 2019.

26. Since the filing of this lawsuit, three employees have submitted resignations, although Defendants re-hired one of these employees temporarily to assist in the dissolution process.

27.  Grassroots groups in nearly 200 communities across the country have solicited and received assistance from CELDF. *See* CELDF website, available at https://celdf.org/about-celdf/.

28.  CELDF assists these grassroots community groups by providing them with ongoing organizing and legal support  in local democracy-building activities.

29.  Communities pay practically nothing, contributing only occasional travel costs and filing fees together with their own labor and expertise in addressing the problems they face.

30.  CELDF organizers host workshops, facilitate meetings, solicit input and support for local lawmaking, and are often the first point of contact for grassroots community groups seeking CELDF's services.

31.  The organizers maintain consistent communication with community members and provide the logistical support and strategic thinking necessary for local lawmaking campaigns, including navigating the campaigns' publicity and media coverage and linking the groups with CELDF contract attorneys.

32. CELDF fully sponsors the legal support for this work, paying contracted attorneys to lead the drafting of local ordinances, ballot initiatives, and city and county charters, and advancing litigation to put measures on the ballot and defending them from legal attack.

33.   CELDF has also incorporated and supported Community Rights Networks (CRNs), statewide nonprofit organizations committed to advancing the right to local self-government and the rights of nature in the states where CELDF is actively organizing.

34.   These CRNs are not subsidiaries of CELDF, but rather are separate § 501(c)(3) tax-exempt nonprofits that operate largely at the discretion of their own boards.

35.   CELDF depends exclusively on donations to render its services freely accessible to grassroots community organizations and to pay its staff and contractors.

36.   To safeguard the integrity of donations as they transform into expenditures, "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Third." Ex. A, Art. V.

37.   Donors choose to support CELDF because they believe in its mission and the ways that CELDF organizers and litigators catalyze much needed change in client-communities.

38.   CELDF is committed, and legally required, to apply donations received to its specified charitable purposes and not to siphon off these gifts for the benefit of any one member of the organization.

## TIMELINE OF EVENTS GIVING RISE TO PLAINTIFFS' LEGAL CLAIMS

39. Since co-founding CELDF and until his fragmented and incomplete resignation process began in 2019, Defendant Thomas Linzey held both the roles of Executive Director and of President and authored both the initial Bylaws and every subsequent amendment from 1995 through present day.

40. CELDF's bylaws give the President (Linzey) the power to determine who is qualified to be on the board, and then give the Executive Director (also Linzey) the power to appoint those new board members.

41. As the Executive Director, Defendant Linzey appointed three CELDF Board members: Defendants Tammy Belinsky, Fred Walls, and Edward Wells (together, "Defendants Board members").

42. Belinsky, Walls, and Wells were the only three Board members at the beginning of 2019, when the turmoil encompassed within this Complaint began.

43. On March 1, 2019, Plaintiffs Kai Huschke, Chad Nicholson, Tish O'Dell, and Michelle Sanborn, along with their supervisor (collectively, CELDF's "Organizing Team") emailed a letter to the CELDF Executive Committee proposing a meeting for all full-time staff.

44. The Organizing Team sought this meeting to address the "breach of trust and mutual respect" between the staff and CELDF leadership, specifically Defendant Linzey, and the harm that CELDF and its staff suffered as a result. Ex. D, March 1, 2019 Letter to Board.

45. On April 9th, 2019, Defendant Linzey indicated in an email to Plaintiff Schmader that he intended to resign as Executive Director, effective April 30, 2019. Ex. E, Linzey's April 9th, 2019 email.

46. On April 18, 2019, the Organizing Team again proposed a meeting between staff and Defendant Linzey, reiterating concerns that "current internal organizational health is compromised and that there has been a breach of trust and mutual respect with major leadership arenas of the organization which is affecting the work as well as the health and viability of the organization itself." Ex. F, Organizer Proposal, April 18, 2019.

47.   The Executive Committee approved this request, scheduled a meeting for June 25th and 26th, 2019, and apprised Defendant Linzey that his attendance was expected. Ex. G, Executive Committee Email May 17, 2019.

48.   On May 14, 2019, the Board accepted Linzey's resignation as Executive Director, decreeing that Linzey remain President "for now" but that he "shall be relieved of all management responsibilities" and that "the five member committee created to manage the organization shall assume the powers otherwise exercised by an Executive Director, until the Board decides that hiring a new Executive Director is necessary." Ex. H, Board Resolution, May 14, 2019, §§ 2, 11.

49.   Instead of working to resolve grievances raised by the organizing staff, the Defendants Board members also used the May 14th resolution that Defendant Linzey drafted to fire all of the full-time staff organizers, revoke all of their benefits, and outsource their financial arrangements to the CRNs by the end of 2019. *Id*. at §§ 3-5.

50. On June 18, 2019, Linzey, now in his capacity as President of CELDF, stated in an email to Plaintiff Schmader and then-Associate Director Mari Margil, "I am not willing to continue to raise money for CELDF if the organization comes out of the gathering as dysfunctional as it was when it went in." Ex. BB, June 18 Linzey Email.

51.   CELDF leadership disclosed the May 14th Board Resolution to CELDF staff at the June 25-26 gathering, who expressed frustration over its terms and over the Board precluding staff input prior to adopting it.

52.   The Organizing Team, CELDF then-Associate Director Margil, Plaintiff Schmader, and then-Outreach and Communications Director Emelyn Lybarger met on June 25-26, 2019 as

scheduled, and discussed this resolution along with other concerns outlined in previous letters to the Executive Committee.

53. Defendant Linzey declined to attend this meeting.

54. The contract attorneys and other CELDF staff began piecing together the amended bylaws, Defendant Linzey's resignation, and the turmoil underlying Defendants' radio silence over the summer and early fall of 2019.

55. Linzey did not inform the contract attorneys of his May 14th resignation until July 10, 2019, when he briefly joined the attorneys' quarterly update call to break the news of his departure and then immediately hung up.

56. On September 30, 2019, Plaintiff Schmader exercised her authority under the bylaws to appoint members to the Board of Directors in the absence of an Executive Director to seat two additional Board members: Kat Walter and David Leeger. Ex. B, Art. III § 1.

57. On October 15, 2019, Defendant Linzey filed Articles of Incorporation in the State of Washington for a new organization, the Center for Democratic and Environmental Rights (CDER). Ex. J, CDER Articles of Incorporation.

58. On October 24, 2019, Defendant Linzey responded to an email in which Plaintiff Schmader noted that Defendant Linzey was extorting the Board of Directors. Ex. K, Linzey's Email Oct. 24 2019; Ex. R, Schmader's Email Oct. 24, 2019.

59. In Defendant Linzey's response, sent to all five members of the Board (including Plaintiff Schmader's new appointees), Defendant Linzey suggested that CELDF file a declaratory judgment action against Defendant Schmader to determine whether she had exceeded her powers under the Bylaws in appointing the new board members. *Id*.

60.  On October 29, 2019, the Defendants Board members unanimously passed a resolution rescinding the provisions of the May 14th resolution which outsourced the Organizing Team to the state CRNs. Ex. L, Board Resolution, Oct. 29, 2019.

61.  This resolution also shifted "day-to-day management" responsibilities to the Executive Committee for fourteen months, and appointed Daniel Brannen to the position of Executive Director. *Id*.

62.  Thomas Linzey was re-appointed as Executive Director on or about November 30, 2019 by Defendants Board members. Ex. M, Linzey's email, Dec. 1, 2019.

63.  Defendant Linzey's romantic partner, Mari Margil, resigned from her position at CELDF as Associate Director in November of 2019.

64.  The Board of Directors unanimously approved a severance agreement for Margil, subject to Margil herself submitting an edited version, at a meeting where Defendant Linzey was present and participating first in his capacity as Senior Counsel and then as newly reappointed Executive Director. Ex. CC, Board Minutes, December 1, 2019.

65.  In January of 2020, Defendant Linzey appointed Merrily Mazza to the Board of Directors.

## DEFENDANT LINZEY'S ACTIONABLE CONDUCT

66.  During and following his tenure as Executive Director, Defendant Linzey repeatedly expressed to staff, donors, prospective donors, clients, prospective clients, and to members of the general public that CELDF is an ineffective organization and is evolving in ways of which Linzey does not personally approve. *See*, *e.g.*, Ex. N, Linzey's email to Board of Directors, page 3 ("I have begun working with our primary donors to apprise them of the immediate situation,

and if it continues, will advise them that their donations are better used elsewhere. They constitute half the operating budget of this organization.").

67.  Defendant Linzey consistently enters late into strategic conversations and purports to mandate to staff how to carry out the business of CELDF, despite having no authority to do so in the bylaws, using his status as CELDF co-founder to assert that his views should dominate over the more informed views of staff who have a better understanding of the situation.

68.  Defendant Linzey has not engaged with the organizers in any meaningful way despite repeated requests from the organizers for his engagement.

69.  For example, he has declined to participate in any of CELDF staff's bimonthly calls used to update each other and to delve into the complexities that organizers face.

70. Despite having resigned as CELDF's Executive Director on April 9, 2019, Defendant Linzey continued to hold himself out as an executive officer in the months that followed.

71.  On CELDF's website and on publications, Defendant Linzey titled himself as CELDF's Executive Director until at least October 2019[1], and in some instances until the time of this complaint. Ex. O, Archived Copy of CELDF Website from Oct. 6, 2019; Ex. OO, Current CELDF Contacts webpage, accessed Dec. 9, 2019.

72.  Defendant Linzey changed his title on some forums, such as his email signature, to CELDF's "Senior Counsel." Ex. P, Email from Linzey Sept. 4, 2019.

73.  Defendants issued no formal statement discussing the changes in leadership and governing structure; CELDF contract attorneys did not officially learn of Defendant Linzey's resignation as Executive Director until July 10, 2019 on a quarterly lawyer phone call.

---

[1] https://web.archive.org/web/20191006133855/https://celdf.org/about-celdf/celdf-board-staff/

74.  Throughout the months of October and November, despite having left the position of Executive Director over five months previously, Defendant Linzey pressured the three Defendant Board members to adopt an agreement that Defendant Linzey drafted promising Defendant Linzey a $800,000.00 severance package. Ex. Q, Board Meeting Notes, Oct. 29, 2019.

75. Defendant Linzey threatened to tell donors not to donate to CELDF should CELDF staff continue to oppose his $800,000 severance package. For example, during a phone conversation on October 21, 2019, Defendant Linzey commented to Plaintiff Schmader and Defendant Walls, "Why wouldn't I, given what transpired over the last month and belief CELDF is stuck in the mud, why not take the existing funders and do the work that needs to be done, help Tammy sue the board - burn all of CELDF existing funders? Money question - needs to be sweet enough." Ex. R, Schmader email Oct. 24, 2019.

76.  Linzey has also threatened to sue CELDF if he does not get his $800,000.00 package. Ex. K at 2 ("I have no wish to destroy the organization that I created and helped to build. I have no wish to 'threaten' that as an option … While I hope it does not come down to filing the lawsuit, it is the only option that Fred and Stacey have produced.").

77. Defendant Linzey, while serving as an Officer of CELDF, admitted that he had had "frank conversations about the state of the Legal Defense Fund" with its funders and further stated his intention to ask "existing CELDF funders specifically to fund the work of the Center for Democratic and Environmental Rights" on December 2 and 3. *See* Ex. EE, November 20, 2019 Board Meeting Minutes.

78. On or about December 30, 2019, longtime CELDF "Donor A" (donor identities are withheld to preserve working relationships) contacted Plaintiff Michelle Sanborn and pressured her to withdraw as a Plaintiff to this lawsuit, stating that "it will not go well" for Sanborn to

continue her opposition to Defendant Linzey, and would be "bad for the work in New Hampshire and bad for CELDF."

79. Donor A sent Sanborn a proposed settlement agreement authored by Defendant Linzey which had been given to Donor A by Defendant Linzey. Ex. Y, Linzey Settlement Agreement, Dec. 28, 2019.

80.  Donor A stated that she considered the Plaintiffs' position in the lawsuit to be unreasonable and that Defendant Linzey's suggested terms were a proper basis for settlement.

81.  The agreement requires an $800,000.00 payment to Defendant CDER, and a change of the business identity of CELDF to destroy its visibility to donors and its existence as an alternative to CDER, Linzey's new organization. *Id*.

82.  The proposed settlement agreement is written so that Defendant Linzey would settle this pending lawsuit by signing off on the agreement as Executive Director of CELDF -- an inherent conflict of interest.

## DEFENDANT BOARD MEMBERS' ACTIONABLE CONDUCT

83. In September 2019, Plaintiff Schmader, in her capacity as Secretary with authority under the operative Bylaws of CELDF to do so, appointed two people to the CELDF Board.

84.  Defendants Board members neglected and refused to recognize the appointments and have continuously failed to give notice as required by the Bylaws to the appointees, nor have Defendants Board members solicited or included the appointees' involvement in any decisions made by the Board.

85. Since November 12, 2019, Defendants Board members have also abandoned their bylaw obligation to inform CELDF's Secretary, Plaintiff Schmader, of Board meetings.

86. Actions the Defendants Board members have taken in their capacity as CELDF's Board of Directors subsequent to September 30, 2019 are therefore not only unlawful but also invalid because not all Board members were properly noticed of and included at meetings.

87.  In an October 29, 2019 Board Resolution the Defendants members of the Board determined  "that divisions between Mr. Linzey and others in the organization make it impossible to tend to either reorganization or strategic planning without first tending to Mr. Linzey's stated desire to depart the organization on amicable, negotiated terms" and  appointed Daniel Brannen, CELDF's Managing Attorney and an ally of Defendant Linzey's, as Executive Director to negotiate Linzey's so-called amicable departure. Ex. L, *supra*.

88.  Upon receiving news of the Board's October 29, 2019 Resolution, all of the Plaintiffs along with other CELDF employees and contracting attorneys (15 people in all) sent a group letter containing their recommendations for negotiation of a departure agreement with Linzey in which they urged the Board to have its outside counsel -- a law firm that specializes in nonprofit law -- negotiate on CELDF's behalf. Ex. S, Staff Letter Nov. 6, 2019, and Ex. T, Staff email Nov. 12, 2019.

89.  The staff urged the Defendants Board members not to use CELDF funds to purchase Defendant Linzey's separation from the organization because donor intentions would be frustrated; because Linzey intended to set up a competing organization; and that CELDF, not Linzey, would be blamed for violating the spirit and the legal, donative intention behind those contributions.

90. On November 20, 2019, Defendant Linzey told the Board of his intention to ask "existing CELDF funders specifically to fund the work of the Center for Democratic and Environmental

Rights," which Defendants Board members "felt ... was acceptable in light of dissolution." Ex. EE, November 20, 2019 Board Meeting Minutes.

91. On November 22, 2019, Defendants Belinsky, Walls, and Wells, acting in their capacities as CELDF's Board, voted to formally dissolve the organization. Ex. U, Board Response to Staff, Nov. 22, 2019.

92.  This decision was not made in the best interests of CELDF, but was a retaliatory action made to punish staff for questioning and continuously opposing the Board's proposed and completed actions respecting the severance arrangements for Defendant Linzey, and for approving the termination of the organizing staff in May 2019. *Id*.

93. In December 2019, a longtime donor, Donor B, rescinded an intended $40,000 donation to CELDF because Defendant Belinsky told the giver that CELDF "was transitioning." *See* Ex. DD, Email from Donor.

94. Also in December, Donor C, a foundation with a lengthy history of support of CELDF, sent a donation of $200,000.00 to the CELDF office address, expressly intended for Defendant CDER: the accompanying cover letter suggested that Donor C thought CDER was a corporate affiliate of CELDF. *See* Ex. AA, Letter from Donor.

## APPLICABLE STANDARDS OF LAW

## STANDARDS FOR NONPROFIT CORPORATE OFFICERS AND DIRECTORS

95. Defendants Board members, as directors of a Pennsylvania nonprofit corporation, have responsibilities as fiduciaries of CELDF, which are delineated in 15 Pa. Code § 5712(a), Directors Standard of Care:

> (a) A director of a nonprofit corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, *in*

*a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.*

15 PA Cons Stat § 5712 (emphasis added).

96. The Board of Directors of a Pennsylvania nonprofit must act in good faith, observe a duty of care and loyalty, and avoid conduct that a person of ordinary prudence would find to be against the best interest of that corporation.

97.  Board members may face personal liability for breaching or failing to perform according to this standard of care, when this breach or failure amounts to "self-dealing, willful misconduct, or recklessness." *Id.* at § 5713(a).

98.  Board members violate their duty to act in good faith when relying on information while having actual knowledge that contradicts that information. 15 Pa. C.S. § 5712(b).

99. Officers also have duties of good faith, care and loyalty; to perform their official duties:

in good faith, in a manner [they] reasonably believe[] to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. A person who so performs his duties shall not be liable by reason of having been an officer of the corporation. *Id.* at § 5712(c).

100.      The president of CELDF, as an officer of a nonprofit corporation, must not act on behalf of CELDF in ways that a reasonable person would find to be against CELDF's best interests.

101.      When any part of the solicitation of funds for a charitable nonprofit organization is carried on within the State of Pennsylvania, certain acts and/or practices are prohibited in the planning, conduct or execution of fundraising.

102.      A fundraiser is forbidden from "[u]tilizing any unfair or deceptive acts or practices or engaging in any fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 10 Pa Code § 162.15(a)(2).

103.     In addition, a charitable fundraiser may not "[u]tiliz[e] a . . . statement so closely related or similar to that used by another charitable organization . . . that the use thereof would tend to confuse or mislead a solicited person." 10 Pa Code § 162.15(a)(4).

104.     Also, 10 Pa Code § 162.15(a)(6) bars a fundraiser from "[m]isrepresenting or misleading anyone in any manner to believe that any other person sponsors, endorses or approves such solicitation or charitable sales promotion when such other person has not given consent in writing to the use of his name for these purposes."

105.     Finally, 10 Pa. Code § 162.15(a)(7) disallows a fundraiser from "[m]isrepresenting or misleading anyone in any manner to believe that goods or services have sponsorship, approval . . . that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have."

## PLAINTIFFS HAVE STANDING

106.      Plaintiffs have state statutory standing to challenge the validity of a corporate action by virtue of being "any person aggrieved" by the contested action: "Upon application of any person aggrieved by any corporate action, the court may hear and determine the validity of the corporate action."[2] 15 Pa. C.S. § 5793.

107.     A person facing a direct threat of pecuniary or proprietary injury is a "person aggrieved" absent a more specific statutory definition, for the purpose of standing. *Gen. Instrument Corp. of Del. v. Nu-Tek Electronics & Mfg. Inc.*, 197 F.3d 83, 87 (3d Cir. 1999).

---

[2] Section 5793(a) of the NCL was amended effective September 7, 2013. Prior to amendment, Section 5793(a) read "Upon petition of any person whose status as, or whose rights or duties as, a member, director, member of an other body, officer or otherwise of a nonprofit corporation are or may be affected by any corporation action, the court may hear and determine the validity of such corporate action." Therefore, the legislature clearly intended to expand the pool of potential plaintiffs in claims against nonprofit corporations, including all Plaintiffs here.

108.     Both economic and unquantifiable injuries may give rise to standing. *Wm. Penn Parking, Inc. v. City of Pittsburgh*, 464 Pa. 168, 193 (1975) ("It is clear that some interests will suffice to confer standing even though they are neither pecuniary nor readily translatable into pecuniary terms.").

109.     Not only did Defendant Linzey literally threaten Plaintiffs' livelihoods, but also all Defendants working in concert already deprive Plaintiffs of their job stability through the initial attempted retaliatory firing, the *de facto* firing through the arbitrary dissolution of Plaintiffs' employer, and the acts of subterfuge (donor theft, disparagement, and directives to staff to stop doing the work that sustains the organization) designed to render CELDF unable to continue.

110.     Plaintiffs are current employees of CELDF and face direct pecuniary injury from the series of invalid, illegal, and unconscionable acts of CELDF directors and officers, which by law and by Constitutional principles they have standing to challenge in court.

111.     "If a bylaw adopted by the members of a nonprofit corporation so provides, a director shall not be personally liable, as such, for monetary damages for any action taken *unless (1) the director has breached or failed to perform the duties of his office under this subchapter; and (2) the breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.*"[3] 15 Pa. C.S. § 5713(a) (emphasis added).

112.     "The duty of the board of directors, committees of the board and individual directors under section 5712 (relating to standard of care and justifiable reliance) is solely to the nonprofit corporation and may be enforced directly by the corporation or may be enforced by a

---

[3] CELDF's Third Amended Bylaws, Article VI, provides: "The members of the Board of Directors...shall not be personally be liable for monetary damages for any action taken, or any failure to take any action, to the fullest extent permitted by law."

member, as such, by an action in the right of the corporation, and may not be enforced directly by a member or by any other person or group." 15 Pa. C.S. § 5717.

113.     Additionally, Plaintiff Schmader has standing to bring a derivative action on behalf of CELDF.

114.     A derivative action is proper "to argue an injury to the corporation or its members as a whole." *Patterson v. Shelton,* No. 2396 C.D. 2011, *3 (Pa. Commw. Ct. Mar. 6, 2013).

115.     The contested funds that Defendant Linzey has fraudulently diverted from CELDF to CDER, as well as the $800,000.00 severance payment to Linzey that Defendants are attempting to orchestrate, are all CELDF assets and their theft constitutes an injury to the corporation.

116.      For nonprofit corporations such as CELDF without voting members or shareholders, officers and directors may utilize authority that Pennsylvania Law otherwise vests in the members of a corporation. 15 Pa.C.S. § 5751.

117.     Being the Secretary and the Treasurer of CELDF, Plaintiff Schmader may bring a derivative action as an officer of a memberless corporation.

118.     CELDF functions as a closely-held corporation because very few people could bring an action in its name.

119.     There are only six people who might bring a derivative action on behalf of CELDF: The two officers, Schmader and Linzey, and the four Board members.

120.     Five of them are parties to the lawsuit: Schmader is a Plaintiff, and the other four are defendants.

121.     As such, section 7.01 of the ALI Principles applies[4] and the court may allow the case to proceed as a direct, rather than a derivative, action. *See Liss v. Liss,* 2002 WL 576510, *7 (Phila. Cty. 2002); *see also White v. George*, 66 Pa. D. & C.4th 129 (2004).

122.     In November 2019, Plaintiffs provided the Defendants with a series of written demands, putting them on notice of their incipient breach of fiduciary duty. *See, e.g.,* Ex. S (November 6, 2019 Letter), Ex. T (November 12, 2019 Email), and Ex. W (November 20, 2019 Letter).

123.     Defendants thus had notice and an opportunity to cure their planned actions, but proceeded to implement them anyway.

124.     The purpose of the demand statutes was met, and the court should at minimum allow Plaintiff Schmader to bring breach of fiduciary duty claims against Linzey and the board members.[5]

125.      As current employees of CELDF, Plaintiffs face direct pecuniary injury from the impending dissolution of their employer.

126.     Absent judicial intervention, termination of Plaintiffs' employment is inevitable: Defendant Board members voted to dissolve CELDF, rehired an employee for the stated purpose of assisting with dissolution, and ordered CELDF not to renew contracts -- all of which is tantamount to *de facto* termination.

---

[4] Section 7.01(d) of the ALI Principles for Corporate Governance states that "in the case of a closely held corporation, the court in its discretion may treat an action raising derivative claims as a direct action," and do away with the requirements applicable to derivative actions. In the case of a close corporation, the court can allow the case to proceed as a direct action as long as doing so would not: "(i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons." Section 7.01(d).

[5] Indeed, if only members, officers, and directors could sue for a nonprofit's officers and directors breaching their duties, then here Schmader would be the only person who could do so.

127.     Therefore, Plaintiffs' claims are ripe and they have standing to challenge the

corporate actions that are negatively impacting their livelihoods.

## THE CONTESTED ACTIONS ARE APPROPRIATE FOR JUDICIAL EXAMINATION

128.     Directors' and Officers' duties apply, and are subject to judicial review, when

those parties engage in a "corporate action" as defined by 15 Pa. C.S. § 5791(a):

> [T]he term "corporate action" in this subchapter shall mean any of the following
> actions: (1) The election, appointment, designation or other selection and the
> suspension, removal or expulsion of members, directors, members of an other body
> or officers of a nonprofit corporation. (2) The taking of any action on any matter
> that is required under this subpart or under any other provision of law to be, or that
> under the bylaws may be, submitted for action to the members, directors, members
> of another body or officers of a nonprofit corporation.

129.     Pennsylvania courts routinely review contested corporate actions and issue orders

enjoining or validating actions. *Bannister v. Eagle Lake Community*, 17 Pa. D. & C.4th 582 (Ct.

Com. Pl. 1992) ("We agree generally with the association that a petition for review under section

5793 is the correct procedural vehicle for claims regarding questionable actions of officers and

directors of nonprofit corporations.").

130.     The acts of Defendants Board members, including the decision to dissolve

CELDF and effectively terminate the employment of all staff including officers, are questionable

corporate actions subject to judicial scrutiny.

## CAUSES OF ACTION

### Count One. Violation of Pennsylvania Law (15 Pa. Code § 5712 *et seq*.)

131.     Plaintiffs hereby incorporate by reference and reallege herein as though rewritten

the contents of the foregoing paragraphs.

**Defendants Board members, as individuals and as CELDF's Board of Directors,
willfully violated their fiduciary duties to reasonably protect the interests of CELDF
by acting at the behest of an officer with interests opposed to CELDF.**

132.     Defendants Board members violated their fiduciary duties by passing resolutions that undermined CELDF's best interests for the emolument of Defendant Linzey: the attempted retaliatory firing of the entire Organizing Team, the hurried attempts to execute the $800,000.00 severance agreement, and the unjustifiable vote to dissolve CELDF rather than remove the handful of corrupt individuals impeding its continued success.

133.     Upon information and belief, Defendants Board members have passed each resolution mentioned in this complaint after receiving it from Defendant Linzey but without making any substantive changes or taking advice from outside counsel as to the actions' propriety.

134.     These resolutions have included the resolution firing the entire Organizing Team on May 14th, the October 29th resolution appointing Daniel Brannen as Executive Director and attempting to pave a path forward to convey Defendant Linzey his $800,000.00 exit fee, and the November 20th resolution to dissolve CELDF without justification.

135.     On May 14, 2019, Defendants Board members passed a resolution, drafted by Defendant Linzey, to end the CELDF organizers' full-time employment and benefits. Ex. H, Board Resolution, May 14, 2019.

136.     This resolution purported to outsource the organizers to the CRNs, which organizations CELDF would then provide with limited short-term, revocable funding to rehire the organizers as contractors. *Id*.

137.     Defendants Board members excised the Organizing Team from CELDF as a direct response to the Organizing Team's repeated requests for a meeting with Defendant Linzey to air staff grievances and address poor communication.

138.     These grievances continued to accumulate. Throughout the month of October, with no input from outside counsel or CELDF staff, Defendant Linzey and Defendant Board members deliberated the proposal to convey $800,000.00 to Defendant Linzey without any lawful justification.

139.     After Defendant Linzey's girlfriend, Mari Margil, resigned after 12 years at CELDF, Defendant Linzey in his position as newly chosen Executive Director met with the three Defendants Board members who at that meeting voted unanimously to give Margil a severance package with absolutely no basis or precedent for doing so.

140.     Neither the Bylaws nor CELDF protocol authorize severance payments.

141.     In 24 years, no departing employee has ever been offered a severance package, apart from Defendant Linzey and his romantic partner Margil.

142.     The duty of good faith and fair dealing would require Defendants Board members to negotiate the terms of Defendant Linzey's and his lover's departure from CELDF at arm's length, such as by involving legal counsel in the negotiations.

143.     Defendant Board members did not seek advice from outside counsel until the newly appointed Executive Director, Dan Brannen, looped them into an email conversation in November of 2019 in which Brannen, unsuccessfully, sought an opinion from outside counsel that the proposed $800,000.00 severance package needed no further review.

144.     This third-party law firm, which specializes in nonprofit law, advised Brannen and Defendants Board members to have outside counsel and the Pennsylvania Attorney General thoroughly review Defendant Linzey's $800,000.00 parachute proposal:

> Going through the Board review process as counsel advises, and having counsel review the transaction, and also requesting a non-objection letter from the AG, will be critical if CELDF wishes to proceed on solid legal footing and without court approval. Failure to do so could lead to more legal costs, reputational risk, personal

liability for Board members, and disputes about the efficacy of future bequests and gifts.

Ex. V (Cheshire and Brennan Emails, Nov. 12, 2019) at 2.

145.     The actual knowledge that the contemplated severance proposal puts CELDF at risk renders the Defendants Board members' reliance on Defendant Linzey's and Daniel Brannen's representations concerning the proposed $800,000.00 conveyance a violation of the Defendants Board members' duty of good faith. 15 Pa. C.S. § 5712.

146.     The Defendants Board members' preference to then fire their expert nonprofit law counsel, after receiving advice that contradicted Defendant Linzey's, indicates their violation of their duties was willful misconduct or recklessness.

147.     Defendant Linzey drafted his severance proposal himself and advocated for it during Board meetings, using his position and influence as President and "senior counsel" of the organization.

148.     Neither precedent nor bylaw supports the proposition that an outgoing officer or director of a nonprofit should receive a share of the organization's assets upon departure, or indeed, months after having already resigned as Executive Director.

149.     Since the cash parachute would come from donations earmarked for specific purposes, misappropriating those funds to CDER would violate the donative intent.

150.     Cofounders of CELDF, like those of any nonprofit, have no proprietary claim to the financial resources or property of the organization; for the Defendant Board members to entertain a severance package that contemplates Defendant Linzey having a stake in the organization that he resigned from six months previously violates the Defendant Board members' fiduciary duties of loyalty to CELDF to avoid wasting its resources.

151.     But-for the objection of the CELDF staff and organizers, by way of formal letters of opposition and repeated email requests to talk through the $800,000.00 proposal on the phone, the Board of Directors would certainly have gone through with the transfer. Ex. S, Staff Letter Nov. 6, 2019.

152.     On November 20, 2019, Defendants Board members passed a resolution drafted by Defendant Linzey, ordering the dissolution and winding up of CELDF and then notified the Plaintiffs two days later. Ex. FF, Board Resolution Nov. 20, 2019; Ex. U, Board Response Nov. 22, 2019.

153.     Defendants Board members violated their fiduciary duties by formally resolving to dissolve and wrap up the affairs of CELDF without reasonable justification.

154.      At all times referenced in this Amended Complaint, CELDF has functioned productively as a nonprofit corporation and a going concern without significant financial burdens.

155.     The Defendants Board members' dissolution of CELDF had both retaliatory and pecuniary motives and also represented a capitulation to Defendant Linzey's threats:

> **WHEREAS**, the staff undermined the negotiation with Thomas Linzey to amicably depart from CELDF to form a new organization, and thereby defeated any chance that CELDF may have had to continue to work successfully on the same landscape as Linzey's new organization;

> Ex. FF, *supra*.

156.     In its "Board Statement of November 22, 2019," the CELDF Board stated in part:

> Since May 2019, a significant portion of the staff have worked to defeat efforts by the Board to reach an agreement with departing co-founder, Thomas Linzey. Such an agreement would have allowed for an amicable departure and continued operation of CELDF. The Board considered the cost of such an agreement the cost of goodwill. Without that agreement, there is no goodwill and it is the Board's belief that CELDF simply cannot survive the consequences. Combined with other organizational and management issues, it is the Board's conclusion that dissolution

of CELDF and the reinvigoration of the CRN's is in the best interest of the organization.

Ex. U, *supra*.

157.     The resolution followed a letter that CELDF staff had sent two days before, asking Defendants Board members to refrain from shutting down CELDF and affirming their commitment to continuing the organization's activities. Ex. W, Staff Letter Nov. 20, 2019.

158.     Defendants Board members' stated justification for terminating the existence of CELDF was to avoid the "consequences" of denying Defendant Linzey's demand for an $800,000.00 exit payment. Ex. U.

159.      By terminating CELDF, Defendants Board members are freeing up CELDF's assets, totaling more than $2,000,000.00, for distribution to other IRS Section 501(c)(3) tax-exempt nonprofit corporations according to CELDF's Articles of Incorporation.

160.     The top candidate to receive distribution of CELDF's assets is Defendant Linzey's newly-founded Sect. 501(c)(3) nonprofit, Defendant CDER.

161.     Defendants Board members' decision to dissolve CELDF was a retaliatory, unreasonable concession to the demands of a CELDF officer with a clear conflict of interest, and as such, this decision violates Defendant Board members' duty of care and loyalty to CELDF.

162.     A reasonable, informed person would not act to destroy the organization to which they owe care and loyalty in order to fund another organization to which they owe no duties.

163.     Further, having decided to terminate advice from their expert nonprofit law firm (who had cautioned against Linzey's $800,000.00 exit fee), the Defendant Board members appear to have made the decision to dissolve CELDF solely on the advice of "senior counsel" Linzey, who will be the chief beneficiary of the decision through the fund transfer from CELDF to his new organization CDER.

26

164.     Defendant Board members' willful desire not to seek the advice of outside counsel in deciding whether to terminate the organization (as opposed to the mechanics of dissolution, which they have apparently sought counsel for), and their adherence to advice from a blatantly conflicted internal "Senior Counsel," amount to willful misconduct or recklessness.

**Defendants Board members, as individuals and as a Board of Directors, willfully violated their fiduciary duties by violating the Internal Revenue Code, thereby unreasonably and in bad faith exposing CELDF to liability and a loss of goodwill.**

165.     Defendants Board members violated their fiduciary duties by exposing CELDF to potential public embarrassment and monetary liability by considering the disbursement of $800,000.00 to Defendant Linzey in violation of the "excess benefit rule" applicable to § 501(c)(3) public charities under § 4958 of the Internal Revenue Code.

166.     An excess benefit transaction is one in which a nonprofit corporation provides an economic benefit to or for the use of a "disqualified person," and the value of this economic benefit exceeds the value of consideration for the benefit. 26 CFR § 53.4958-4(a)(1).

167.     Internal Revenue Service regulations at 26 C.F.R. § 53.4958-4 presume an "excess asset" distribution when it is made to a "disqualified person," meaning someone who for the most recent five years has had significant control or influence over fiscal matters for the organization.

168.     The IRS views an organization's founder as a prime example of someone who might have substantial influence over the organization and would thus be a "disqualified party" barred from receiving an "excess benefit."[6]

169.     Defendants Board members and Defendant Linzey knew or should have known that as a co-founder and officer of CELDF, Defendant Linzey exercised substantial influence in

---

[6]See IRS, "Intermediate Sanctions - Substantial Influence" (last updated March 26, 2019, available at https://www.irs.gov/charities-non-profits/charitable-organizations/intermediate-sanctions-substantial-influence).

the financial affairs of CELDF, and as such would be a "disqualified person" according to U.S. Treasury Department regulations and be barred from receiving all or part of the $800,000 benefit upon departing from CELDF.

170.     An officer's amicable departure from a nonprofit (for which that person still serves as President and Senior Counsel and to which the person still owes fiduciary duties) is a pre-existing obligation and thus Defendant Linzey offered no valuable consideration in exchange for the $800,000 benefit he sought.

171.     All Defendants also knew or should have known that engaging in a transaction with unusual tax consequences may expose CELDF to IRS fines, subject CELDF to monetary liability to indemnify its Board for their having contributed to the improper asset distribution, and endanger the organization's tax-exempt status.

172.     When CELDF staff objected to the Board approving any disproportionate benefit for Defendant Linzey in exchange for his (already accepted) resignation, the Board responded instead by voting to dissolve and wind up CELDF as a going nonprofit business.

173.     Defendants Board members also violated their fiduciary duties by aiding and abetting the planned private inurement of $800,000.00 to Defendant Linzey from the general cash reserves of CELDF.

174.     The Internal Revenue Code's private inurement doctrine reserves § 501(c)(3) tax-exempt status exclusively for organizations wherein "no part of the net earnings of [the organization] inures to the benefit of any private shareholder or individual."

175.     A § 501(c)(3) organization that violates the private inurement doctrine fails to be operated exclusively for one or more exempt purposes and may be subjected to revocation of its exempt status. *See* Treas. Reg. § 1.501(c)(3)-1(c)(2).

176.     By offering CELDF's net earnings up to benefit Defendant Linzey and Mari Margil for no valid consideration, Defendants Board members breached their duty of care and loyalty by failing to investigate and protect CELDF from potential forfeiture if its tax-exempt status.

177.     Defendants Board members violated their fiduciary duties by formally resolving on behalf of CELDF to dissolve and wind up CELDF as a going concern nonprofit business operation, orchestrating circumstances to unjustly enrich Defendant Linzey and his business interests.

178.     Reasonable Board members acting in the best interests of their organization would terminate engagement and discontinue collaboration with an officer who uses extortion and undue influence to undermine the interests of the organization for personal gain.

179.     Instead, Defendants Board members pursued a payment to Linzey. When that payment plan did not work, they then approved Linzey's recommendation to dissolve CELDF. They did all of this without advice of outside counsel (which they had retained, but terminated after receiving advice contrary to Linzey's intentions), which amounts to willful or at a minimum reckless misconduct.

**Defendant Linzey violated his fiduciary duties by using his position as an Officer of CELDF to suborn and prompt the Board of Directors to act against CELDF's best interests, and by meeting with funders in his capacity as an Officer to stymie CELDF's continued organizational success for personal gain.**

180.     Defendant Linzey violated his duty of loyalty to CELDF by engaging in self-dealing; using his relationship with the Board of Directors that he had appointed and his position as President as leverage to convince the Board of Directors first to pay him $800,000.00 in severance notwithstanding the fact that the Board had accepted his resignation over six months

prior and then, when this failed, by formally acting to dissolve the organization, leaving Defendant Linzey in position to take over the entirety of CELDF's assets.

181.     Defendant Linzey further violated his fiduciary duties by using his position as Executive Director and his presence at Board meetings to arrange for an unprecedented severance package to his romantic partner, Mari Margil.

182.     Defendant Linzey further violated these duties by holding himself out as the Executive Director of CELDF to set up meetings with CELDF donors in order to solicit funds for himself and CDER.

183.     Presidents and Directors of a Pennsylvania corporation owe their undivided loyalties to that corporation. *Lutherland, Inc. v. Dahlen*, 53 A.2d 143, 147 (Pa. 1947).

184.     Defendant Linzey violated his fiduciary obligations to CELDF by remaining as a corporate officer (President, and later re-appointed Executive Director) and as an employee while suborning or prompting board action to dissolve CELDF without any reasonable justification.

185.     In June 2019, while serving as CELDF's President and while holding himself out to the public as CELDF's Executive Director, Linzey violated his fiduciary duties as an officer by delivering the following ultimatum: "I am not willing to continue to raise money for CELDF if the organization comes out of the [June 25-26, 2019] gathering as dysfunctional as it was when it went in." Ex. BB, June 18 Linzey Email.

186.     Defendant Linzey violated his duty of loyalty to CELDF by using his actual authority as President and his fraudulent authority as Executive Director to set up meetings with long-standing CELDF donors.

187.     In November 2019, Defendant Linzey obtained approval from Defendants Board members of his plan, while an executive officer of CELDF, to tell existing CELDF donors that there were organizational problems, and to encourage those donors to support Defendant Linzey's new organization, Defendant CDER. *See*, e.g. Ex. EE, Nov. 20, 2019 Board Meeting Minutes, *2 ("Linzey stated that he had not yet asked existing CELDF funders specifically to fund the work of the Center for Democratic and Environmental Rights, but that *as previously disclosed to the Board*, that he intended to do so December 2nd and December 3rd. The Board felt that this was acceptable in light of dissolution.") (*emphasis added*).

188.     CELDF contract attorneys challenged Defendant Linzey directly for "threatening to take CELDF's funders in his departure from this organization." Ex. X, CELDF Attorneys' Email Oct. 25, 2019.

189.     Defendant Linzey's response did not refute the allegations against him, but did acknowledge that recent events surrounding his departure negotiations have "been kept secret from both the lawyers and the organizers for the Legal Defense Fund." *Id*. at 2.

190.     The CELDF Articles of Incorporation require distribution of the dissolved organization's assets to qualifying Sect. 501(c)(3) nonprofit corporations.

191.     Defendant Linzey incorporated the Center for Democratic and Environmental Rights as a nonprofit, Sect. 501(c)(3) tax-exempt corporation in the State of Washington on October 15, 2019. *See* Ex. J.

192.     The "whereas" clauses of the October Board resolution to negotiate with Defendant Linzey, *which Defendant Linzey himself authored*, reveal his intentions at the time of creating a direct competitor to CELDF. *See* Ex. L.

193.	To the detriment of CELDF and in breach of the fiduciary duties he owes to CELDF, Defendant Linzey as a corporate officer of CELDF in October 2019 demanded that the CELDF Board pass a resolution, for no valid consideration, that would: transfer $800,000.00 to Defendant Linzey's new duplicative nonprofit organization, CDER; subject CELDF to uncapped liability to indemnify Linzey in currently pending Pennsylvania Disciplinary Board proceedings; redirect certain grant funds from CELDF related to a "Rights of Nature" Conference to be convened in Florida in early 2020 with donations to benefit CDER; and bestow on Linzey significant pieces of office equipment.

194.	Defendant Linzey further would be free to continue soliciting CELDF's financial supporters for the benefit of his new, directly competing nonprofit corporation.

195.	Defendant Linzey breached his fiduciary duties in October 2019 by making an extortionate demand that the Board approve his separation proposal or else he would retaliate by damaging CELDF's reputation with some of its donors.

196.	Throughout November and December 2019, Defendant Linzey ordered CELDF staff to not conduct annual fundraising solicitations, causing a loss of hundreds of thousands of dollars to CELDF and thus breaching his fiduciary duties of care and responsibility to CELDF by depriving it of a significant portion of its operating budget.

197.	On December 1, 2019, Defendant Belinsky stated during a board meeting that following Brannen's resignation as Executive Director, that the Board needed to appoint a new Executive Director, and that she and Thomas had spoken to Karen Breslin. Ex. CC, Board Minutes, December 1, 2019.

198.    Per the meeting minutes, Defendant "Linzey stated that he didn't think that she would be a good choice, *as she expressed reservations about dissolving the organization*." *Id.* (emphasis added).

## Count Two: Civil Conspiracy

199.    Plaintiffs hereby incorporate by reference and reallege herein as through rewritten the contents of the foregoing paragraphs.

200.    Establishing a civil conspiracy in Pennsylvania requires a showing that "two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." *Burnside v. Abbott Lab.*, 351 Pa. Super 264, 277-78 (1984).

201.    Facts that Pennsylvania courts consider when finding that defendants have entered such an agreement, or devised a "conspiratorial scheme," include: holding meetings, conferences, telephone calls, and otherwise cooperating with one other beyond just happening to act negligently, contemporaneously. *Burnside* at 280.

202.    A complaint alleging civil conspiracy in Pennsylvania must include proof that the defendants acted with the unjustified intent to cause injury. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

203.    Additionally, a claim for conspiracy requires an overt act to further the conspiracy, which results in actual damage. *GMH Associates Inc. v. Prudential Realty Group*, 752 A.2d 889, 905 (Pa. Super. 2000).

204.    Here, Defendants amount to two or more people who orchestrated a conspiratorial scheme, as evidenced by the regularly occurring meetings primarily in the form of telephone conferences and email threads.

205.     The unlawful acts were the violations of state and federal law set forth in this complaint for the purpose of depleting more than half of CELDF's annual operating budget for the purpose of funding Defendant Linzey's new organization, and, when that scheme failed, for the purpose of terminating CELDF's entire existence to accomplish the functionally equivalent, if not augmented, aim of the original $800,000 severance package proposal.

206.     Defendants had no justification for terminating the existence of CELDF and siphoning its funding, thus injuring the organization and its employees, but instead offered fabricated, insufficient reasons to rationalize turning substantially all of CELDF's assets over to a nonprofit organization founded and controlled by Defendant Linzey.

207.     Defendant Linzey cannot simultaneously wear two hats: CELDF Executive Director (and "Senior Counsel") overseeing and advising on the organization's dissolution, and CDER officer or director preparing to receive the funds from CELDF.

208.     Linzey's actions are self-dealing, and the Defendant Board Members' knowledge of Linzey's conflicted roles and simultaneous adherence to Defendant Linzey's self-serving advice, shows willful misconduct or recklessness on their part. *See* Ex. EE, Board Meeting Minutes, November 20, 2019.

209.     Defendants attempted to conceal their scheme in many ways (some of which likely remain to be discovered), including by holding meetings for at least the past three months without notifying CELDF's secretary, Plaintiff Schmader.

210.     Defendants' secrecy in violation of CELDF's bylaws and habitual processes demonstrates Defendants' actual knowledge that their actions and aims are unlawful.

211.     The Defendants' overt acts, such as the resolution to dissolve CELDF and accompanying orders to refrain from normal fundraising activities, have already caused economic injury to CELDF and its employees.

## Count Three: Violation of the Racketeer Influenced & Corrupt Organizations Act (18 USC § 1961)

212.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

213.     The Racketeer Influenced & Corrupt Organizations (RICO) Act prohibits three distinct activities: (a) investing income derived from a pattern of racketeering activity in an enterprise, (b) acquiring control of or an interest in an enterprise through a pattern of racketeering, and (c) conducting or participating in an enterprise through a pattern of racketeering. 18 U.S.C. § 1962(a)-(c).

214.     An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," and which must be engaged in or have an effect on interstate commerce. 18 U.S.C. § 1961(4) and § 1962.

215.     CELDF and CDER are both enterprises because they are legal entities, and they are engaged in or have an effect on interstate commerce because they employ people in many different states.

216.     Standing to bring a civil RICO suit requires only that the plaintiff(s) suffered an injury as a result of the predicate or underlying acts, or from the racketeering itself. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498-500 (1985).

217.     The defendant(s) do not have to have been charged with the underlying offenses, so long as facts show that they *could* be. *Id*. at. 488.

218.     A "pattern of racketeering activity" exists where defendant(s) have engaged in at least two instances of an enumerated state or federal crime, which in this instance include but are not limited to wire fraud, 18 U.S.C. § 1343, and extortion, 18 Pa.C.S.A. § 3923(a)(7). 18 U.S.C. § 1961(1), (5).

219.     Wire fraud requires that a person devise any "scheme or artifice to defraud" or to "obtain[] money or property by means of false or fraudulent pretenses, representations, or promises" and to execute this scheme using internet communications. 18 U.S.C. § 1343.

220.     Defendant Board members used false pretenses to vote to dissolve CELDF and did so through email exchanges with Defendant Linzey to receive bylaws Defendant Linzey drafted.

221.     The internal disagreements and the alleged difficulty of continued organizational functioning was a falsely pretextual reason to end CELDF's existence and an attempt to obscure the real motive: siphoning CELDF assets to Defendant Linzey and CDER.

222.     Defendant Linzey also obtained money under false pretenses using electronic communications, by sending emails that misrepresented the relationship between CDER and CELDF and obscuring his own conflicts of interest as a Director of both organizations in order to set up meetings with donors to acquire funds for Linzey's other organization, CDER.

223.     Pennsylvania's Crimes Code defines extortion as, *inter alia*, obtaining or withholding property of another by threatening to inflict harm which would not benefit the actor. 18 Pa.C.S.A. § 3923(a)(7).

224.     Defendant Linzey threatened, if his demand for an $800,000.00 payment was not met, to "take the existing funders," "help [Defendant Belinsky] sue the board," and "burn all of CELDF's existing funders."  *See* Ex. R.

225.     Defendant Linzey plainly threatened to inflict harm upon CELDF by taking

CELDF's funding and suing the organization if his demand to obtain financial gain was not met.

226.     In an October 24, 2019 email, Linzey stated:

> [I]t is in the best interests of the organization to *arrive at a settlement with the organization concerning my potential departure.* As long as I remain with the organization, I have a fiduciary, officer, and legal counsel duty to ensure that the organization is acting pursuant to Pennsylvania law. *While I hope it does not come down to filing the lawsuit, it is the only option that Fred and Stacey have produced* ... . They have thus put the organization in peril; because *once a lawsuit is filed, word will circulate to donors and other supporters of the unstableness [sic] of the Legal Defense Fund.*

> Ex. K at 2 (emphasis added).

227.     Here, again, Defendant Linzey made a threat to inflict financial harm to CELDF if

he did not receive his severance payment of $800,000.00, constituting a separate instance of an

extortion threat, adding to the "pattern of activity" required to be shown under the RICO statute.

228.     As noted in Count One, *supra*, after the October 21 threat, CELDF contract

attorneys called Defendant Linzey out directly for "threatening to take CELDF's funders in his

departure from this organization." Ex. X, CELDF Attorneys' Letter, Oct. 25, 2019.

229.     Defendant Linzey's response did not refute the allegations against him, but did

acknowledge that recent events surrounding his departure negotiations have "been kept secret

from both the lawyers and the organizers for the Legal Defense Fund." *Id.*

230.     These multiple acts of wire fraud and multiple acts of coercion constitute a pattern

of racketeering activity with no end in sight and which directly harm Plaintiffs' job security and

ability to use CELDF as a stable hub for their charitable work.

231.     CELDF and Plaintiffs have suffered financial loss as a result of Defendant Linzey

and the Board members' ordering them to not solicit donations to CELDF: at least $240,000 of

lost expected donations is a direct result of Defendant Linzey using his connections and role

within CELDF to solicit donations for his new organization that would otherwise have gone to CELDF.

232.     The pattern of coercion and the wire fraud manifests as all three types of illegal racketeering activity: investing in an enterprise, acquiring control of an enterprise, and operating an enterprise through the pattern of racketeering activity. 18 U.S.C. § 1962(a)-(c).

233.     Defendant Linzey attempts to invest the fraudulently obtained donations and the departure settlement, income derived through a pattern of racketeering, into the CDER enterprise in violation of 18 U.S.C. 1962(a).

234.     Defendant Linzey and Defendants Board members, through extortionist threats and secretive, fraudulent attempts to take funding from CELDF and to obstruct the work and communications of the organizers, have acquired control of the enterprise CELDF through a pattern of racketeering in violation of 18 USC § 1962(b).

235.     All Defendants have conducted the affairs of the enterprise CELDF through a pattern of racketeering, involving coercion and wire fraud against Board members, staff, other Officers, and donors, and thus in violation of 18 USC § 1962(c).

### Count Four:  Unjust Enrichment

236.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

237.     Defendant Linzey sought unjust enrichment in order to benefit himself, with the assistance of Defendant Board members and at the expense of Plaintiffs and CELDF.

238.     "Unjust enrichment" is an equitable doctrine with three elements: "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for

defendant to retain the benefit without payment of value." *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super. 1986), overruled on other grounds, *Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991); see also *Burgettstown-Smith v. Langeloth*, 588 A.2d 43 (Pa. Super. 1991).

239.    In determining whether this doctrine applies, courts focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. *State Farm Mut. Auto. Ins. Co. v. Jim Bowe & Sons, Inc.*, 539 A.2d 391, 393 (Pa. Super. 1988), citing *Myers-Macomber Engineers v. M.L.W. Construction Corp. & HNC Mortgage and Realty Investors*, 414 A.2d 357 (Pa.Super. 1979).

240.    The most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is unjust. *Styer*, supra at 267, 619 A.2d at 350; *State Farm Mut. Auto. Ins. Co.*, supra.

241.    Where unjust enrichment is found, the law implies a contract and requires that the defendant pay to plaintiff the value of the benefit conferred: the defendant must make restitution to the plaintiff in *quantum meruit. Chesney v. Stevens*, 644 A.2d 1240 (Pa.Super. 1994); *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (Pa. 1969).

242.    Upon information and belief, Defendant Linzey has acquired or prospectively will acquire benefits in the form of cash and economic assets of CELDF for the personal benefit of himself and his estate, conferred by Defendants Board members.

243.    If Defendant Linzey accepts and retains such benefits under the circumstances alleged hereinabove, it would be inequitable for him to do so without payment of value to CELDF.

244.     Upon information and belief, Defendant Linzey has acquired or prospectively will acquire benefits in the form of cash and economic assets of CELDF for the benefit of himself as an officer of CDER.

245.     If Defendant Linzey in his capacity as an officer of CDER accepts and retains such benefits under the circumstances alleged hereinabove, it would be inequitable for him to do so without payment of value to CELDF.

246.     After the filing of the original complaint, in December 2019, a foundation with a lengthy history of support of CELDF sent a donation of $200,000.00 to the CELDF office address intended for Defendant CDER, and the accompanying cover letter suggested that the donor thought CDER was a corporate affiliate of CELDF. *See* Ex. AA.

247.     Also in December 2019, another longtime CELDF donor contacted Plaintiff Michelle Sanborn and pressured her to withdraw as a Plaintiff to this lawsuit, stating that "it will not go well" for Sanborn to continue her opposition to Defendant Linzey, and would be "bad for the work in New Hampshire and bad for CELDF." This donor sent Sanborn a proposed settlement agreement that Defendant Linzey had authored and shared with this donor. *See* Ex. Y.

248.     The donor stated that they considered the Plaintiffs' position in the lawsuit to be unreasonable and that Defendant Linzey's suggested terms were a proper basis for settlement. The agreement requires an $800,000.00 payment to Defendant CDER, and a change of the business identity of CELDF to destroy its visibility to donors as an alternative to CDER. The agreement is written so that Defendant Linzey would sign off on the agreement as Executive Director of CELDF -- an inherent conflict of interest causing any resulting transfer of funds to be by definition unjust.

249.     Around the same time, a third donor rescinded an intended $40,000.00 donation to CELDF because Defendant Belinsky told the giver that CELDF "was transitioning." Ex. DD, December 23, 2019 donor email.

## Count Five: Usurpation of Corporate Opportunities

250.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

251.     Defendant Linzey has usurped corporate opportunities in violation of the common law doctrine prohibiting officers or directors from competing with their organization and which Defendants have done here by diverting donations and thwarting organizing opportunities.

252.     The doctrine of corporate opportunity applies to officers and directors, and imposes liability on those "who take personal advantage of business opportunities when these opportunities fall within the 'scope of activities' of, and constitute a 'present or potential advantage' to, the corporation." *Levy and Surrick v. Surrick*, 524 A.2d 993, 995 (Pa. 1987). The doctrine prohibits an officer or director from competing with the corporation in any fashion, even in areas outside the scope of the officer's or director's work for the corporation. *Id.* The principle against usurpation of corporate opportunities stems from the fiduciary duty owed to the corporation by officers and directors. *Lutherland v. Dahlen*, 53 A.2d 143, 147 (Pa. 1947). The test of liability is whether or not they have unjustly gained enrichment. *Bailey v. Jacobs*, 189 A. 320, 324 (Pa. 1937). In this test, it is irrelevant whether their actions have caused a loss or any type of harm to the corporation. *Id.* A fiduciary may not place himself in a position that "invites conflict between self-interest and integrity." *Id.* at 324-25. Whether or not something is a corporate opportunity is a question of fact. *CST Inc. v. Mark*, 520 A.2d 469, 471 (Pa. Super. 1987).

253.     Here, Defendant Linzey took donations for himself and his new pet project using connections and authority that he established in his roles of President and Executive Director of CELDF.

254.     As described at length above, he has diverted donations that would otherwise have gone to CELDF for his new corporation, CDER.

255.     He has done so while being CELDF's President, Executive Director, or both.

256.     Defendant Belinsky, a director of CELDF, has also interfered with the corporation's opportunities by instructing donors not to give to CELDF because the organization was "transitioning."

257.     Defendant Belinsky, as president of CELDF's board, also circulated an email to all staff on December 30, 2019, ordering that no one from CELDF is authorized to enter into any new contracts, which effectively dissolves the organization because it has the effect of terminating staff attorney and other contractual staff relationships with the organization. See Ex. Z, Belinsky Email Dec. 30, 2019.

### Count Six: Waste of Corporate Assets

258.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

259.     Defendants have wasted corporate assets by squandering funding earmarked for CELDF's ongoing charitable work into CDER.

260.     Pennsylvania Jurisprudence states that in order to find that a waste of corporate assets has occurred, "there must be a blatant squandering of assets to the detriment of the business entity, as if the sole purpose were to harm the entity." 13 Summ. Pa. Jur. 2d Business Relationships § 11:24. American Law Institute, Principles of Corporate Governance, section

1.42, Waste of Corporate Assets: "A transaction constitutes a 'waste of corporate assets' if it involves an expenditure of corporate funds or a disposition of corporate assets for which no consideration is received in exchange and for which there is no rational business purpose." Section 1.42.[7]

261.    Here, Defendant Board Members conspired with Defendant Linzey to squander, at first, $800,000.00 belonging to CELDF for his extortionate demand in exchange for him not taking CELDF donors with him to his new organization, CDER.

262.    Then, Defendant Board Members went even further, voting at Defendant Linzey's behest to dissolve the entire organization and transfer assets to CDER. This dissolution also necessarily involves terminating the employment of Plaintiffs and other CELDF staff and contractors, ending the work of the organization.

263.    Finances squandered include not only the entirety of CELDF's assets that might remain after the existing obligations have been provided for, but also the debts incurred in this dissolution process. Paying for attorneys to dissolve the organization is literally spending assets to the detriment of the entity, for the sole purpose of harming that entity, as 13 Summ. Pa. Jur. 2d Business Relationships § 11:24 explicitly provides.

### Count Seven: Tortious Interference with Business Expectancy

264.    Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

---

[7] The Supreme Court of Pennsylvania adopted certain sections of the Principles, and noted that the adoption of those sections was not a rejection of other sections. *Cuker v. Mikalauskas*, 692 A.2d 1042, 1049 n.5 (Pa. 1997). Section 1.42 was not one of the specifically adopted sections. The definition of waste provided in Pennsylvania Jurisprudence is not contradicted by the definition stated in the ALI Principles and has been relied on by PA courts. *See White v. George*, 66 Pa. D. & C.4th 129, 149 (2004).

265.     To prove tortious interference with prospective contractual relations, a plaintiff

must demonstrate: "(1) a prospective contractual relation; (2) the purpose or intent to harm the

plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on

the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's

conduct." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 184 (3d Cir. 1997); *accord Glenn*

*v. Point Park Coll.*, 272 A.2d 895, 898 (Pa. 1971).

266.     A prospective contractual relation "is something less than a contractual right,

something more than a mere hope." *Synthes (U.S.A.) v. Globus Med., Inc.*, No. Civ.A. 04-CV-

1235, 2005 WL 2233441, at *7 (E.D. Pa. Sept. 14, 2005) (quoting *Thompson Coal Co. v. Pike*

*Coal Co.*, 412 A.2d 466, 471 (Pa. 1979)). To survive a motion to dismiss, a plaintiff must

establish a reasonable probability that but for the defendant's interference, a contract would have

materialized. *Id.* (citing *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123,

140); *accord Glenn*, 272 A.2d at 898-99. Because such prospective relationships are "not

susceptible of a definite, exacting identification, " a plaintiff is not required to identify a potential

contractual partner by name. *See, e.g., Dunlap v. Peco Energy*, 1996 WL 617777 (E.D. Pa. Oct.

23, 1996) (finding that plaintiff's allegation that defendant had interfered with "a business

expectancy in contracts . . . to the energy industry" sufficient for purposes of motion to dismiss).

267.     Here, all of these elements are met. Defendants interfered with prospective

contractual relations between CELDF and donors. As amply demonstrated above, the donations

would have materialized but for Defendants' interference. *See* Exs. AA, DD.

268.     Defendants prevented the expected donations from occurring in order to effect the

dissolution of CELDF and fire the Plaintiffs. They had no justification for doing so, and actual

damage to the Plaintiffs has resulted: Defendants have now ordered that CELDF be dissolved and Plaintiffs' contracts not be renewed.

### Count Eight: Violation of Pennsylvania's "Solicitation of Funds for Charitable Purposes Act" (10 P.S. § 162.1 *et seq.*)

269.     Plaintiffs hereby incorporate by reference and reallege as though rewritten herein the contents of the foregoing paragraphs.

270.     As alleged hereinabove, Defendant Linzey, with the apparent or actual approval and authority of Defendants Board Members, solicited Donor C, a past donor to CELDF, for funds to support Defendant CDER. Defendant Linzey did so, upon information and belief, by holding himself out as having a position of authority with CELDF as well as having a board or officer affiliation with Defendant CDER, and by suggesting or stating that CDER is a project of, or spinoff of, CELDF. Defendant Linzey undertook his fundraising and solicitation of Donor C, being thoroughly knowledgeable as he did so that Defendants Board Members had formally resolved on November 22, 2019 to dissolve and wind up the affairs of CELDF as a nonprofit corporation by December 31, 2019.

271.     By holding himself out to Donor C as a CELDF officer, and Defendant CDER, which Linzey organized, as a successor or linked organization to CELDF, Defendant Linzey violated 10 P.S. § 162.15(a)(2) by committing an unfair or deceptive act or practice or engaging in fraudulent conduct which created a likelihood of confusion or of misunderstanding on the part of Donor C. Defendant Linzey violated the statute when he successfully solicited Donor C to give $200,000.00 to Defendant CDER in the mistaken belief that CDER is linked or affiliated with CELDF.

272.     By conflating CELDF with Defendant CDER to Donor C, Defendant Linzey further violated § 162.15(a)(4)by "[u]tilizing a . . . statement so closely related or similar to that

used by another charitable organization . . . that the use thereof would tend to confuse or mislead a solicited person." Upon information and belief, Donor C mistakenly thought that Defendant CDER was closely related to CELDF based upon representations by Defendant Linzey and was moved to donate to Defendant CDER as a result.

273.     Defendant Linzey additionally violated § 162.15(a)(6) by "[m]isrepresenting or misleading" Donor C "to believe that" CELDF "sponsors, endorses or approves such solicitation or charitable sales promotion," when in fact CELDF had "not given consent in writing to the use of [its] name for these purposes."

274.     Defendant Linzey further violated § 162.15(a)(7) by "[m]isrepresenting or misleading anyone in any manner to believe that" Defendant CDER's "services have sponsorship [or] approval . . . that they do not have."

## PRELIMINARY INJUNCTION

275.     The "essential prerequisites for a preliminary injunction" that a plaintiff must show are: (1) "that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;" (2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceeding;" (3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;" (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits;" (5) "that the injunction sought is reasonably suited to abate the offending activity; and (6) that the injunction will not adversely affect the public interest. *Summit Towne Ctr., Inc. v. The Shoe Show of Rocky Mount., Inc.*, 573 Pa. 637, 646-47 (2003).

276.     Here, a preliminary injunction is an appropriate and, indeed, essential remedy that will properly restore the status quo as it existed prior to Defendants' dissolution of the Community Environmental Legal Defense Fund.

277.     The first prerequisite is present: the challenged conduct threatens the very existence of CELDF and, as a one-of-a-kind charitable organization, no monetary damage could completely compensate for the harms to Plaintiffs of trying to replace the irreplaceable.

278.     Should Defendant Linzey continue disparaging CELDF to other donors, this would imperil the goodwill of the organization and threaten its vitality; should Defendants board members continue with their proposed dissolution, CELDF would no longer exist.

279.     Money damages are a woefully inadequate replacement for an organization that took 25 years to build.

280.     The second element of a preliminary injunction here is self-evident: Defendants already have duties to care for and protect CELDF's reputation and success; an injunction asking Defendants to refrain from violating their existing obligations adds no additional hardship.

281.     Defendants suffer no "substantial harm," or any to speak of, from a court order precluding Defendants from dissolving a fully functional and highly successful charitable organization, but this dissolution would fundamentally destroy decades of experienced staff organizing in dozens of communities which have contributed to greater local participation in community affairs and decision-making. Dissolution and termination of CELDF would further cause termination of  Plaintiffs' employment, cause them financial difficulties and terminate their relationships with grassroots activists.

282.     Prior to the separation compensation "parachute" proposed for Defendant Linzey, and attempts to divert CELDF funding to his directly competing organization, and the retaliatory

firing of all CELDF staff, the *status quo* was that of a dedicated cadre of professionals working for a nonprofit that allowed them to pursue their shared passion.

283.     The requested injunction would pause CELDF's dissolution and any threatened transfer of funds, allowing Plaintiffs to return their attention to their service.

284.     The facts clearly satisfy the fourth factor of likelihood that Plaintiffs will succeed on the merits: Defendants breached fiduciary duties of loyalty and care by taking actions to benefit Defendant Linzey while purporting to act on behalf of the very organization whose demise they seek.

285.     The fifth factor, that the injunction sought is reasonably suited to abate the offending activity, is satisfied. The offending activity is the dissolution and potential dismissal of staff; Plaintiffs are requesting this Court enjoin that very activity.

286.     Finally, the sixth factor, that the injunction will not adversely affect the public interest, is also satisfied. The Pennsylvania Legislature, in enacting Pennsylvania's Nonprofit Law (15 Pa. Code § 5301), specified the duties of fiduciary responsibility and loyalty owed by directors and officers to the organization they represent. 15 PA Cons Stat § 5712. Here, to enjoin Defendants from continuing to breach those same fiduciary duties would be to uphold the public interest in good nonprofit governance.


**CONCLUSION**

287.     CELDF's Executive Director continues to manipulate the Board of Directors in an attempt to commandeer CELDF's assets for personal motives, arranging a transaction that is a clear conflict of interest and a betrayal of loyalty. The best interests of this nonprofit organization should govern the Board of Directors' actions and decisions. Defendants Board of Directors

members continue to violate their fiduciary duties to CELDF as well. Defendants' collective abandonment of good faith has left CELDF vulnerable to being plundered and dissolved. Plaintiffs have filed suit to continue the work of this organization, free from Defendants' interference.

## REQUESTED RELIEF

288.     WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

a.  Find and declare that Thomas Linzey and the Defendant Board members breached the fiduciary duties to CELDF required of them by 15 PA Code § 5712;

b.  Find and declare that Thomas Linzey and the Defendant Board members breached the fiduciary duties to CELDF in a manner that constitutes self-dealing, willful misconduct or recklessness, and are thus personally liable under 15 PA Code § 5713;

c.  Find and declare that the Defendant Board members resolved to dissolve CELDF without a proper business purpose, as is within this Court's power under 15 PA Code § 5793(a);

d.  Enter preliminary and permanent injunctions against all Defendants, as well as any CELDF officers, agents, employees or persons working in concert therewith to prevent the dissolution of CELDF as well as undertaking of any steps or proceedings that impair or circumvent CELDF's continued operations, including transferring CELDF assets to the Center for Democratic and Environmental Rights and/or any other organization with which Defendant Linzey is affiliated;

e.  Enter preliminary and permanent injunctions permanently terminating and removing all individual Defendants from their positions in CELDF;

f.  Enter preliminary and permanent injunctions against Defendant Linzey, any corporate officers, employees, agents and any persons working in concert with him, either at CELDF and/or at the Center for Democratic and Environmental Rights, barring him and them from soliciting current or past CELDF donors to donate funds or other resources to the Center for Democratic and Environmental Rights, and further enjoining and preventing him and them from disparaging CELDF to any current, present or prospective donor of CELDF;

g.  Enter preliminary and permanent injunctions to prevent all Defendants, or officers, agents, employees and persons working in concert with Defendants from firing any CELDF staff absent a showing of just cause;

h.  Enter preliminary and permanent injunctions against the Center for Democratic and Environmental Rights from the receipt, possession, ownership and control of any monetary assets formerly owned by CELDF;

i.  Award compensatory damages to Plaintiffs of $3,000,000.00;

j.  Award exemplary damages to Plaintiffs in an amount to be determined by the trier of fact;

k.  Award Plaintiffs reasonable attorney fees and costs; and

l.  Grant such other and further relief, at law and in equity, as the Court may deem just and proper.

Dated: February 7, 2020                    Respectfully submitted,


David M. Koller, Esq
Koller Law

2043 Locust Street, Suite 1B
Philadelphia, PA 19103
Phone 215-545-8917
Fax 215-575-0826
davidk@phillyhometownlawyer.com

Counsel for Plaintiffs

## JURY DEMAND

Now come all Plaintiffs, by and through counsel, and demand a trial by jury of all issues of the Complaint that are so triable.

David M. Koller, Esq.

51

## VERIFICATION

Stacey L. Schmader verifies that she is the Secretary/Treasurer, Community Environmental Legal Defense Fund; that she is authorized to sign this Verification on behalf of Plaintiffs; and that the statements made in the foregoing Complaint are true and correct to the best of her knowledge, information and belief. She understands that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

Date: 2/7/20

Stacey L. Schmader